## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| VINCENT DECICCO, individually and on behalf of all others similarly situated, | **JURY TRIAL DEMANDED** |
| Plaintiff, | |
| v. | |
| UNITED RENTALS, INC., WAYLAND R. HICKS; MARTIN E. WELCH; MICHAEL J. KNEELAND; BRIAN D. MCAULEY; GERALD TSAI, JR.; MICHAEL S. GROSS; LEON D. BLACK; HOWARD L. CLARK, JR.; SINGLETON MCALLISTER; JOHN S. MCKINNEY; JENNE K. BRITELL; KEITH WIMBUSH; ROGER E. SCHWED and JASON D. PAPASTAVROU, | **November 16, 2007** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff, individually, and on behalf of all other persons similarly situated, by his undersigned attorneys, allege as follows:

## NATURE OF THE ACTION

1.       Plaintiff brings this class action individually and on behalf of all other persons similarly situated, (the "Class"), other than defendants and their affiliates, who purchased or otherwise acquired securities of United Rentals, Inc. ("URI" or the "Company") between August 29, 2007 through and including November 14, 2007 (the "Class Period") for violations of the federal securities laws.  Plaintiff seeks to recover damages caused to the Class by defendants' violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1337 and 1367, and Section 22 of the Securities Act, 15 U.S.C. §77v.

3.      Venue is proper in this judicial district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §1391(b) and (c).  Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District, and the Company maintains its principal executive offices in this District.  Many of the acts giving rise to the violations of law complained of herein occurred in this District, including conference calls with analysts and the preparation and dissemination of false press releases and false financial statements filed with the Securities and Exchange Commission ("SEC").

4.      In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

5.      Plaintiff Vincent DeCicco acquired shares of URI common stock during the Class Period, as set forth in the certification attached hereto.

6.      Defendant URI is a Delaware corporation with its principal executive offices located at Five Greenwich Office Park, Third Floor, Greenwich, Connecticut 06830.  URI is the largest equipment rental company in the world, with an integrated network of over 690 rental locations in 48 states, 10 Canadian provinces and Mexico.  The Company's more than 12,000 employees serve construction and industrial customers, utilities, municipalities, homeowners and

others. The company offers for rent over 20,000 classes of rental equipment with a total original cost of $4.0 billion. URI is a member of the Standard & Poor's MidCap 400 Index and the Russell 2000 Index.

7.      Defendant Wayland R. Hicks ("Hicks") served as Chief Executive Officer ("CEO") of URI from December 2003 until June 4, 2007, and is currently a director of the Company and Vice Chairman of the Board of Directors.

8.      Defendant Martin E.  Welch ("Welch") is, and has been since September 2005, the Executive Vice President and Chief Financial Officer ("CFO") of URI.

9.      Defendant Michael J. Kneeland ("Kneeland") is, and has been since March 2007, the Executive Vice President and Chief Operating Officer ("COO") of URI.  Kneeland is, and has been the Company's interim Chief Executive Officer since June 2007.

10.      Defendant Roger E. Schwed ("Schwed") is, and has been since June 2006, Executive Vice President and General Counsel of the Company.

11.      Defendant Brian D. McAuley ("McAuley") is, and has been a director of URI since April 2004.

12.      Defendant Gerald Tsai, Jr. ("Tsai") is, and has been, as a director of URI since 2002.

13.      Defendant Michael S. Gross ("Gross") is, and has been, a director of URI since 1999.

14.      Defendant Leon D. Black ("Black") is, and has been, a director of URI since 1999.

15.      Defendant Howard L. Clark, Jr. ("Clark") is, and has been, a director of URI since April 2004.

16.     Defendant Singleton McAllister ("McAllister") is, and has been, a director of URI since April 2004.

17.     Defendant John S. McKinney ("McKinney") is, and has been, a director of the Company since September 1998 and served as vice president of the Company until the end of 2000.

18.     Defendant Jenne K. Britell ("Britell") is, and has been a director of URI since December 14, 2006.

19.     Defendant Keith Wimbush ("Wimbush") is, and has been of URI since April 11, 2006.

20.     Defendant Jason D. Papastavrou ("Papastavrou") is, and has been, as a director of the Company since June 2005.

21.     Defendants Hicks, Welch, Kneeland, Schwed, Gross, Black, Britell, Clark, McAllister, McAuley, McKinney, Papastavrou, Tsai and Wimbush are sometimes referred to herein collectively as the "Individual Defendants."

22.     Defendant URI, together with the Individual Defendants, are sometimes referred to herein collectively as the "Defendants."

23.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false and misleading information conveyed in URI's public filings, press releases and other group-published documents addressed herein reflect the collective work of the Individual Defendants.  Each of the Individual Defendants, was a director of the Company and/or an officer of the Company who, by virtue of his or her position with the Company, was a corporate insider and directly participated in the day-to-day operations and affairs of the Company at the highest levels and was privy to confidential proprietary information

regarding the Company and its business operations, products, growth, financial statements and financial condition, as alleged herein. During the Class Period, the Individual Defendants were involved in the drafting, preparation, review and/or dissemination of the various public, shareholder and investor reports (including the Proxy) and other communications which contained the materially false and misleading information alleged herein and were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. The Individual Defendants signed numerous materially false statements filed with the SEC.

24.     The Individual Defendants were aware of, or recklessly disregarded, the misstatements contained in the SEC filings, press releases and other public statements complained of herein, and their materially false and misleading nature. Because of their URI Board membership and/or executive and managerial positions, each of the Individual Defendants had access to the materially adverse undisclosed information about URI and its merger with Cerberus, and knew or recklessly disregarded that these adverse facts rendered the representations made by them or URI materially false and misleading.

25.     As officers and/or directors and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's present and future business prospects, and the status of its merger with Cerberus, and to correct any previously issued statements that were known to have become

materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information, but failed to do so.

26.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company discussed herein.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the SEC filings, press releases and other public statements detailed herein and is therefore liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

### URI Announces a Proposed Merger with Cerberus

27.     On July 23, 2007, URI announced that it had entered into a definitive merger agreement (the "Merger Agreement") under which affiliates of Cerberus Capital Management, L.P. ("Cerberus") would acquire all of the outstanding shares of URI common stock for $34.50 per share (the "Merger").  The Company issued a press release that stated:

> United Rentals today announced that it has signed a definitive merger agreement to be acquired by affiliates of Cerberus Capital Management, L.P. ("Cerberus"), in a transaction valued at approximately $6.6 billion, including the assumption of approximately $2.6 billion in debt obligations.
>
> Under the terms of the agreement, United Rentals stockholders will receive $34.50 in cash for each share of United Rentals common stock that they hold. The purchase price per share represents a 25% premium over United Rentals' closing share price of $27.55 prior to the company's announcement on April 10, 2007 that it had commenced a process to explore a broad range of strategic alternatives.
>
> Bradley S. Jacobs, chairman of United Rentals, said, "We're pleased that our strategic alternatives process has resulted in this favorable agreement

for our shareholders. This transaction is a credit to the thousands of United Rentals employees who have created unmatched value in our industry. A decade ago we started United Rentals with little more than a concept and achieved industry leadership in just 13 months. Today we remain the preeminent equipment rental company in the world."

Michael J. Kneeland, chief executive officer of United Rentals, said, "We will continue to focus intensely on customer service and employee satisfaction. Cerberus is a firm that shares our deep respect for operational excellence. They have an impressive track record of investing in industry leaders and working constructively with management teams to accelerate profitability and growth."

The board of directors of United Rentals has approved the merger agreement and has recommended the approval of the transaction by United Rentals stockholders.

Completion of the transaction is subject to customary closing conditions, including approval of the transaction by United Rentals' stockholders and regulatory review. Stockholders will be asked to vote on the proposed transaction at a special meeting that will be held on a date to be announced. Holders of the company's preferred stock, including affiliates of Apollo Management, L.P., which represent approximately 18% of the voting power of the capital stock of United Rentals, have agreed to vote their shares in favor of the merger.

Under the agreement, United Rentals may continue to solicit proposals for alternative transactions from third parties for a period of 30 business days continuing through August 31, 2007. There can be no assurances that this solicitation will result in an alternative transaction. United Rentals does not intend to disclose developments with respect to this solicitation process unless and until its board of directors has made a decision regarding any alternative proposals that may be made.

UBS Investment Bank acted as financial advisor to United Rentals in connection with the strategic review process and the transaction. Simpson Thacher & Bartlett LLP acted as legal advisor to United Rentals. Lowenstein Sandler PC, and Schulte, Roth & Zabel acted as legal advisor to Cerberus. Bank of America, Credit Suisse, Morgan Stanley and Lehman Brothers have committed to provide debt financing.

28.    The Merger Agreement, which was signed by the parties on July 22 2007, provides that, in the event that Cerberus elected not to consummate the Merger transaction, Cerberus would be required to pay a $100 million breakup fee to URI (the "Termination Fee").

29.     On August 30, 2007, the Company announced that Bradley S. Jacobs had resigned as Chairman and a director of URI effective August 31, 2007.  The Company also announced that it had filed a preliminary proxy statement with the SEC relating to the previously announced Merger Agreement. That Schedule 14A Preliminary Proxy Statement was filed with the SEC on August 30, 2007.

30.     On September 13, 2007, URI announced that it would hold a special meeting of stockholders on October 19, 2007 for the purpose of voting on the Merger Agreement.

31.     On September 19, 2007, URI filed its Schedule 14A Proxy Statement (the "Proxy") with the SEC in anticipation of the shareholder vote to approve the Merger.

32.     On October 16, 2007, URI issued a press release and announced that its wholly owned subsidiary, United Rentals (North America), Inc. ("URNA"), had commenced cash tender offers and consent solicitations for all of its outstanding 6 1/2% Senior Notes due 2012 (the "6 1/2% Notes"), 7 3/4% Senior Subordinated Notes due 2013 (the "7 3/4% Notes") and 7% Senior Subordinated Notes due 2014 (the "7% Notes" and together with the 6 1/2% Notes and the 7 3/4% Notes, the "Notes").   The tender offers and consent solicitations were conducted in connection with the anticipated Merger.

33.     On October 19, 2007, URI announced that its stockholders approved the Merger Agreement.  Approximately 99.8 percent of the votes cast by stockholders were in favor of the purchase, representing approximately 76.8 percent of the total voting power outstanding).  The Company also announced that it anticipated that the transaction would close in November 2007, and at that time, the Company's holders of common stock would be entitled to receive $34.50 in cash for each share held.

34.     On October 30, 2007, URI announced that URNA had received tenders of notes and deliveries of related consents from holders of approximately $998 million or 99.8% of the $1,000,000,000 aggregate principal amount of the 6 1/2 % Notes outstanding, approximately $517 million or 98.4% of the $525,000,000 aggregate principal amount of the 7 3/4 % Notes outstanding, and approximately $371 million or 99.0% of the $375,000,000 aggregate principal amount of the 7% Notes outstanding.

35.     On October 31, 2007, URI issued a press release and announced its financial results for the quarter ended September 30, 2007.  As part of the announcement, the Company confirmed that the Merger was expected to close on or about November 16, 2007.  The relevant portion of the press release stated:

> **Merger Agreement**
>
> On July 23, 2007, the company announced that it had signed a definitive merger agreement to be acquired by affiliates of Cerberus. The signing followed the April 10, 2007 announcement that the board of directors had authorized a process to explore a broad range of strategic alternatives to maximize shareholder value. The board of directors then approved the merger agreement and recommended the adoption of the merger agreement by United Rentals stockholders. On October 19, 2007, at a special meeting, stockholders approved the merger agreement. Subject to the provisions of the merger agreement, the company currently expects the transaction to close on or about November 16, 2007. Completion of the transaction is subject to customary closing conditions, but is not subject to a financing condition. The acquiring Cerberus affiliate has obtained debt and equity financing commitments for the transactions contemplated by the merger agreement, the aggregate proceeds of which will be sufficient to pay the aggregate merger consideration, related fees and expenses and any required refinancings or repayments of existing company indebtedness.
>
> Due to the signing of the merger agreement and the expected timing of the closing, the company has discontinued providing earnings guidance and will not hold a third quarter earnings conference call.

36.     On November 14, 2007, URI announced that the expiration time and date for the previously announced debt tender offers and consent solicitations being made by URNA had been extended to 12:00 midnight, New York City time, on November 16, 2007.

37.     On November 14, 2007, Cerberus sent a letter to URI informing them that Cerberus was not prepared to proceed with the Merger on the terms contemplated by the Merger Agreement.  However, Cerberus also informed URI that it was prepared to explore a revised transaction between the companies and that if URI was not interested in such a discussion, Cerberus was prepared to pay the Termination Fee.

38.     On November 14, 2007, URI publicly announced that Cerberus had informed the Company that Cerberus was not prepared to proceed with the purchase of URI on the terms set forth in the Merger Agreement.  The Company noted that Cerberus confirmed that there had been no material adverse change at URI and that it viewed the repudiation by Cerberus as unwarranted and incompatible with the covenants of the Merger Agreement. The Company also pointed out that Cerberus has received binding commitment letters from its banks to provide financing for the transaction through required bridge facilities.

39.     On the news that Cerberus was backing out of the Merger, the Company posted its biggest drop since it went public in 1997 and plunged 31%, or $10.51, from $34.01 per share to a closing price of $23.50 per share.

40.     On November 14, 2007, the Company also filed a Form 8-K with the SEC that included its press release announcing the termination of the Merger and two letters, dated August 31, 2007 and September 6, 2007 which reflected significant information related to URI's knowledge, since August 29, 2007 that the Merger was at risk, and that Cerberus sought to renegotiate the terms of the Merger Agreement.  In its August 31, 2007 letter to URI, and via

attempts to have telephonic discussions on this subject before and after it sent that letter, Cerberus stated its express concern about its ability to proceed with the Merger given the changes in the credit and financial markets, on which its financing for the deal depended.

41.     At no time between August 29, 2007 (when Cerberus first contacted URI) until November 14, 2007, did Defendants reveal this critical information

42.     On August 31, 2007, Cerberus executive Steven Mayer wrote a letter to URI's General Counsel, Roger Schwed, in which Cerberus asked to discuss the terms of the Merger Agreement with URI. The letter makes reference to Cerberus' August 29, 2007 communication with UBS Securities LLC (URI's financial advisor with respect to the Merger, which firm conducted the negotiations with Cerberus on URI's behalf) about re-negotiating the Merger Agreement. Since Cerberus was financing its URI acquisition via borrowings in the credit market, the deterioration of that market was of extreme concern to Cerberus, as it put the transaction at risk. Mr. Mayer's August 31, 2007 letter stated:

> As you know, on August 29, 2007, we communicated to UBS Investment Bank our desire to have a conversation with United Rentals, Inc. (" URI ") about the terms of the Agreement and Plan of Merger, dated as of July 22, 2007, among URI, Ram Holdings, Inc. and Ram Acquisition Corp. (the " Merger Agreement "). We are troubled by URI's refusal to discuss the Merger Agreement with us.
>
> Our request for a discussion was prompted by our concerns about recent unanticipated developments in the credit and financial markets. We fully understand the terms and conditions of the Merger Agreement, Guarantee and Stockholders Agreements (each as defined in the Merger Agreement) and related agreements. We believe it is in all of the parties' best interests to discuss the impact of these unanticipated market developments sooner rather than later. We would have expected that URI's Board of Directors would prefer to address these concerns now through a constructive dialogue.
>
> We are also troubled by URI's actions surrounding the filing of the Proxy Statement (as defined in the Merger Agreement). We raised a number of comments on the last draft we received, but URI chose to file the Proxy

Statement without addressing our substantive comments or even discussing them with our counsel.

In light of the foregoing concerns, we are renewing our request to discuss the terms of the Merger Agreement. We will look forward to your response.

43. It was also not until November 14, 2007 that URI disclosed that on September 6, 2007, Defendant Wimbush, on behalf of URI sent a letter to Cerberus. It said:

We have not met, but with Brad Jacobs stepping down from United Rentals, Inc.'s board I wanted to introduce myself. The board has asked me to oversee the completion of our transaction with Cerberus. In that connection, I wanted to address with you the *recent calls and letter that we received from Cerberus's acquisition vehicle, RAM Holdings, Inc., asking for a discussion with URI about the terms of the merger agreement*.

As our advisors previously communicated to your colleagues, Steven Mayer and Mike Green, there is no basis for any discussion regarding changes to the merger agreement. The sole basis cited in the letter is your organization's "concerns about recent unanticipated developments in the credit and financial markets." We fail to see how these developments have any relevance to our negotiated transaction, as their impact is expressly carved out of the merger agreement. Section 3.1 of the merger agreement, for example, is clear that "facts, circumstances, events, changes, effects or occurrences ... generally affecting the economy or the financial, debt, credit or securities markets in the United States..." do not excuse RAM's performance under our agreed-upon transaction. Moreover, RAM has committed debt financing which by its terms is not conditioned on the developments referenced in your team's letter.

We also question the letter's characterization of the change in market conditions as "unanticipated." The merger agreement and related debt commitment letters were signed early in the morning on July 23, 2007. A review of the business press at that time (and in the weeks beforehand) shows that changes and further tightening in the credit markets were widely known and, in any event, were discussed at length during the negotiation of our transaction.

Simply put, *we are sorely disappointed that your organization is now looking to renegotiate our deal* without cause or contractual support. Steve and Mike repeatedly represented at the time of our negotiations that Cerberus prided itself on not renegotiating its deals and should be viewed as being in the same league as other top-tier private equity firms. RAM's seeking any modifications to the merger agreement is wholly inconsistent

not only with these representations but also with the good faith discharge of its contractual obligation to use its reasonable best efforts to consummate the merger.

Finally, RAM's complaints about our filing the preliminary proxy statement without calling its counsel to discuss the final few comments sent for our review are not warranted. We provided RAM with a number of drafts of the proxy statement, and we waited to file the proxy statement until we had a chance to carefully consider and discuss with our advisors all of the suggestions RAM submitted.

I hope we can dispense with further communications of this type. We have received enthusiastic feedback about URI from your colleagues on site in Greenwich who are transition planning, which is not surprising given the performance of the business. We should continue to focus the energy of the group on transition cooperation, working together to finalize the materials RAM will need to complete its financing on the best possible terms, and bringing this transaction to a successful closing under the existing contractual terms.(emphasis added)

44.    Thus, Wimbush's letter acknowledges that Cerberus had clearly communicated to URI its need to modify the terms of the Merger and that URI understood the purpose of the communication to be for a renegotiation of the Merger Agreement.

45.    Defendant's failure to disclose Cerberus' August 2007 expressed desire to have a discussion with URI about the terms of the Merger Agreement was materially misleading because it caused the market for URI's shares to trade at prices artificially inflated by the belief that the transaction would proceed. Had the correspondence between Ceberus and URI been disclosed to the public in the Proxy, URI's shareholders would have been alerted to the risk of the transaction not going forward.  Defendants' failure to disclose this key information also precluded Class members from making informed decisions whether to vote for the Merger. Despite the numerous statements made by Defendants during the Class Period with respect to the Merger described above, this Information was never disclosed.   Clearly this was vital information that URI shareholders deserved and needed to know.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

46.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased or otherwise acquired common stock and other securities of URI between August 29, 2007 through and including November 14, 2007, excluding the defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of URI and the directors and executive officers of URI, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

47.     This action is properly maintainable as a class action because:

a.     The members of the proposed Class in this action are dispersed throughout the United States and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that Class members number in the millions.  Millions of URI shares were traded publicly on the NYSE under the symbol "URI" There are approximately 85.8 million shares of URI common stock issued and outstanding;

b.     Plaintiff's claims are typical of those of all members of the Class because all have been similarly affected by Defendants' actionable conduct in violation of federal securities laws as alleged herein;

c.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action litigation.  Plaintiff has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent;

d.    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable.  Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them.  The likelihood of individual Class members prosecuting separate claims is remote;

e.    Plaintiff anticipates no unusual difficulties in the management of this action as a class action; and

f.    the questions of law and fact common to the members of the Class predominates over any questions affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

i.    whether Defendants' acts and/or omissions as alleged herein violated the federal securities laws;

ii.    whether statements made by Defendants to the investing public during the Class Period and in the Proxy misrepresented an/or omitted material facts about the Merger;

iii.    whether the Company's Class Period public statements and filings misrepresented and/or omitted material facts;

iv.    whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

v.    whether Defendants participated in and pursued the common course of conduct complained of herein;

vi.    whether the market price of URI securities was inflated artificially as a result of Defendants' material misrepresentations and/or omissions during the Class Period; and

vii.    to what extent the members of the Class have sustained damages and the proper measure of damages.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE:  FRAUD-ON-THE-MARKET DOCTRINE

48.     The market for URI's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, URI's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired URI common stock relying upon the integrity of the market price of URI's common stock and market information relating to URI, and have been damaged thereby.

49.     At all relevant times, the market for URI's securities was an efficient market for the following reasons, among others:

      (a)    URI's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

      (b)    As a regulated issuer, URI filed periodic public reports with the SEC and the NYSE;

      (c)    URI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      (d)    URI was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

50.     As a result of the foregoing, the market for URI's common stock promptly digested current information regarding URI from all publicly available sources and reflected such information in URI's stock price.  Under these circumstances, all purchasers of URI's securities during the Class Period suffered similar injury through their purchase of URI's securities at artificially inflated prices and a presumption of reliance applies.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 of the Securities and Exchange Commission**
**(Against All Defendants)**

51.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.     This Count is asserted against all Defendants and is based upon Section 10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

53.     During the Class Period, Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiffs and the other members of the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiffs and the other members of the Class to purchase or otherwise acquire URI common stock during the Class Period at artificially inflated prices.

54.     During the Class Period, Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

55.      As a result of the dissemination of the false and misleading statements set forth above, the market price of URI securities were artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the statements described above and the deceptive

and manipulative devices and contrivances employed by said defendants, plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing or otherwise acquiring URI common stock. Had plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock or would not have acquired them at the inflated prices that were paid.

56.     Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

57.     By reason of the foregoing, defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiffs and the other members of the Class in connection with their acquisitions of URI common stock during the Class Period.

### COUNT II
### For Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the Company's products, sales, accounting, plans and implementation thereof, they had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various statements that plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's Proxy, reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.     The Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

61.     By virtue of their positions as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases or acquisitions of the Company's securities during the Class Period.

### COUNT III
### For Violation of Section 14(a) of the Exchange Act
### (Against All Defendants)

62.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except for allegations of fraud set forth herein, as the within claim is based upon Defendants' negligence.

63.     This count is brought by Plaintiff pursuant to Section 14(a) Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9, against the Defendants.  This claim does not sound in fraud and should be read to

exclude any reference in the preceding paragraphs to recklessness, fraud, or intentional acts by the Defendants other than Defendants' negligence.

64.     Under Section 14(a) of the Exchange Act it is "unlawful for any person...to solicit *or permit the use of his name to solicit* any proxy or consent or authorization in respect to any security" in contravention of SEC regulations. (emphasis added).

65.     The Proxy was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose the material facts described above.

66.     As a result of the negligence of Defendants, and the material misrepresentations and omissions set forth in the Proxy, Plaintiff and the Class have been damaged.

## **NO SAFE HARBOR**

67.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   In the alternative, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual

knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of URI who knew that the statement was false when made.

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action to be a proper class action and certifying Plaintiff as Class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Act, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as is just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 16 2007

SCHATZ NOBEL IZARD P.C.

By: _____

Andrew M. Schatz (ct00603)
Jeffrey S. Nobel (ct04855)
Seth R. Klein (ct18121)
Nancy A. Kulesa (ct25384)
20 Church Street, Suite 1700
Hartford, Connecticut 06103
Telephone:  (860) 493-6292
Facsimile:  (860) 493-6290

**ABBEY SPANIER ROOD**
 **& ABRAMS, LLP**
Arthur N. Abbey

Jill Abrams
Richard B. Margolies
212 East 39th Street
New York, New York 10016
Telephone:  (212) 889-3700
Facsimile:  (212) 684-5191

*Attorneys for Plaintiff*

**CERTIFICATION OF LEAD PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

I Vincent De Cicco, declare as follows:

1. I have reviewed a copy of the complaint filed in this action.

2. I did not purchase the security that is the subject of this action [United Rentals, Inc. ("URI")] at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

| Security (Common Stock, Call, Put, Bonds) | Transaction (Purchase/Sale) | Quantity | Trade Date | Price Per Share/ Security |
|---|---|---|---|---|
| Common Stock | Purchase | 100 | October 22, 2007 | $33.70 |
| Common Stock | Purchase | 100 | October 25, 2007 | $33.73 |
| Common Stock | Purchase | 800 | October 26, 2007 | $33.89 |
| Common Stock | Purchase | 2000 | October 30, 2007 | $33.85 |
| Common Stock | Purchase | 2000 | November 7, 2007 | $34.27 |
| Common Stock | Purchase | 2000 | November 9, 2007 | $34.19 |
| Common Stock | Purchase | 1000 | November 13, 2007 | $33.89 |
| Common Stock | Sale | 1000 | November 15, 2007 | $23.41 |

5. I have not served as or sought to serve as a representative party on behalf of a class during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court or any award to me by the Court of reasonable costs and expenses (including lost wages) directly relating to my representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   November 19, 2007                         Signed: _Vincent De Cicco_