UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| VINCENT DECICCO, ET AL., | : | |
| Plaintiffs, | : | CIVIL ACTION NO. |
| v. | : | 3:07-cv-01708 (JCH) |
| UNITED RENTALS, INC., ET AL., | : | MARCH 10, 2009 |
| Defendants | : | |

**RULING RE: DEFENDANTS' MOTIONS TO DISMISS (Doc. Nos. 70 and 72)**

Plaintiffs, shareholders of United Rentals, Inc. ("URI"), bring this putative securities fraud class action against defendants URI, Michael Kneeland, Roger Schwed, and Keith Wimbush ("URI defendants"), and Cerberus, RAM Holdings, RAM Holdings Company, LLC, Cerberus Partners, Cerberus Associates, L.L.C., Steven F. Mayer, and Stephen M. Feinberg ("Cerberus defendants").[1] Plaintiffs allege violations of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b). They also bring a claim for control person liability against the individually named defendants, pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Plaintiffs principally object to alleged misrepresentations and omissions of material facts by defendants in connection with a proposed all-cash acquisition of URI by Cerberus, acting through various entities.[2] These misrepresentations and failures to

[1]Defendants' names are listed as they appear on the court's docket. According the Cerberus defendants' Motion to Dismiss, the actual names of the Cerberus entities are Cerberus Capital Management, L.P., RAM Holdings, Inc., RAM Holdings Company, LLC, Cerberus Partners, L.P., and Cerberus Associates, L.L.C.

[2]Throughout this Ruling, the court generally uses the term "Cerberus" when referring to one or more of these various entities, including Cerberus, RAM Holdings, RAM Holdings Company, LLC, Cerberus Partners, and Cerberus Associates, L.L.C. Where necessary, the court refers to the specific

disclose, plaintiffs allege, caused plaintiffs to suffer significant losses when the parties ultimately failed to consummate the merger and URI's stock price plunged.

Pending before the court are defendants' Motions to Dismiss for failure to state a claim (Doc. Nos. 70 and 72). Because the court concludes that plaintiffs have not sufficiently alleged scienter as required by the Private Securities Litigation Reform Act of 1995 (PSLRA), it grants defendants' Motions. Because this is the first time the court has dismissed plaintiffs' claim, the court allows plaintiffs leave to move to reopen to replead their claims. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108` (2d Cir. 2007).

## I. BACKGROUND[3]

### A. Negotiations

In April 2007, URI announced that its Board of Directors was exploring "strategic alternatives," and its financial advisors solicited inquiries from potential acquirers. In May 2007, URI's Board met with its advisors and outside counsel, and subsequently circulated an initial draft of a Merger Agreement to five potential purchasers. This initial draft included section 9.10, which provided that URI could specifically enforce the Merger Agreement.

In June 2007, Cerberus and another bidder submitted a marked-up version of the Merger Agreement. Cerberus's mark-up deleted the specific performance provision in section 9.10. In late June 2007, after discussions between URI's counsel and the two

---

entity at issue.

[3]On a Motion to Dismiss, the court accepts all factual allegations in the complaint as true.

bidders, URI's counsel submitted a revised version of the Merger Agreement to both bidders. The revised version restored the specific performance provision.

Negotiations and revisions to the Merger Agreement continued in late June and early July. On July 6, 2007, the Board met with its advisors and counsel, decided to reject an offer made by the other bidder on the grounds that its price was insufficient, and directed its advisors to continue working with Cerberus in order to get a definitive proposal from Cerberus. After rejecting a second, revised proposal by the other bidder, URI focused its attention on Cerberus. Over the next several weeks, negotiations with Cerberus over price and non-price terms ensued. Throughout the negotiations, Cerberus insisted that it be able to walk away from the Agreement with the payment of a termination fee.

On July 15, 2007, Cerberus's counsel submitted a revised draft of the Merger Agreement to URI's advisors and counsel, including two revisions that, in Cerberus's view, provided that URI's sole and exclusive remedy against Cerberus for breach of the Merger Agreement would be limited to payment of a $100 million termination fee. Cerberus's draft provided in section 8.2(e) that Cerberus's exposure was limited to payment of the $100 million fee. Section 9.10, regarding specific performance, remained in the Agreement, but was modified to provide that it was "subject in all respects" to Section 8.2(e), the termination fee provision.

On July 16, 2007, counsel for URI held a conference call with representatives of and counsel for Cerberus, and indicated that Cerberus's July 15 draft was generally acceptable. URI's counsel specifically indicated the acceptability of the provision that the termination fee was URI's sole and exclusive remedy in the event of a breach by

Cerberus.

Negotiations continued over the next several days. On July 19, 2007, representatives of Cerberus and URI met to discuss, among other issues, Cerberus's ability to abandon the transaction by paying a termination fee. Cerberus reiterated to URI's counsel that, if the transaction did not go forward, URI's only remedy would be payment of the termination fee and the documents needed to reflect this agreement.

On July 20, 2007, Cerberus raised its all-cash offer for URI stock to $34.20 per share and on July 21, 2007, raised it again to $34.50 per share.

On July 22, 2007, the Board of Directors of URI met, and after hearing presentations from its financial advisors and counsel, discussed the terms and risks of the Merger Agreement. Following additional discussion with advisors and counsel, the Board approved the Merger Agreement and agreed to recommend its adoption to URI's stockholders.

B. Merger Agreement

The Merger Agreement was executed between RAM Holdings, Inc., RAM Acquisition Corp., and United Rentals, Inc. The Merger Agreement, as adopted, includes two provisions relating to termination of the Merger. Section 8.2(e), entitled "Effect of Termination," provides in part as follows:

> Notwithstanding anything to the contrary in this Agreement, including with respect to Sections 7.4 and 9.10, (i) the Company's right to terminate this Agreement in compliance with the provisions of Sections 8.1(d)(i) and (ii) and its right to receive the Parent Termination Fee pursuant to Section 8.2(c) or the guarantee thereof pursuant to the Guarantee, and (ii) Parent's right to terminate this Agreement pursuant to Section 8.1(e)(i) and (ii) and its right to receive the Company Termination Fee pursuant to Section 8.2(b) shall, in each case, be the sole and exclusive remedy, including on account of punitive damages, of (in the case of clause (i)) the Company and its subsidiaries against Parent, Merger Sub,

> the Guarantor or any of their respective affiliates, stockholders, general partners, limited partners, members, managers, directors, officers, employees or agents (collectively 'Parent Related Parties") and (in the case of clause (ii)) Parent and Merger Sub against the Company or its subsidiaries, affiliates, stockholders, directors, officers, employees or agents (collectively "Company Related Parties"), for any and all loss or damage suffered as a result thereof, and upon any termination specified in clause (i) or (ii) of this Section 8.2(e) and payment of the Parent Termination Fee or Company Termination Fee, as the case may be, none of Parent, Merger Sub, Guarantor or any of their respective Parent Related Parties or the Company or any of the Company Related Parties shall have any further liability or obligation of any kind or nature relating to or arising out of this Agreement or the transactions contemplated by this Agreement as a result of such termination. The parties acknowledge and agree that the Parent Termination Fee and the Company Termination Fee constitute liquidated damages and are not a penalty and shall be the sole and exclusive remedy for recovery by the Company and its subsidiaries or Parent and Merger Sub, as the case may be, in the event of the termination of this Agreement by the Company in compliance with the provisions of Section 8.1(d)(i) or (ii) or Parent pursuant to Section 8.1(e)(i) and (ii), including on account of punitive damages. In no event, whether or not this Agreement has been terminated pursuant to any provision hereof, shall parent, Merger Sub, Guarantor or the Parent Related Parties, either individually or in the aggregate, be subject to any liability in excess of the Parent Termination Fee for any or all losses or damages relating to or arising out of this Agreement or the transactions contemplated by this Agreement, including breaches by Parent or Merger Sub of any representations, warranties, covenants or agreements contained in this Agreement, and in no event shall the Company seek equitable relief or seek to recover any money damages in excess of such amount from Parent, Merger Sub, Guarantor, or any Parent Related Party or any of their respective Representatives or Affiliates.

Merger Agreement, section 8.2(e). Section 9.10, entitled "Specific Performance," provides as follows:

> The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, (a) Parent and Merger Sub shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement by the Company and to enforce specifically the terms and provisions of this Agreement, in addition to any other remedy to which such party is entitled at law or in equity and (b) the Company shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement by Parent or Merger Sub or to enforce specifically the terms and provisions of this Agreement and the Guarantee to prevent breaches of or enforce compliance with those covenants of Parent or Merger Sub that require Parent or Merger Sub to (i) use

> their reasonable best efforts to obtain the Financing and satisfy the conditions to closing set forth in Section 7.1 and Section 7.3, including the covenants set forth in Section 6.8 and Section 6.10 and (ii) consummate the transactions contemplated by this Agreement, if in the case of this clause (ii), the Financing (or Alternative Financing obtained in accordance with Section 6.10(b)) is available to be drawn down by Parent pursuant to the terms of the applicable agreements but is not so drawn down solely as a result of Parent or Merger Sub refusing to do so in breach of this Agreement. The provisions of this Section 9.10 shall be subject in all respects to Section 8.2(e) hereof, which Section shall govern the rights and obligations of the parties hereto (and of the Guarantor, the Parent Related Parties, and the Company Related Parties) under the circumstances provided therein.

Merger Agreement, section 9.10.

A Limited Guarantee was also executed by Cerberus Partners, L.P. in favor of United Rentals, Inc. The Limited Guarantee provided that Cerberus Partners, L.P. would guarantee the due and punctual payment by RAM Holdings, Inc. and RAM Acquisition Corp. of up to $100 million, plus costs, expenses, and interests, in the event the RAM entities incurred that payment obligation under certain sections of the Merger Agreement. The Limited Guarantee was referenced in the Merger Agreement and Proxy Statement and its terms were partially disclosed, but the full text of the Guarantee was not publicly disclosed until November 2007.

C. Initial Filings

On July 23, 2007, URI issued a Press Release announcing the Merger Agreement. Among other things, the Release noted that "Completion of the transaction is subject to customary closing conditions, including approval of the transaction by United Rentals' stockholders and regulatory review." The Press Release did not disclose that completion of the transaction was subject to the risk that Cerberus could terminate the transaction by paying the termination fee. It also did not disclose

Cerberus's statements regarding its view that URI's sole and exclusive remedy if Cerberus breached its contract was the $100 million termination fee, that Cerberus viewed the Acquisition as a "$100 million option," or that in Cerberus's view, its willingness to offer $34.50 per share was in part consideration for this "option" and the limitation on liability. Nor did it state that there was a right of specific performance.

On July 24, 2007, URI filed a Form 8-K with the SEC. The filing included, among other documents, the Merger Agreement and the July 23, 2007 Press Release. Aside from the disclosures made in the text of the Merger Agreement itself, the Form 8-K did not disclose the allegedly material information omitted from the July 23, 2007 Press Release.

On August 1, 2007, RAM Holdings, Cerberus's acquisition vehicle, filed a Schedule 13D disclosing its beneficial ownership of URI securities over which it had gained voting control. It incorporated by reference exhibits to the previously filed Form 8-K, including the Merger Agreement. It did not disclose the allegedly material information omitted from the Form 8-K and July 23, 2007 Press Release.

On August 1, 2007, URI issued a Press Release, and on August 2, 2007, URI filed a Form 8-K with the SEC, including the August 1, 2007 Press Release as an exhibit. Among other things, the Release noted that:

> Completion of the transaction is subject to customary closing conditions, including approval by United Rentals stockholders and regulatory review, but is not subject to a financing condition. The acquiring Cerberus affiliate has obtained debt and equity financing commitments for the transactions contemplated by the merger agreement, the aggregate proceeds of which will be sufficient for it to pay the aggregate merger consideration, related fees and expenses and any required refinancings or repayments of existing company indebtedness.

The Release did not disclose the allegedly material information omitted from the Form 8-K and July 23, 2007 Press Release. In addition, it did not disclose that the Cerberus defendants' statement about securing sufficient financing did not demonstrate that Cerberus was fully committed to proceeding with the closing of the Agreement.

On August 1, 2007, URI filed a Form 10-Q with the SEC. Among other things, it provided that:

> Consummation of the proposed merger contemplated by our merger agreement with affiliates of Cerberus is subject to the satisfaction of various conditions, including the approval of our stockholders, expiration or termination of applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and applicable foreign antitrust laws, and other customary closing conditions described in the merger agreement.

The Form 10-Q did not disclose the allegedly material information omitted from the Form 8-K and July 23, 2007 Press Release. In addition, it did not disclose that, even if the various stated approvals were obtained, Cerberus could still terminate the acquisition by paying a termination fee.

D. Renegotiation Efforts and Proxy Filings

On August 29, 2007, Cerberus representatives contacted URI's advisors and explained that, due to changing credit markets and in light of Cerberus's ability to terminate the acquisition by paying the termination fee, Cerberus wanted to renegotiate the transaction. This call was reported to URI's counsel. Defendants did not publicly disclose this call or update prior disclosures to reflect that the call had taken place, or to reflect any increased risk that Cerberus might terminate the acquisition.

On August 30, 2007, URI filed its Preliminary Proxy. The Proxy described risks to completion of the acquisition but did not disclose the allegedly material information

omitted from the Form 8-K and July 23, 2007 Press Release. Nor did it contain a disclosure to reflect any increased risk that Cerberus might terminate the acquisition based on the August 29, 2007 telephone call. It did include a narrative disclosure of material aspects of the negotiations leading up to the Merger Agreement. This disclosure discussed the negotiations at some length, including efforts to negotiate a "go shop" period, but did not mention anything about discussions over the availability of specific performance. The Preliminary Proxy also contained language about specific performance that paraphrased the language of the Merger Agreement, including the following statement: "The provisions relating to specific performance are subject to the rights and obligations of the parties relating to receipt of payment of the termination fee, as described above under 'Fees and Expenses,' under the circumstances described therein."

On August 31, 2007, Cerberus sent a letter to URI reiterating Cerberus's desire to discuss the terms of the Merger Agreement. On September 6, 2007, URI sent a letter to Cerberus, stating that "there is no basis for any discussion regarding changes" to the Agreement, noting that Cerberus had not identified any basis for reopening the discussion, and expressing disappointment "that your organization is now looking to renegotiate our deal."

On September 13, 2007, URI issued a Press Release and filed a Schedule 14A with the SEC that included the Press Release. It announced a special meeting of stockholders to approve the Merger Agreement. The Press Release and Schedule 14A again did not disclose the allegedly material information omitted from the Form 8-K and July 23, 2007 Press Release, nor did it disclose Cerberus's efforts to renegotiate the

agreement or URI's refusal to do so.

On September 19, 2007, URI filed its Proxy Statement with the SEC, which for all relevant purposes was the same as its Preliminary Proxy, including the lack of disclosure of allegedly material information omitted from the Form 8-K and July 23, 2007 Press Release.

Further press releases followed on October 16, 2007, announcing the commencement of tender offers, and October 19, 2007, announcing approval of the Merger Agreement by URI stockholders. URI attached both press releases to a Form 8-K filed with the SEC on October 19, 2007. URI filed another Form 8-K on October 30, 2007, stating that URI anticipated completing the Merger Agreement subject to the provisions of the Agreement. An October 31, 2007 Press Release and November 1, 2007 Form 8-K and Form 10-Q provided additional information and reiterated earlier statements that completion of the transaction is subject to customary closing conditions and stockholder approval, but not a financing condition. URI also filed a Form 8-K on November 7, 2007, supplying further details about how the transaction would be financed. None of these releases or filings disclosed the allegedly material information omitted from the Form 8-K and July 23, 2007 Press Release, nor did they disclose Cerberus's efforts to renegotiate the agreement or URI's refusal to do so.

Finally, in early November 2007, Cerberus participated in a "road show" to assist in placing debt related to the acquisition. At the Road Show, Cerberus did not disclose the allegedly material information omitted from the Form 8-K and July 23, 2007 Press Release, nor did Cerberus disclose Cerberus's efforts to renegotiate the agreement or URI's refusal to do so.

E. The Merger Falls Apart

On the morning of November 14, 2007, media outlets reported that Cerberus was considering withdrawing from the Merger. That afternoon, URI issued a Press Release that acknowledged a dispute with Cerberus. In reaction to these disclosures, URI's common stock price fell from an opening price of $34.37 per share to close at $23.50 per share. Following the market close, URI filed a Form 8-K disclosing a letter received that day, November 14, 2007, stating that Cerberus's acquisition vehicle, RAM Holdings, was free to abandon the Agreement in exchange for paying the termination fee if URI was unwilling to renegotiate the Merger Agreement. It also disclosed the letters between URI and Cerberus of August 31, 2007 and September 6, 2007.

On November 15, 2007, RAM Holdings filed an amendment to its Schedule 13D, stating that it had informed URI that it was not prepared to proceed on the existing terms, and that it was willing to either pay the termination fee or renegotiate the transaction. It highlighted the fact that its liability was limited to the $100 million termination fee and noted that it "agreed to a higher per share purchase price in consideration for this limitation on liability." It disclosed the terms of the Limited Guarantee by which Cerberus Partners, L.P., had limited its liability to $100 million. RAM Holdings also noted its earlier efforts to engage in a dialogue with URI to address its concerns.

On November 19, 2007, URI filed a suit in Delaware Chancery Court seeking specific performance of the Merger Agreement. See United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810 (Del. Ch. 2007). The Chancellor denied URI's Motion for Summary Judgment and conducted a bench trial. See id. at 834. The court concluded

that the Merger Agreement was ambiguous and that both parties' interpretations were reasonable. Id. It then considered extrinsic evidence and determined that no agreement had been reached on the right to specific performance. Id. at 836-37. It determined, however, that Cerberus had clearly communicated its understanding that the $100 million termination fee was the "sole and exclusive" remedy available to URI if the merger did not go through. Id. at 840-41. It found that Cerberus "communicated this understanding to URI in such a way that URI either knew or should have known of their understanding." Id. Therefore, given that no agreement had been reached on the right to specific performance, and based on URI's knowledge of Cerberus's position and URI not having conveyed any contrary understanding to Cerberus, the court applied the "forthright negotiator" principle and concluded that URI could not compel specific performance. Id. at 836-37, 844-45.

URI did not appeal the decision, but instead delivered a notice of termination to Cerberus. URI requested that Cerberus pay the termination fee, and Cerberus did so.

## II. CLAIMS

Plaintiffs allege violations of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b). They also bring a claim for control person liability against the individual named defendants, pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Plaintiffs allege that in the URI defendants' various Press Releases and SEC filings, as detailed supra, at 6-10, defendants failed to publicly disclose material information. Specifically, the defendants failed to disclose Cerberus's statements regarding its view that URI's sole and exclusive remedy if Cerberus breached its contract was the $100 million termination fee, that it considered the Acquisition to be a

"$100 million option," and that its willingness to offer $34.50 per share was in part consideration for this "option" and the limitation on liability. They also failed to disclose that completion of the transaction was subject to the risk that Cerberus could terminate the transaction by paying the termination fee. Plaintiffs allege that, in representing the specific performance provision of the Merger Agreement in summary form in the Proxy, and in saying that the deal was only subject to customary closing conditions, defendants misrepresented the availability of specific performance and misrepresented the risks of the deal not closing. Plaintiffs allege that negotiations over the termination fee and availability of specific performance were omitted from the detailed disclosures in the Preliminary Proxy and Proxy of the history of the negotiation, and that because other aspects of the negotiation were disclosed, the public was led to believe that there were no other principal points of contention, when in fact the parties had disputed the availability of specific performance and the termination fee. Finally, they allege that the discussions and letters exchanged, on August 29, August 31, and September 6, called the viability of the Agreement into question and should have been promptly disclosed to the public.

Plaintiffs' allegations of misrepresentations and omissions are directed primarily at public SEC filings and press releases of URI. Plaintiffs also make allegations against the Cerberus defendants with regard to URI's disclosures or failures to disclose. Plaintiffs ground their allegations in the Merger Agreement, arguing that Cerberus's acquisition vehicle had the right to have input into statements made by URI, and in fact generally signed off on URI's statements, and therefore can be held liable for URI's statements. Plaintiffs also allege that Cerberus participated extensively in drafting the

Merger Agreement. Finally, plaintiffs allege that Cerberus made its own Schedule 13D disclosure in which it similarly misrepresented or failed to disclose the allegedly material information omitted from URI's various filings and press releases.

Defendants' misrepresentations and omissions, plaintiffs allege, caused plaintiffs to suffer significant losses when, in November 2007, the parties ultimately failed to consummate the merger and URI's stock price plunged from an opening price of $34.37 per share to close at $23.50 per share.

## III. DISCUSSION

### A. Legal Standards

On a motion to dismiss, the court must accept all factual allegations in the complaint as true. ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 193, 196 (2d Cir. 2009) (citation omitted). The court may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). To survive a motion to dismiss, a plaintiff must "provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" Id. (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)).

Under Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a complaint alleging securities fraud must meet heightened pleading requirements, stating with particularity the circumstances constituting fraud. JP Morgan

Chase, 553 F.3d at 196; ATSI Commc'ns, 493 F.3d at 99. Under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Any allegations of false statements or omissions must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1).

Plaintiffs allege violations of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements the statute, prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b); see JP Morgan Chase, 553 F.3d at 197. To bring such a claim, a plaintiff must allege that "the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, 493 F.3d at 105; see also JP Morgan Chase, 553 F.3d at 197 (citations omitted). In their Motions, defendants contend that the Amended Complaint fails to adequately allege a false statement or omission of material fact, and fails to adequately allege scienter.

Plaintiffs also bring a claim for control person liability against the individual named defendants, pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the

defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, 493 F.3d at 108.

1. Materiality

The materiality inquiry is fact-specific and depends on all relevant circumstances. JP Morgan Chase, 553 F.3d at 197 (citation omitted). "The materiality of a misstatement depends on whether there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." Id. (citations, alterations, and internal quotation marks omitted). To be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Id. (citations and internal quotation marks omitted). On a motion to dismiss for failure to state a claim, a complaint may only be dismissed on the grounds of a lack of materiality if the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Id. (citations and internal quotation marks omitted).

2. Scienter

On a motion to dismiss, the court ordinarily draws all reasonable inferences in favor of the plaintiff, but to plead scienter under the PSLRA, a plaintiff's complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008). To qualify as "strong," an "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent." Teamsters Local 445, 531 F.3d at 194 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2504-05 (2007)). "In determining whether this inference can reasonably be drawn, courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." JP Morgan Chase, 553 F.3d at 198 (citing Tellabs, 127 S. Ct. at 2504, 2509). The required state of mind is an intent "to deceive, manipulate, or defraud," Id. (quoting Tellabs, 127 S. Ct. at 2507), or "reckless conduct," ATSI Commc'ns, 493 F.3d at 99 n.3; see JP Morgan Chase, 553 F.3d at 198 ("In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud in this circuit.").

Scienter can be established by alleging facts that sufficiently show (1) that defendants had the motive and opportunity to commit the fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. ATSI Commc'ns, 493 F.3d at 99 (citing Ganino v. Citizens Utilities Co., 228 F.3d 154, 168-69 (2d Cir. 2000)). The Second Circuit has explained that at least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." JP Morgan Chase, 553 F.3d at 199; Teamsters Local 445, 531 F.3d at 194; Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000).

B. Analysis of Plaintiffs' Section 10(b) Claims

Plaintiffs contend that defendants made false and misleading material statements or material omissions by (1) failing to disclose the existence of extensive negotiations around the issue of specific performance; (2) failing to disclose that, because the specific performance provision was limited in application, completion of the transaction was subject to the risk that Cerberus could terminate the transaction by paying the termination fee; (3) failing to disclose Cerberus's view, communicated repeatedly to URI's representatives, that URI's sole and exclusive remedy if Cerberus breached its contract was the $100 million termination fee; (4) failing to disclose that Cerberus viewed the acquisition as a "$100 million option" and that Cerberus's willingness to offer $34.50 per share was in part consideration for this "option" and the limitation on liability; (5) issuing Press Releases and SEC filings that, by suggesting that the deal was subject only to customary closing conditions, and by detailing the substance of other negotiations over non-financial terms but not the negotiations over the specific performance terms, misrepresented the risk that the deal might not close; and (6) failing to disclose Cerberus's efforts to renegotiate the Merger Agreement.

The court first considers whether plaintiffs' Amended Complaint raises a strong inference of scienter. The court first addresses plaintiffs' claims against the URI defendants, and then plaintiffs' claims against the Cerberus defendants. Insofar as allegations that defendants did not disclose material facts that they had a clear duty to disclose may support allegations of scienter, see Kalnit v. Eichler, 264 F.3d 131, 144 (2d Cir. 2001), the court will discuss the materiality of the statements to the extent necessary to resolve the question of whether plaintiff has adequately alleged scienter.

Because it finds that plaintiffs' Amended Complaint does not raise a strong inference of scienter as required by the PSLRA and Tellabs, it will not address whether the statements in question were material.

1. URI Defendants

a. Motive and Opportunity

Plaintiffs allege that the URI defendants had concrete financial motives to make misrepresentations and omissions because, if the URI defendants had disclosed that no agreement had been reached on the specific performance provisions in the Merger Agreement, they would have been prejudiced in their efforts to compel Cerberus to specifically perform the contract. Consol. Am. Class Action Compl. ¶ 71.

"Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Kalnit, 264 F.3d at 139 (internal quotation marks and citation omitted). "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." Id. (citing Novak, 216 F.3d at 307-08). Therefore, it is insufficient for plaintiffs to allege that defendants have the general desire to make the corporation appear profitable or to keep stock prices high to increase their compensation. Id. (citing Novak, 216 F.3d at 307-08). On the other hand, motive is adequately pleaded where the plaintiffs allege that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares. Id.; Novak, 216 F.3d at 307-08 (citing cases).

Plaintiffs have not alleged any such "concrete and personal benefit;" they point only to defendants' general interest in maintaining a high stock price and successfully closing the merger. There are no allegations that defendants sold their own shares, or otherwise personally profited from URI's high stock price during the Class period. See, e.g., Novak, 216 F.3d at 307-08. Finally, at oral argument, plaintiffs conceded that their allegations of scienter were based on recklessness, not "motive and opportunity." Accordingly, plaintiffs have not adequately alleged a motive to commit fraud.

b. Conscious Misbehavior and Recklessness

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant[s], though the strength of the circumstantial allegations must be correspondingly greater." Kalnit, 264 F.3d at 142. To do so, plaintiffs must plead "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant[s] or so obvious that the defendant[s] must have been aware of it." JP Morgan Chase, 553 F.3d at 202-03 (internal quotation marks and citations omitted). Typically, plaintiffs adequately state a claim based on recklessness by alleging that defendants knew facts or had access to non-public information contradicting their public statements, and that defendants knew, or should have known, that they were misrepresenting material facts related to the corporation. In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001); Novak, 216 F.3d at 308. In addition, as discussed earlier, in order to state a claim, the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Teamsters Local 445,

531 F.3d at 194 (quoting Tellabs, 127 S. Ct. at 2504-05).

Plaintiffs' allegations of fraud fall into two broad categories: first, they allege misrepresentations and omissions involving the terms of the agreed-upon transaction, the negotiations over those terms, and the availability of specific performance, Consol. Am. Class Action Compl., ¶ 152(a)-(e); and second, they allege the failure to disclose that Cerberus sought to renegotiate the terms of the transaction, id. ¶ 152(f).

i. Misrepresentations and Omissions Involving the Terms of the Agreed-Upon Transaction

With regard to the first category of statements, plaintiffs allege that defendants knew or should have known that there was an explicit understanding that specific performance would not be available, but nevertheless failed to convey that understanding or the substance of the negotiations to the public and misrepresented in the Proxy Statement that the parties had agreed that specific performance was available.

In their Motion to Dismiss, the URI defendants argue that the knowing failure to disclose a fact cannot give rise to a strong inference of scienter absent a clear duty to disclose. As they point out, the Merger Agreement was made available to the public. As a result, investors were in the position to make their own assessment as to ambiguity of the agreement. Because it is reasonable to read the Merger Agreement to permit specific performance as a remedy, and it was disclosed in any case, they argue that there cannot be a strong interference that defendants had the intent to deceive, manipulate, or defraud. At the very least, they contend that, because whether or not specific performance was available was a close question, the omissions were at most

an incorrect choice between plausible, alternative interpretations. This, they argue, cannot establish that the inference of scienter was strong and "at least as compelling as any opposing inference of nonfraudulent intent." Teamsters Local 445, 531 F.3d at 194 (quoting Tellabs, 127 S. Ct. at 2504-05).

Plaintiffs counter that the filing of the Merger Agreement was insufficient in light of an actual, ongoing, and escalating dispute between the parties over the availability of specific performance, which could not be gleaned from a review of the Agreement itself and was not otherwise disclosed. The Chancellor concluded that neither the contract's text nor extrinsic evidence supported the conclusion that the parties unambiguously reached an agreement on specific performance. Plaintiffs argue that, by publicizing the Merger Agreement and summarizing its provisions in the proxy, plaintiffs misled the public as to the availability of specific performance, since they knew it was not available. Testimony at trial indicating that there was an explicit understanding that no right to specific performance existed provides strong evidence, they claim, that the deception was intentional. Finally, they contend that, even if URI subjectively believed that it had the right to specific performance, it knew Cerberus had an opposite interpretation and should have known its belief was implausible. Thus, plaintiffs contend, URI acted recklessly in making misstatements and omissions that led the public to believe there was a right to specific performance.

As the parties agree and the Chancery Court found, not only was the text of the Merger Agreement ambiguous as to whether URI had a right to specific performance under any circumstances, but the parties themselves never came to an agreement on

specific performance.[4] Plaintiffs have alleged that Cerberus strongly believed that there was no right to specific performance under the Merger Agreement, and that it repeatedly communicated that belief to URI. Plaintiffs focus on the Chancery Court's conclusion that URI "knew or should have known" of Cerberus's *belief*, and contend that this conclusion supports a finding that the URI defendants acted with recklessness. However, knowledge of Cerberus's *belief* is not the same thing as knowledge that the agreement itself did not provide for specific performance. What ultimately determined that URI did not have the right to specific performance was not Cerberus's strong belief, but the Chancery Court's interpretation of the Merger Agreement. While the court's interpretation drew upon Cerberus's belief, and the fact that Cerberus had communicated that belief to URI, the court did so only after concluding that the Merger Agreement itself was ambiguous and susceptible of two reasonable interpretations, and that even an examination of extrinsic evidence did not reveal an unambiguous agreement between the parties on the issue of specific performance. See United Rentals, Inc., 937 A.2d at 834, 836-45. The Chancery Court also came "exceedingly close" to deciding that the text of the Agreement itself was susceptible to only one reasonable interpretation—that specific performance was available to URI—and in that circumstance would not have looked to extrinsic evidence at all. Id. at 832 n.104.

The URI defendants publicly disclosed the Merger Agreement and summarized its terms in the Proxy. Plaintiffs, in their Opposition, emphasize that the Proxy

[4] Plaintiffs highlight this fact in contending that the Proxy Statement's text that the "parties have agreed" on the availability of specific performance was a misrepresentation. See, e.g., Pls.' Mem. of Law in Opp'n to URI defendants' Mot. to Dismiss at 34.

Statements made an affirmative misrepresentation of fact that the "parties have agreed" specific performance was available. Pls.' Mem. of Law in Opp'n to URI defendants' Mot. to Dismiss at 34. An examination of the relevant parts of the Proxy Statements in their entirety, however, reveals that the language in the Statements merely summarizes the provisions of the Agreement. Just like the Agreement, the Proxy Statements summarize the termination fee provision and specific performance provision, and note that the latter is subject to the former. The Proxy Statements are not misleading, therefore, but rather are faithful to the Agreement by replicating the ambiguity contained within the Agreement itself. Compare Proxy Statement at 70 ("The merger agreement provides that our right to terminate the merger agreement in the above circumstances and to receive payment of the $100 million termination fee is the sole and exclusive remedy available to the Company and its subsidiaries against Parent, Merger Sub, the guarantor and any of their respective affiliates . . . for any loss or damage suffered as a result of such termination."), with Merger Agreement § 8.2(e) ("The parties acknowledge and agree that the Parent Termination Fee and the Company Termination Fee . . . shall be the sole and exclusive remedy for recovery by the Company and its subsidiaries or Parent and Merger Sub, as the case may be, in the event of the termination of this Agreement . . . ."); compare Proxy Statement at 70 ("[T]he parties have agreed that they shall be entitled to seek an injunction to prevent breaches of the merger agreement and to be able to enforce specifically the terms and provisions of the merger agreement . . . . The provisions relating to specific performance are subject to the rights and obligations of the parties relating to receipt of payment of the termination fee, as described above . . . under the circumstances described therein"), with Merger

Agreement § 9.10 ("The parties agree that . . . (a) Parent and Merger Sub shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement by the Company and to enforce specifically the terms and provisions of this Agreement . . . and (b) the Company shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement by Parent or Merger Sub or to enforce specifically the terms and provisions of this Agreement and the Guarantee . . . . The provisions of this Section 9.10 shall be subject in all respects to Section 8.2(e) hereof, which Section shall govern the rights and obligations of the parties hereto (and of the Guarantor, the Parent Related Parties, and the Company Related Parties) under the circumstances provided therein.").

Plaintiffs' argument that the disclosures of the Agreement and Proxy, and its failure to disclose the negotiations over specific performance, constituted misrepresentations and omissions rests on the presupposition that the URI defendants anticipated that the disputed issue over the specific performance provision might lead to litigation, and that by failing to disclose the communications from Cerberus to URI emphasizing Cerberus's belief or otherwise informing the public of the dispute, the URI defendants deprived the public of the very piece of information they would need to accurately assess the viability of the specific performance provision. As it turns out, information about Cerberus's belief and its communications to URI proved essential to the Chancery Court's decision. But that information proved essential only in the context of what the Chancery Court called "a deeply flawed negotiation in which both sides failed to clearly and consistently communicate their client's positions," and because neither the text of the agreement nor extrinsic evidence of the negotiations was "clear

enough to conclude that there is a single, shared understanding with respect to the availability of specific performance under the Merger Agreement." United Rentals, Inc., 937 A.2d at 836.

Given the multiple layers of ambiguity and failed communication, any party to the transaction would have had difficulty determining how the Chancery Court might resolve the challenging question of whether specific performance was available. The URI defendants publicly disclosed the Merger Agreement and summarized its terms in the Proxy, and failed to disclose the substance of the negotiations over specific performance. Yet because these negotiations were inconclusive about whether or not specific performance was available, plaintiffs have not alleged that the URI defendants knew facts that contradicted their public statements. See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001); Novak, 216 F.3d at 308. Even if the URI defendants knew or should have known that specific performance was likely to be unavailable, it was not a misrepresentation for the defendants to disclose the Merger Agreement and Proxy summarizing its terms, which themselves conveyed to a careful reader that the Merger Agreement was fundamentally ambiguous on the question of whether a right to specific performance existed, without disclosing the substance of the negotiations. That substance would only have revealed what was already apparent from the face of the Agreement—that the availability of specific performance was unclear. Moreover, even though disclosure of the substance of the negotiations and the dispute might have further clarified and highlighted the extent of the ambiguity, and enabled an investor to make a slightly more educated guess as to the potential of litigation and as to how the Chancery Court might ultimately rule if the provision was

litigated, an allegation that the URI defendants intentionally or recklessly failed to disclose the substance of the negotiations in order to hide such information from investors is too speculative to be considered "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Teamsters Local 445, 531 F.3d at 194 (quoting Tellabs, 127 S. Ct. at 2504-05). The Chancery Court determined that the text of the Agreement was susceptible of two reasonable interpretations. An analysis from hindsight may reveal that the negotiations should have been disclosed, but in the face of an ambiguous agreement and a flawed negotiating process, plaintiffs have not adequately pled that URI, in disclosing the ambiguous agreement and allowing the market to assess the likely meaning of its provisions, acted with a strong inference of recklessness.

ii. Failure to Disclose that Cerberus Sought to Renegotiate the Terms of the Transaction

With regard to the second category of statements, plaintiffs allege that Cerberus's efforts to discuss or renegotiate the terms of the transaction on August 29, August 31, and September 6, 2007, made clear that the transaction was in serious jeopardy. They contend that investors had the right to know that Cerberus was growing concerned about the price of the transaction, and that the URI defendants' filings and failures to disclose this fact constituted material misrepresentations and omissions.

In their Motion to Dismiss, the URI defendants contend that Cerberus's efforts to discuss the terms of the transaction were a bargaining tactic, not an effort at repudiation. The conclusion that the August request to discuss the Merger Agreement was a bargaining tactic and immaterial because it was not accompanied by an intention

to repudiate nor any statement that Cerberus would abandon the merger if URI refused to renegotiate, the URI defendants argue, far outweighs any inference of scienter. URI contends that the facts as alleged better support their version of events. See Tellabs, 127 S. Ct. at 2504, 2509 ("[C]ourts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively."). As alleged, Cerberus informed URI in the August 29 call and August 31 letter that it wanted to renegotiate the transaction. Plaintiffs have not alleged that Cerberus expressed a desire to repudiate the transaction. URI responded in its September 6 letter, stating that there was no basis for any discussion and expressing disappointment that Cerberus sought to renegotiate the deal. Plaintiffs do not allege that either party again contacted each other prior to November 14 about renegotiating the transaction, and both parties continued to proceed towards closing the merger. Cerberus never amended its Schedule 13D filing to indicate an intent to revise the terms of the merger or to not consummate the transaction, URI launched tender offers, Cerberus conducted a Road Show, and URI filings continued to indicate that URI expected the merger to close.

The URI defendants contend that these facts support the inference that Cerberus only decided to repudiate the transaction in November. The URI defendants further contend that, in light of these facts and the fact that URI could have reasonably read the Merger Agreement to permit specific performance, the stronger, non-culpable inference is that these requests were isolated, immaterial negotiation tactics that did not need to be disclosed. Even if material, the URI defendants contend that none of the facts were clearly material and that there was no clear duty to disclose, so an inference of scienter

is unwarranted. Defendants point to a case, Evanowski v. BankWorcester Corp., that held on similar facts that a request for renegotiation of a merger agreement is not a material fact requiring disclosure where earlier statements were not "so incomplete as to be misleading." 788 F. Supp. 611, 614-15 (D. Mass 1991).

In response, plaintiffs contend that Cerberus sought to renegotiate the transaction, and that the URI defendants were obligated to disclose this fact. In support, they note that Cerberus suggested to URI that it publicly disclose Cerberus's efforts to renegotiate the transaction in the Proxy Statement, suggesting that Cerberus viewed them as material at the time. They point out that materiality and scienter are determined at the time of the alleged misstatement or omission, so subsequent efforts to consummate the transaction are irrelevant. Cerberus specifically requested to renegotiate the purchase price and terms of the deal, and it expressed concerns when URI refused to discuss the Agreement. When asked if Cerberus intended to repudiate the contract, Cerberus responded that it did not, but emphasized the $100 million termination fee and sought to use that fee as leverage. Pls.'s Mem. of Law in Opp'n (URI) at 13. Plaintiffs allege that by failing to disclose the efforts at renegotiation, URI's disclosures misrepresented the status of merger negotiations and the likelihood that the deal would close. Disclosure of Cerberus's statements, they argue, would have significantly altered the total mix of information available, and thus URI was obligated to disclose them. See JP Morgan Chase, 553 F.3d at 197 (quoting Basic, Inc. v. Levinson, 485 U.S. 224 , 231-32 (1988)) ("[I]n order for the misstatement to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of

information made available.'").

Finally, plaintiffs point to two cases. In In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F. Supp. 712 (S.D.N.Y. 1989), the court partially denied summary judgment and allowed plaintiffs to proceed to trial where fraud allegations were based on the failure to disclose a "change of heart" from a "strong interest in consummating the deal" to being "no longer as interested in the transaction as before." Id. at 745-46. In In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1245 (3d Cir. 1989), the court stated that a party may change its intent with respect to a transaction without violating § 10(b), but if it has already publicly disclosed its initial intent, it must promptly convey that it has changed its intent.

The court finds defendants' arguments persuasive. Plaintiffs have not alleged that extensive renegotiation efforts or any threats to repudiate took place. Cerberus did remind URI, in the course of proposing a renegotiation, of its position that the Merger Agreement could be terminated for $100 million. It did not press efforts to renegotiate after receipt of the September 6 letter and, indeed, continued to expend time and resources on efforts to close the transaction for two more months. As defendants accurately point out, while materiality and scienter must be measured at the time of the alleged misrepresentation or omission, later events can be used to illuminate the parties' intent at that time.

Cerberus's suggestion on August 29 that URI disclose in its Preliminary Proxy that Cerberus requested discussions earlier that day suggests that Cerberus may have viewed its efforts to renegotiate as material information warranting disclosure. Yet Cerberus did not follow up after URI's failure to disclose the August 29 request for

discussion, and plaintiffs have not alleged that continued efforts to renegotiate the deal took place after the brief exchange of letters. This brief exchange did not continue beyond September 6 or lead to any actual renegotiations, and the parties continued to proceed towards closing the deal.

Gulf Oil, cited by plaintiffs, emphasizes that when intentions change, prior disclosures may be rendered materially misleading if not corrected with additional disclosures:

> [Prior warnings] simply cannot serve as a blanket *caveat emptor* such that defendants owed plaintiffs no duty to advise them later if termination became a substantially greater possibility because of some previously undisclosed fact or condition. When objectively verifiable factors cause a significant change in a party's attitude toward a merger—a sharp break from prior public positions—the securities laws may require that previously disclosed intentions be corrected. The question here is whether defendants' view of the transaction changed so substantially on July 12-13 as to render their earlier statements—namely, that they would use their best efforts but that certain contingencies might prevent consummation—materially misleading.

725 F. Supp. at 747-748 (internal quotation marks and citation omitted). Gulf Oil does not, however, provide that every change in attitude must be disclosed. Instead, it provides for disclosure of "significant change[s]" that constitute a "sharp break from prior public positions." Id. The emphasis is on a change in intention significant enough that a prior public statement, upon which investors might rely, is no longer accurate. Phillips, while not emphasizing any requirement that the change be "significant," similarly provides that: "[A] statement of intent need only be true when made; a subsequent change of intention will not, by itself, give rise to a cause of action . . . . [A]ll one can fairly require is that a notice of a change of intent be disseminated in a timely fashion . . . ." 881 F.2d at 1245. Relying on Gulf Oil and Phillips, plaintiffs contend that

Cerberus's efforts to renegotiate the transaction demonstrated a change in their attitude towards the transaction requiring disclosure. But plaintiffs have not pointed to any specific prior disclosures rendered inaccurate by Cerberus's phone call or letter, such that a prior public statement might need to be amended to avoid making it materially misleading.

In Evanowski, renegotiations taking place in secret did not render statements made materially misleading, and the court accordingly found no § 10(b) violation. See 788 F. Supp. 611. In Evanowski, the parties engaged in efforts to renegotiate the merger agreement for five to six weeks prior to the deal falling apart. Id. at 613. These efforts included the making of revised offers, including specific, lower proposed price ranges. Id. Despite the fact that the renegotiation discussions in Evanowski progressed considerably further than those in the instant case, that court held that there was no duty to disclose the fact of the renegotiations and that statements the parties made were not "so incomplete as to mislead at the time they were made." Id. at 614-15. The court emphasized that, even though renegotiations were occurring, a duty to disclose did not automatically arise:

> The mere existence of renegotiation discussions does not mean that BankWorcester had stopped working towards completing the merger on its original terms. Plaintiff has not alleged that, at the time any of the purportedly misleading statements were made, the original merger agreement had already been terminated, or that the defendants had stopped working to fulfill the merger's original conditions.

Id. at 614. Read together, Gulf Oil, Philips, and Evanowski make clear that a party's change in attitude or position with respect to a transaction triggers a duty to disclose only when that change is sufficiently significant as to render prior or subsequent public

disclosures materially misleading. As in Evanowski, plaintiffs here have not alleged that either the URI or Cerberus defendants ever stopped working towards fulfillment of the Merger Agreement on the negotiated terms. Plaintiffs have alleged a brief exchange of letters and telephone calls, but they have not alleged the occurrence of significant renegotiation efforts or other "significant change[s]" constituting a "sharp break from prior public positions." See Gulf Oil, 725 F. Supp. at 747-748. Cerberus's brief, rebuffed, un-repeated effort at renegotiation, when contrasted with the extensive efforts of both parties to close the deal on its original terms, cannot lead to a strong inference of scienter based upon a failure to disclose. Thus, plaintiffs have not pled a strong inference of conscious misbehavior or recklessness based upon the failure to disclose the suggestion of renegotiations.

c. Conclusion

Because the plaintiffs have not pled motive and opportunity, or conscious misbehavior or recklessness, they have failed to adequately allege scienter on the part of the URI defendants.

2. Cerberus Defendants

a. Motive and Opportunity

Plaintiffs allege that the Cerberus defendants had concrete financial motives to make misrepresentations and omissions because disclosure that Cerberus could abandon the acquisition upon paying $100 million would have given lenders the opportunity to rescind their lending commitments on the grounds that they were misled. Consol. Am. Class Action Compl. ¶ 157.

Plaintiffs do not adequately allege motive. As the Cerberus defendants point out, it was apparent from a reading of the Merger Agreement that under some, and possibly all circumstances, Cerberus could abandon the acquisition upon paying a $100 million fee. The Amended Complaint does not plausibly allege how additional disclosure of Cerberus's negotiation (and eventually) litigation position to the lenders—that the $100 million "walk-away" right existed under all circumstances—would or could have led lenders to terminate their funding commitments. Nor do plaintiffs articulate a cogent theory of what concrete benefits accrued or could have accrued to the Cerberus defendants by their non-disclosure. Finally, at oral argument, plaintiffs conceded that their allegations of scienter were based on recklessness, not "motive and opportunity." Accordingly, plaintiffs have not adequately alleged a motive to commit fraud on the part of the Cerberus defendants.

b. Conscious Misbehavior and Recklessness

As stated supra, at 21, plaintiffs' allegations of fraud fall into two broad categories: first, misrepresentations and omissions involving the terms of the agreed-upon transaction, the negotiations over those terms, and the availability of specific performance, Consol. Am. Class Action Compl., ¶ 152(a)-(e); and second, the failure to disclose that Cerberus sought to renegotiate the terms of the transaction, id. ¶ 152(f). With regard to the Cerberus defendants specifically, plaintiffs charge that defendants RAM Holdings and Mayer are liable for each of URI's statements because RAM Holdings had a contractual right, which it exercised, to review, comment, and control URI's public statements. Id. ¶¶ 137, 153. Mayer, plaintiffs allege, exercised that right on behalf of RAM Holdings. Id. They also allege that the Schedule 13D disclosure and

comments made at the "Road Show" contained material misrepresentations and omissions.

i. Misrepresentations and Omissions Involving the Terms of the Agreed-Upon Transaction

With regard to the first category of statements, plaintiffs allege that the Cerberus defendants knew and believed that there was an explicit understanding that specific performance would not be available, but nevertheless failed to convey that understanding or the substance of the negotiations to the public and acceded in the misrepresentations by URI as to the terms of the agreement between the parties.

In their Motion to Dismiss, the Cerberus defendants contend that they are not liable for any alleged misstatements or omissions by URI. They argue that URI did not require and did not receive permission from Cerberus before making disclosures, that mere allegations of knowledge and approval do not state a claim, and that plaintiffs make no particularized allegations of involvement by Cerberus in URI's disclosures. With regard to allegations regarding Cerberus's own disclosures and omissions, the defendants contend that it was not necessary to amend RAM Holdings' Schedule 13D, and that the form contained all necessary disclosures. With regard to the Road Show, the Cerberus defendants argue that plaintiffs have not alleged specific statements and omissions, and that they did not owe the plaintiffs any duty in relation to the Road Show. Finally, the Cerberus defendants argue that they did not conceal the "walk-away" terms from anyone, but instead believed that the Merger Agreement adequately specified the terms of the transaction and that no further disclosure was necessary.

Plaintiffs counter that because the Merger Agreement was ambiguous, further clarification of the terms of the merger were necessary to avoid misleading the public. Plaintiffs point out that the Schedule 13D disclosure did not include the "Limited Guarantee," which plaintiffs contend was a material document that needed to be disclosed. With regard to the Road Show, plaintiffs contend that they adequately alleged the making of materially false or misleading statements, that equity purchasers were entitled to rely on those statements, and that once Cerberus chose to speak at the Road Show, it had a duty to speak truthfully and completely. They contend that Cerberus's involvement in URI's statements was sufficient to make it liable for any misrepresentations and omissions made by URI. Finally, plaintiffs argue that because they have pled that Cerberus knew facts that caused its public statements to be inaccurate or materially misleading, they have pled a strong inference of scienter.

As already discussed in conjunction with the analysis of the URI defendants' Motion to Dismiss, plaintiffs have alleged that Cerberus strongly believed that there was no right to specific performance under the Merger Agreement, that Cerberus believed that the Merger Agreement expressly provided as such by making the specific performance provision subject to the termination fee provision, and that Cerberus repeatedly communicated that belief to URI. Plaintiffs have not alleged that Cerberus believed the Merger Agreement to be ambiguous or that it could reasonably be interpreted to provide for specific performance. As such, plaintiffs have not adequately alleged that the Cerberus defendants acted with scienter in not further disclosing what they believed was apparent from the disclosure of the Merger Agreement itself—that URI's remedy in the event that Cerberus walked away from the deal was the $100

million termination fee.

Nor does a strong inference of scienter arise from Ceberus's failure to explicitly spell out the risks related to the termination fee provision, or its opinion on the availability of that provision, in its Schedule 13D disclosure. Schedule 13D disclosures must be filed by any person (including an entity) who acquires "beneficial ownership" of more than 5% of the securities of a publicly traded corporation. 15 U.S.C. § 78m(d)(1). The purpose of a Schedule 13D filing is to notify the security issuer and the public that a person has accumulated a significant position in a company's stock, and to disclose that person's intentions. In relevant part, disclosure is required of "any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure," and provides that "[i]f any material change occurs in the facts set forth in the statements . . . an amendment shall be transmitted . . . ." 15 U.S.C. § 78m(d)(1)(C), (d)(2); see also 17 C.F.R. § 240.13d-101, Item 4 (requiring that the filer "[d]escribe any plans or proposals"). Cerberus's Schedule 13D filing incorporated the Merger Agreement by reference. As plaintiffs point out, additional material information must be included in the disclosure (including the description of the filer's "plans or proposals") if such information is necessary to render the disclosure not misleading. Plaintiffs argue that because, as the Chancery Court later determined, the text of the Merger Agreement was ambiguous, Cerberus was required to disclose further information to clarify that ambiguity. See Pls.'s Mem. in Opp'n (Cerberus) at 12-15.

The court disagrees. Plaintiffs' argument presupposes that Cerberus knew or should have known that the final version of the Merger Agreement, despite extensive

negotiations on the subject of specific performance and termination, remained ambiguous. Yet plaintiffs have not alleged that Cerberus considered the Merger Agreement to be ambiguous; on the contrary, plaintiffs rest their claims against the URI defendants on the allegation that Cerberus considered the remedies for termination to be clearly limited to the $100 million termination fee. Even assuming that a Schedule 13D disclosure is required to describe plans in the level of detail that plaintiffs assert, the Agreement was not (in Cerberus's view as alleged by the plaintiffs) ambiguous or misleading. Accordingly, plaintiffs have not alleged that Cerberus acted with scienter in failing to make further disclosures beyond the text of the Agreement itself.

Similarly, even assuming that Cerberus could be held liable for any misrepresentations or omissions of URI, the court has already concluded, supra, at 21-33, that plaintiffs have not adequately alleged scienter with regard to URI's disclosures. Cerberus knew that the Merger Agreement had been disclosed. The Proxy Statement, which was also disclosed, accurately summarized the Merger Agreement (including noting that any provision with regard to specific performance was "subject to" the termination fee provision). Therefore, from Cerberus's point of view, every URI filing in which it was even potentially involved was accurate with regard to the Merger Agreement's termination provisions. Given plaintiffs' allegations that Cerberus believed that the Merger Agreement clearly provided it with a $100 million "walk-away," a strong inference of scienter does not arise from Cerberus's failure to make additional disclosures—or to attempt to correct or supplement URI's disclosures—regarding the $100 million termination fee provision beyond disclosure of the Merger Agreement and Proxy Statements.

Plaintiffs also contend that failure to disclose the "Limited Guarantee" constituted a material omission because the Limited Guarantee related to Cerberus Partners's plans for the acquisition, formed part of Cerberus's defense to URI's lawsuit, and was belatedly disclosed after the deal fell apart. The existence of the Limited Guarantee and a brief summary of its provisions was disclosed in the Proxy Statement; however, its text was not disclosed until November 2007. In their Opposition, plaintiffs contend that the Limited Guarantee was "material to an understanding and proper description of the terms of the Acquisition," and suggest that its disclosure would have raised questions in the mind of a reasonable shareholder about the availability of specific performance. Mem. in Opp'n (Cerberus) at 16-17. Yet when RAM Holdings, Inc. and RAM Acquisition Corp. sought to rely on the Limited Guarantee's provision limiting liability as a defense to URI's suit for specific performance, the Chancery Court rejected their argument as "untenable." See United Rentals, 937 A.2d at 829. As the Chancery Court held, the Limited Guarantee had no bearing on the ability of URI to compel RAM Holdings, Inc. and RAM Acquisition Corp. to specifically perform the contract. Id.

Plaintiffs' objection to Cerberus's failure to disclose the terms of the Limited Guarantee is based on the notion that disclosure of the Limited Guarantee would have alerted investors that URI's remedy was limited to the $100 million termination fee. Even assuming that Cerberus was required to disclose the Limited Guarantee as part of its Schedule 13D disclosure, the Guarantee was not material, as it ultimately had no bearing on URI's inability to compel specific performance against RAM Holdings, Inc. and RAM Acquisition Corp. (the Cerberus acquisition entities). The issue of specific performance was governed only by the Merger Agreement. Thus, failure to disclose the

terms of the Guarantee could not have affected investors' ability to determine how a suit by URI for specific performance might be resolved.[5] Thus, it could not have been "clearly material," and defendants had no duty to disclose it. Accordingly, plaintiffs have not adequately pled scienter with regard to Cerberus's failure to disclose the terms of the Limited Guarantee.

Plaintiffs and defendants debate whether plaintiffs may state a claim for Cerberus's alleged misrepresentations and omissions at the "Road Show." Cerberus contends that the Amended Complaint fails to allege the content of statements made during the road show, that Cerberus had no duty to disclose information about the walk-away terms to Road Show attendees, that plaintiffs were not entitled to rely upon the road show presentation, and that plaintiffs have not in fact alleged reliance on the road show presentation. Plaintiffs counter that they have alleged the contents of the statements by incorporating them by reference into the Amended Complaint, that all market participants had the right to rely on statements made in the road show, and that in choosing to speak at the road show, Cerberus had a duty to speak truthfully.

The court need not resolve this dispute because it has already concluded that plaintiffs have not alleged a strong inference of scienter with regard to Cerberus's failure to disclose the "walk-away" terms beyond disclosures made in the Merger Agreement. Therefore, whether or not misrepresentations or omissions made in the Road Show would be theoretically actionable in a suit by plaintiffs, they have not stated a claim

---

[5]To the extent investor knowledge of the *existence* of a Limited Guarantee may have proven useful in understanding the overall structure of the merger and the relationships between the entities, a summary of its provisions were disclosed in the Proxy Statement. See Proxy Statement at 70.

under Tellabs with respect to any such statements.

ii. Failure to Disclose that Cerberus Sought to Renegotiate the Terms of the Transaction

With regard to the second category of statements, plaintiffs allege that Cerberus's efforts to discuss or renegotiate the terms of the transaction on August 29, August 31, and September 6, 2007, made clear that the transaction was in serious jeopardy. They contend that investors had the right to know that Cerberus was growing concerned about the price of the transaction, and that Cerberus's acquiescence in the URI defendants' filings, as well as their failures to disclose these facts in their own Schedule 13D filing or at the road show, constituted material misrepresentations and omissions.

The court has already concluded in its analysis of the URI defendants' statements that Cerberus's brief, rebuffed, un-repeated effort at renegotiation, when contrasted with the extensive, continued efforts of both parties to close the deal on its original terms, cannot lead to a strong inference of scienter based upon a failure to disclose. Furthermore, Cerberus suggested on August 29 that URI disclose in its Preliminary Proxy that Cerberus had requested discussions about the terms of the acquisition. URI, contrary to Cerberus's request, declined to include the information in the Proxy. Given Cerberus's request that its August 29 request be publicly disclosed, it cannot be said that the inference that Cerberus intended to hide this request from the public is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." See Teamsters Local 445, 531 F.3d at 194 (quoting Tellabs, 127 S. Ct. at 2504-05).

Plaintiffs nevertheless contend that Cerberus should have chosen to disclose the limited renegotiation efforts on its own, as an amendment to its Schedule 13D. The parties dispute whether the events of August 29 and 31 were "material" and whether they constituted a "plan or proposal" within the meaning of Item 4 of Schedule 13D.

Even assuming materiality, plaintiffs have not alleged that the renegotiation efforts progressed beyond the initial phone call and exchange of two letters. As the earlier discussion of case law makes clear, an amendment is only necessary when there is a significant shift in a party's attitude, position, or intentions towards the transaction. See Evanowski, 477 F. Supp. at 614 (holding that even though renegotiation discussions were taking place, disclosure was not required because the agreement had not been terminated and the parties had not stopped working to fulfill it); Gulf Oil, 725 F. Supp. at 747-48 ("When objectively verifiable factors cause a significant change in a party's attitude toward a merger—a sharp break from prior public positions—the securities laws may require that previously disclosed intentions be corrected."). With regard to Schedule 13D disclosures specifically, Azurite Corp. Ltd. v. Amster & Co. further provides that: "[U]nless a course of action is decided upon or intended, it need not be disclosed as a plan or proposal under Item 4. . . . Whether a plan or proposal is material is not relevant to determining whether it is sufficiently "fixed" to require disclosure as a "plan or proposal" under Item 4 . . . ." 52 F.3d 15, 18 (2d Cir. 1995). In their Opposition, plaintiffs contend that Cerberus may have had a well formed plan on August 29, 2007, and that plan was fixed and eventually carried out in November 2007. Pls.' Mem. in Opp'n (Cerberus) at 19. Plaintiffs, however, have not alleged that there were further discussions or efforts to renegotiate or abandon the

merger between late August and mid-November 2007. Nor have they alleged that Cerberus ever stopped working towards fulfillment of the Merger Agreement on the negotiated terms. Cerberus's preliminary efforts at discussion, accompanied by no proposals and resulting in no actual discussion, does not rise to the level that triggers a duty to amend a Schedule 13D. Finally, even if Cerberus had been obligated to amend its Schedule 13D, the fact that Cerberus suggested to the URI defendants that URI revise its Preliminary Proxy to note Cerberus's efforts at renegotiation supports the conclusion that Cerberus did not act with scienter in failing to amend its Schedule 13D. Had it wanted to keep the renegotiation efforts secret, it would not have requested that the URI defendants disclose them. Given these undisputed facts, plaintiffs have not plausibly alleged a strong inference that Cerberus acted with recklessness in failing to amend its Schedule 13D.

c. Conclusion

Because the plaintiffs have not pled motive and opportunity, or conscious misbehavior or recklessness, they have failed to adequately allege scienter on the part of the Cerberus defendants.

C. Analysis of Plaintiffs' Section 20(a) Claims

Having found that plaintiffs have failed to state a claim under section 10(b), their control person liability claims pursuant to section 20(a) fail for want of a primary violation. See JPMorgan Chase Co., 553 F.3d at 206-07.

## IV. CONCLUSION

For the foregoing reasons, defendants' Motions to Dismiss (Doc. Nos. 70 and 72) are GRANTED. Plaintiffs' claims are DISMISSED WITHOUT PREJUDICE. This case is closed.

Plaintiffs may move to reopen the case within 30 days of this Ruling. Plaintiffs should attach a proposed amended complaint to any motion for leave to reopen.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 10th day of March, 2009.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge