# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x

| | |
|---|---|
| FIRST NEW YORK SECURITIES, L.L.C., : | Master Docket No. 3:07-cv-1708 (JCH) |
| OMNI PARTNERS LLP, GLAZER : | |
| CAPITAL MANAGEMENT, LP, : | **SECOND CONSOLIDATED** |
| GLAZER OFFSHORE FUND, LTD., : | **AMENDED CLASS ACTION** |
| BROWNSTONE ASSET MANAGEMENT, : | **COMPLAINT** |
| L.P., and RAVEN CREDIT : | |
| OPPORTUNITIES MASTER FUND, LTD., : | **JURY TRIAL DEMANDED** |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | |
| : | |
| UNITED RENTALS, INC., MICHAEL : | |
| KNEELAND and ROGER SCHWED, : | |
| : | April 16, 2009 |
| Defendants. : | |

------------------------------------------------------ x

**TABLE OF CONTENTS**

I.     SUMMARY OF THE ACTION ................................................................................1

       A.   The Structure Of The Transaction ...........................................................3

       B.   Cerberus's Renegotiation Efforts.............................................................4

       C.   URI's Misleading Disclosures ..................................................................7

II.    JURISDICTION AND VENUE ............................................................................9

III.   PARTIES ............................................................................................................10

       A.   Lead Plaintiffs .......................................................................................10

            1.   First New York Securities, L.L.C. ...............................................10

            2.   Omni Partners LLP ......................................................................10

       B.   Additional Plaintiffs...............................................................................11

       C.   Defendants .............................................................................................12

            1.   United Rentals, Inc.......................................................................12

            2.   Michael Kneeland ........................................................................13

            3.   Roger Schwed ..............................................................................13

IV.    OPERATIVE FACTS .........................................................................................14

       A.   Background Of The Transaction..............................................................14

       B.   The Structure Of The Transaction ..........................................................17

       C.   Termination Provisions...........................................................................20

       D.   The Deterioration Of The Credit Markets Has A Direct Impact On
            Leveraged Buyout Transactions, Including The LBO..............................22

            1.   Cerberus Forces The Renegotiation Of Its Equity Acquisition Of
                 Chrysler Based Upon The Deteriorating Credit Markets...........................22

            2.   The August 7, 2007 Joint Meeting Of The Board Of Directors Of
                 URI And URNA At Which The Board Expresses Concern Over
                 The Impact Of The Deteriorating Credit Markets On The LBO................23

            3.   The Deteriorating Credit Markets Cause Various Renegotiations.............24

            4.   The August 20, 2007 Joint Meeting Of The Board Of Directors Of
                 URI And URNA Concerning The Impact Of The Deteriorating
                 Credit Markets On The Viability Of The LBO And The Decision
                 To Retain Outside Counsel ........................................................................25

       E.   Cerberus Demands Renegotiation Of The LBO  In Light Of The
            Deteriorating Credit Markets ..................................................................26

            1.   The August 29, 2007 Conference Call From Cerberus To URI

Seeking To Renegotiate The Terms Of The Merger Agreement ...............26

2.   The August 30, 2007 Joint Meeting Of The Board Of Directors Of URI And URNA Concerning Cerberus's Request To Renegotiate ...........27

3.   The August 30, 2007 Preliminary Proxy Statement Fails To Include Cerberus's Request to Renegotiate ................................................30

4.   The August 31, 2007 Letter From Cerberus To URI Confirming Cerberus's Desire To Renegotiate The LBO And Protesting The Filing Of The Preliminary Proxy Statement Without Cerberus's Substantive Comments ......................................................................32

5.   The September 6, 2007 Letter From URI To Cerberus In Which URI Refuses To Meet With Cerberus Regarding Proposed Revisions To The Merger Agreement...............................................35

F.   Negative Developments In The Financial Markets And URI's Disappointing Cash Flow Cause Cerberus To Further Reevaluate The Purchase Price Of The LBO...................................................................37

G.   The September 19, 2007 Final Proxy Statement...................................38

H.   Continued Adverse Developments in the Credit Markets ......................41

I.   URI Holds Its Stockholders Meeting To Approve The Transaction And Issues A Press Release; The Market For URI Stock Stabilizes ..............41

J.   Cerberus Abandons Its Acquisition Of Affiliated Computer Citing The Downturn In The Credit Markets.........................................................44

K.   The October 31, 2007 Press Release And November 1, 2007 Form 8-K ..............44

L.   Before The Scheduled Closing, Cerberus Reiterates Its Intent To Renegotiate Its Transaction With URI...................................................45

M.   Cerberus Formally Withdraws From The LBO .....................................45

N.   The Market Reaction........................................................................47

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT........................................................47

A.   The August 30, 2007 Preliminary Proxy Statement...............................49

B.   The September 19, 2007 Final Proxy Statement.....................................50

C.   The October 19, 2007 Press Release....................................................52

D.   The October 30, 2007 Form 8-K.........................................................53

E.   The October 31, 2007 Press Release And November 1, 2007 Form 8-K .............53

F.   The November 1, 2007 Form 10-Q.......................................................54

G.   The November 7, 2007 Form 8-K.........................................................55

VI.   POST-CLASS PERIOD DEVELOPMENTS ........................................................55

VII.   ADDITIONAL SCIENTER ALLEGATIONS ...................................................................58

   A.   The Individual Defendants' Knowledge Or Reckless Disregard That Cerberus Could, And Was Likely To, Walk Away From The LBO Unless URI Agreed To Renegotiate The Price Of The Transaction ...................................60

   B.   The Individual Defendants Were Aware of, But Chose To Ignore Or Recklessly Disregard, Numerous Red Flags Demonstrating The Severe Deterioration Of The Credit Markets And Resulting Risk To The LBO Closing ........................................................................................................62

                                              65

VIII.   LOSS CAUSATION ...................................................................................................66

IX.   GROUP PLEADING ...................................................................................................67

X.   FRAUD-ON-THE-MARKET PRESUMPTION .......................................................68

XI.   THE SAFE HARBOR PROVISION OF THE PSLRA IS INAPPLICABLE ..................69

XII.   CLASS ACTION ALLEGATIONS ...............................................................................

COUNT I
   Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Of The Securities And Exchange Commission ...........................................................................72

COUNT II
   Violation Of Section 20(a) Of The Exchange Act .......................................................75

PRAYER FOR RELIEF ............................................................................................................76

JURY TRIAL DEMAND ..........................................................................................................77

Lead Plaintiffs First New York Securities, L.L.C. and Omni Partners LLP (collectively, "Lead Plaintiffs"), on behalf of themselves and a class of investors (the "Class") consisting of all persons and entities that purchased United Rentals, Inc. ("URI" or the "Company") publicly traded securities during the period from August 30, 2007 through and including November 14, 2007 (the "Class Period"), for their Second Consolidated Amended Class Action Complaint ("Complaint"), make the following allegations against Defendants (as defined below) based upon, among other things, a continuing investigation, conducted by and through their undersigned counsel, into the facts and circumstances alleged herein, including, without limitation, review and analyses of: (i) the filings that URI made with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, public statements, news articles and other publications disseminated by or concerning URI and related parties; (iii) industry publications; (iv) pleadings, transcripts and exhibits related to *United Rentals, Inc. v. RAM Holdings, Inc. and RAM Acquisition Corp.*, No. 3360-CC, filed in the Delaware Chancery Court (the "Delaware Action"); (v) the corporate websites of URI and Cerberus Capital Management, L.P. (together with Cerberus Partners, L.P., "Cerberus"); and (vi) legal opinions in relevant cases. Allegations as to Lead Plaintiffs' own acts are based upon Lead Plaintiffs' personal knowledge. Many additional facts supporting the allegations herein are known only to the Defendants and/or are within their exclusive custody or control. Lead Plaintiffs believe that additional evidentiary support for the allegations herein will emerge after a reasonable opportunity to conduct discovery.

## I.    SUMMARY OF THE ACTION

1.    This action is brought as a class action seeking damages for securities fraud on behalf of purchasers of URI securities during the period August 20, 2007 through November 14,

2007 (the "Class Period"). Relief is sought under Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, promulgated thereunder. Plaintiffs' claims are principally based on deliberate misrepresentations and non-disclosures in proxy materials and other public statements issued by URI in connection with an aborted "going private" leveraged buy-out (the "LBO" and/or the "Transaction") which URI announced -- but did not complete -- in the summer and fall of 2007. This Section I summarizes the allegations as pleaded and amplified in more detail *infra*.

2.      On April 10, 2007, URI publicly announced that its Board of Directors ("Board") had authorized the exploration of strategic corporate alternatives including a possible sale of the Company. The price of URI's publicly traded common stock jumped on the announcement.

3.      As discussed more fully below, deteriorating credit markets directly impacted URI's effort to sell or merge itself, and in the weeks of June and early July 2007, the state of the capital markets worsened, making debt financing far more difficult and costly to obtain. At the conclusion of a bid submission process conducted by the URI Board, the field of potential acquirers was narrowed to Cerberus. Negotiations between the parties leading up to the execution of final transaction documents focused in large part on Cerberus's insistence that, because of the worsening credit markets situation, it needed an "out" in the event it decided not to close the Transaction. As a result, Cerberus proposed -- and URI ultimately accepted -- a series of contractual conditions in which Cerberus could "walk away" from the deal with no further liability before closing upon the payment of a $100 million "reverse termination fee" (the "Termination Fee"). A merger agreement (the "Merger Agreement") and other implementing documents were executed on July 22, 2007, whereupon URI agreed to sell itself for $34.50 per share.

2

## A.    The Structure Of The Transaction

4.    The Merger Agreement provided that upon the closing, each outstanding share of URI common stock would be converted into the right to receive $34.50 per share in cash. That purchase price represented a 25.3% premium over the Company's common stock closing price of $27.55 per share on April 9, 2007, one day prior to the Company's April 10, 2007 announcement.

5.    Cerberus itself was *not* a party to the Merger Agreement. Instead, it insulated itself by creating two special-purpose subsidiaries, RAM Holdings Inc. ("RAM Holdings") and RAM Acquisition Corp. ("RAM Acquisition") (collectively, "the RAM Entities" [1]). These were shell corporations with *de minimis* assets whose only function was to effectuate the LBO and provide the necessary debt financing. The only parties to the Merger Agreement were URI and the RAM Entities. Under the Merger Agreement, RAM Acquisition was to be merged into URI, with URI being the surviving corporation.

6.    As discussed more fully below, pursuant to the Merger Agreement, the Transaction would be financed through three primary arrangements: (i) the RAM Entities would borrow $4.0 billion in debt financing provided by several leading banks; (ii) the RAM Entities would provide URI with borrowed funds so as to enable URI to refinance its long-term debt, including $1.9 billion of its outstanding notes which would be redeemed through tender offers to the noteholders; and (iii) Cerberus itself would make an equity investment of $1.5 billion in the surviving company at closing.

7.    Since the RAM Entities had no assets, their ability to obtain the $4.0 billion in financing and to complete the refinancing of URI's debt was completely dependent upon, and

---

[1] RAM Acquisition was a wholly-owned subsidiary of RAM Holdings.

3

would not occur without, Cerberus's contribution of the $1.5 billion equity investment. Thus, the LBO could not close unless Cerberus provided the essential $1.5 billion.

8.      A major component of the proposed Transaction was Cerberus's Limited Guarantee Agreement ("Limited Guarantee"). A principal term of this agreement was a covenant by URI *not* to sue Cerberus if Cerberus declined to go ahead with the Transaction. URI's remedy against Cerberus in the event Cerberus did not go forward was limited to the payment of the $100 million termination fee. The substantive terms of the Limited Guarantee, particularly the provisions which precluded URI from instituting any proceedings or claims against Cerberus arising under or in connection with the Merger Agreement, were not disclosed to investors. Investors had no way of knowing that the Limited Guarantee insulated Cerberus from liability and provided it with a unilateral right to abandon the LBO, even without the occurrence of any material adverse change. If Cerberus exercised its unilateral right to abandon the LBO, the Transaction would effectively be terminated for lack of Cerberus's vital investment of $1.5 billion in equity capital.

9.      Cerberus's commitment to fund the equity portion of the Transaction was contained in an Equity Commitment Letter that was also not made public until after the Transaction had failed. That Equity Commitment Letter too was misleadingly described in URI's public statements. The commitment ran only to the RAM Entities (Cerberus's own subsidiaries) and was specifically not enforceable by URI -- a critical undisclosed fact.

**B.      Cerberus's Renegotiation Efforts**

10.      After the announcement of the Transaction, in the approximately five weeks before URI filed its Final Proxy Statement seeking approval from the shareholders, the world credit markets continued to deteriorate. These market events caused the stocks of numerous

4

target companies involved in pending leveraged buyout transactions to trade at significant discounts. Because of the rising transactional costs, varying private equity sponsors, including Cerberus, sought to renegotiate other pending transactions. The URI Board engaged in lengthy discussions of these events. In the course of those deliberations, the Board developed concerns about Cerberus's ability to consummate the Transaction -- and, in fact, retained outside litigation counsel to advise the Company on matters that could arise during the pendency of the Transaction.

11.     Predictably, on August 29, 2007, a little more than a month after URI had announced the Transaction, Cerberus approached URI's investment banks and said that because of continued deteriorating conditions in the credit markets, it wanted to renegotiate the $34.50 price for URI's stock. Three weeks earlier, as URI knew, Cerberus had renegotiated its previously-announced agreement to buy a controlling interest in Chrysler Group ("Chrysler") for the same reason. URI turned Cerberus down, saying there was nothing to talk about. Cerberus immediately repeated its renegotiation demand in a letter addressed to URI's Board, urging URI to "discuss the impact of these unanticipated market developments sooner rather than later." URI again turned Cerberus down flat and refused to engage in any discussions. None of these exchanges were disclosed to the public -- *even though Cerberus pointedly asked URI to refer to its renegotiation request in URI's preliminary proxy statement*.

12.     In context, the fact that Cerberus stated it believed it was in the parties' interest to deal with these issues "***sooner rather than later***" was of enormous importance. It indicated that Cerberus's invitation to renegotiate was not merely a passing overture. Unless and until the price term of the LBO was renegotiated there was *a continuing, significant undisclosed risk* that Cerberus would abandon the Transaction. URI's complete failure to address this present and

5

identifiable threat represented a gross departure by the URI Board from the fiduciary duties of informed deliberation and action which it owed to URI's public security holders -- security holders who were completely in the dark as to this material undisclosed risk. URI's conduct was especially reckless in failing to inquire of Cerberus about the pricing risk when it knew unequivocally that the Transaction could not close without Cerberus's final decision to provide the necessary $1.5 billion in equity, and that if Cerberus opted not to proceed (which it could do at any time), URI could not (by litigation or otherwise) compel it to go forward.

13.     From August 30, when URI's preliminary proxy statement was distributed, until October 19, when URI's stockholders formally approved the prospective LBO, the market price of URI stock traded in a range between approximately $31 and $34 per share. URI's shareholders approved the Transaction at the October 19 shareholders' meeting, and the market price of URI stock stabilized a few cents below the announced Transaction price of $34.50 when this was publicly announced. On October 31, URI announced that the Transaction was on track to close November 16 and was "not subject to a financing condition."

14.     During the entire period from late August to mid-November (the Class Period as defined herein) the credit markets continued to tighten, and as a result debt financing became progressively less available and more expensive for leveraged buyout transactions. At the same time, URI's operating results for the third quarter showed a marked diminution of cash flow. Those two factors created an objectively verifiable, significant continuing risk that Cerberus would again try to renegotiate the Transaction, or abandon it. That risk was never disclosed.

15.     On November 14, 2007, *Reuters* reported that Cerberus was considering withdrawing from the LBO as a result of Cerberus's concerns about URI's outlook and the significant deterioration in the credit markets, which were making it difficult for investment

6

banks to sell debt offerings for the deal. URI issued a press release later that day finally acknowledging its dispute with Cerberus and revealing that there was a substantial risk to the closing of the LBO. The next day, Cerberus disclosed that it was not proceeding with the Transaction.

16.     Cerberus's withdrawal cannot have come as a surprise to URI's Board. Cerberus had communicated to URI beginning on August 29, 2007 that it intended to renegotiate the terms of the Transaction due to the deteriorating credit markets, and the condition of those markets continued to worsen thereafter. Indeed, in a press release dated November 15, 2007, when asked about the collapse of the United Rentals deal, Cerberus, said that *it approached URI in August 2007 "as conditions in the capital markets continued to worsen"* in order *"either to arrange for the payment of the negotiated $100 million termination fee, or to engage United Rentals in a constructive dialogue to negotiate a transaction on revised terms."* (Emphasis added). In reaction to these disclosures, URI's common stock declined on extraordinary volume (exceeding 36 million shares) from an opening price of $34.37 per share on November 14 -- a slight discount to the $34.50 per share deal price -- to a closing price of $23.50 per share, a more than 31 percent decline. Thus, when Cerberus announced it would not be prepared to proceed on the price and other terms set forth in the Merger Agreement, URI common shares lost more than 30% of their value, or almost $900 million in market capitalization. The other URI Securities also experienced material price declines.

## C.     URI's Misleading Disclosures

17.     URI's preliminary and final proxy statements, and certain of its interim SEC filings and press releases during the Class Period, stated that the Transaction was scheduled to close in November subject only to "normal closing conditions" (albeit there was a generic

7

disclosure of the risk that it might not close). They did not disclose Cerberus's pointed and repeated efforts to renegotiate the price of the Transaction -- a material fact. The materials distributed on and after September 19, 2007 said -- consistently and unequivocally -- that the closing of the Transaction was "not subject to a financing condition," even though Cerberus had twice raised a serious question as to whether it would ever supply the necessary equity financing because of credit market conditions -- conditions which thereafter continued to deteriorate. This constituted, in practical effect, a highly important "financing condition" because the Transaction was dead if Cerberus declined to provide the equity financing. In addition to URI's failure to disclose critical elements of the Transaction documents as noted above, URI's filings and releases did not disclose the following specific facts which demonstrated a serious risk, known to URI during the entire Class Period, that the LBO would not take place at the announced price -- and perhaps not at all:

  a) After the agreements were signed, Cerberus still had a critical decision to make, which it wished to make "sooner rather than later" (*i.e.,* before proxy materials were distributed and before any closing was scheduled) as to whether it would make its $1.5 billion equity contribution and, thus, permit the deal to proceed.

  b) Cerberus's willingness to provide the critical equity infusion depended on the availability and price of funding for the massive debt the company would be undertaking (more than $6 billion) and Cerberus's projections as to the company's ability to service that debt and still earn a suitable profit for Cerberus, its prospective shareholder-parent.

c) After the merger agreement was signed, Cerberus twice sought to renegotiate the price term of the Transaction in an effort to reduce the amount of debt the surviving company would be required to shoulder.

d) The continuing deterioration in the credit markets and URI's disappointing cash flows during the Class Period made it ever more likely that Cerberus would decline to go ahead.

18. For the reasons set forth herein, as alleged in greater detail below, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of URI securities during the Class Period by reason of the wrongful conduct alleged herein, constituting violations of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## II. JURISDICTION AND VENUE

19. This action arises under Sections 10(b) and 20(a) of the Exchange Act, as amended, 15 U.S.C.§§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

20. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). URI maintains its corporate headquarters in this District and many of the acts and omissions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

22. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited

9

to the United States mails, interstate telephone communications, internet communications and the facilities of the New York Stock Exchange ("NYSE").

## III.    PARTIES

### A.    Lead Plaintiffs

#### 1.    First New York Securities, L.L.C.

23.    First New York Securities, L.L.C. ("FNY") was appointed as a Lead Plaintiff in this action pursuant to the Court's February 7, 2008 Order (the "February 7, 2008 Order"). FNY is a registered broker/dealer and one of the preeminent global principal trading firms in the United States. Founded in 1986, FNY is headquartered in New York City, with additional offices located in Wayne, New Jersey and the United Kingdom. FNY is also a fully reporting member of the National Association of Securities Dealers, as well as a member of the Securities Investor Protection Corporation and the Financial Industry Regulatory Authority, Inc.

24.    As set forth in the certification it previously filed in this Court in connection with its Class Action Complaint, filed on January 22, 2008, and incorporated by reference herein, FNY purchased URI common shares during the Class Period.

#### 2.    Omni Partners LLP

25.    Omni Partners LLP ("Omni") was appointed as a Lead Plaintiff in this action pursuant to the Court's February 7, 2008 Order. Omni is an institutional securities firm, with offices located in London. It is authorized and regulated by the Financial Services Authority, an independent public body and quasi-judicial body that regulates the financial services industry in the United Kingdom.

26.     As set forth in the certification it previously filed in this Court in connection with its Class Action Complaint, filed on January 22, 2008, and incorporated by reference herein, Omni purchased URI common shares during the Class Period.

**B.      Additional Plaintiffs**

27.     Plaintiffs Glazer Capital Management, LP and Glazer Offshore Fund, Ltd. (collectively, the "Glazer Funds") are investment funds managed by Glazer Capital, LLC, an investment adviser registered with the SEC. The Glazer Funds purchased URI common stock during the Class Period, as set forth in the certification they filed with the Court on January 22, 2008 and incorporated by reference herein.

28.     Plaintiff Brownstone Asset Management, L.P. ("Brownstone") is an investment management firm registered with the Alberta Securities Commission. Pursuant to an Investment Manager Agreement and a Trading Manager Agreement, Brownstone has the exclusive right to make investment decisions for its clients. Under these agreements, Brownstone has the unrestricted discretion and authority to manage all aspects of the investment of its clients' assets and take all actions to protect their interests, including bringing litigation to recover on behalf of its clients. Accordingly, Brownstone has complete investment authority, and is agent with full power and authority to act in connection with their investments, including seeking legal redress. During the Class Period, Brownstone purchased URI 6 ½ % Senior Notes due February 15, 2012 on behalf of its clients, as set forth in the certification it filed with the Court on January 22, 2008 and incorporated by reference herein.

29.     Plaintiff Raven Credit Opportunities Master Fund, Ltd. ("Raven") is an investment fund, which purchases and sells securities at the direction of Raven Asset Management, LLC ("Raven Asset Management"). Pursuant to an Investment Management

11

Agreement, Raven Asset Management has the exclusive right to make investment decisions for Raven. As set forth in the certification it filed with the Court on December 21, 2007 and incorporated by reference herein, Raven purchased shares of URI common stock during the Class Period.

30.     Lead Plaintiffs and the additional plaintiffs identified in paragraphs 27-29 are collectively referred to herein as "Plaintiffs."

## C.     **Defendants**

### 1.     **United Rentals, Inc.**

31.     Defendant URI is a holding company, incorporated in the State of Delaware, that conducts its operations primarily through its wholly-owned subsidiary, United Rentals North America, Inc. ("URNA"), which is also incorporated in the State of Delaware. URI maintains executive offices at Five Greenwich Office Park, Greenwich, Connecticut 06831.

32.     Through URNA, URI operates one of the nation's largest equipment rental businesses, which offers for rent over 20,000 classes of equipment to customers that include construction and industrial companies, manufacturers, utilities, municipalities, homeowners and others. URI's fleet of rental equipment consists of over 254,000 units and includes: general construction and industrial equipment; aerial work platforms; general tools and light equipment; and underground safety equipment. As of January 1, 2007, the Company's rental network consisted of 696 locations in the United States, Canada and Mexico. In addition to renting equipment, the Company sells new and used rental equipment as well as related contractor supplies, parts and service. During the Class Period, URI had outstanding the following publicly traded debt securities, among others: 6½% Senior Notes due February 15, 2012 (the "6½% Notes"); 7¾% Senior Subordinated Notes due February 15, 2013 (the "7¾% Notes"); and 7%

12

Senior Subordinated Notes due February 15, 2014 (the "7% Notes"). The 6 ½ % Notes, 7 ¾ % Notes and 7 % Notes are collectively referred to herein as the "Notes."

33.     URI's common stock, together with URI's other publicly traded securities, are collectively referred to herein as "URI Securities."

## 2.     **Michael Kneeland**

34.     Defendant Michael Kneeland ("Kneeland"), at all times relevant to this action, was the interim Chief Executive Officer of URI. In that capacity, Kneeland was responsible for carrying out the policies of the URI Board and managing the Company on a day-to-day basis. In addition, Kneeland signed at least the following documents: the preliminary proxy statement which URI filed with the SEC on August 30, 2007 (the "Preliminary Proxy Statement") in connection with the LBO; the final proxy statement which the Company filed with the SEC on September 19, 2007, and disseminated to shareholders in order to obtain approval of the LBO (the "Final Proxy Statement"); and the Sarbanes-Oxley certification in connection with the Company's Third Quarter 2007 Form 10-Q, filed with the SEC on October 31, 2007. Defendant Kneeland also attended meetings of the Company's Board, including the Board meeting held on August 30, 2007, during which Cerberus's request to renegotiate the terms of the LBO was discussed.

## 3.     **Roger Schwed**

35.     Defendant Roger Schwed ("Schwed"), at all times relevant to this action, was the Executive Vice President and General Counsel of URI. In that capacity, Schwed was responsible for ensuring that URI was in full compliance with the applicable laws and regulations and for providing legal advice on various corporate issues, including transactions and other structural changes to URI and its business as they arose. Accordingly, as General Counsel, Schwed was

13

involved with and knowledgeable regarding the negotiations that led to the Merger Agreement of July 22, 2007 and Cerberus's efforts to renegotiate the Merger Agreement, having, among other things, reviewed the August 31, 2007 letter from Cerberus to URI. In addition, Schwed signed the attestations of the Company's proxy solicitations for the Preliminary Proxy Statement and Final Proxy Statement. Schwed also signed the following Forms 8-K attaching Company press releases alleged herein to be materially false and misleading: October 19, 2007 Form 8-K; October 30, 2007 Form 8-K; November 1, 2007 Form 8-K; and November 7, 2007 Form 8-K. Defendant Schwed also attended meetings of the Company's Board, including Board meetings on August 7, 2007 and August 20, 2007, during which the deterioration of the credit markets and its impact on the LBO were discussed. Schwed also attended the August 30, 2007 Board meeting, during which Cerberus's request to renegotiate the terms of the LBO was discussed.

36.     Defendants Kneeland and Schwed are collectively referred to herein as the "Individual Defendants" and, collectively with URI, the "Defendants."

## IV.     OPERATIVE FACTS

### A.     Background Of The Transaction

37.     Throughout the latter half of 2006 and the first quarter of 2007, URI explored strategic corporate alternatives including a potential sale of the Company. URI's Board of Directors determined that the Company lagged behind a number of its competitors with respect to several important operating metrics and would need to articulate possible areas of operational improvement to any potential buyer to maximize value in any potential corporate transaction. The commercial equipment rental industry in which the Company operated was cyclical, which affected the Company's financial results and share price. When URI explored the possibility of a sale transaction in 2006 it did not receive *any* indications of interest.

14

38.     With this background, on April 10, 2007, the Company issued a press release announcing that the Board had authorized the exploration of strategic alternatives, including a possible sale of the Company. Representatives of the Company's financial advisors immediately began to solicit and/or receive inquiries from potential buyers. Not surprisingly, the market price of URI's common stock jumped immediately upon this announcement, from $27.55 per share on April 9, 2007 to $32.36 per share on April 10, 2007.

39.     As discussed more fully below, deteriorating credit markets directly impacted URI's efforts to sell or merge itself immediately before and during the Class Period. In June and early July 2007, the state of the capital markets worsened, making debt financing far more difficult and costly to obtain. As a result of unprecedented delinquency and default rates on loans in the mortgage market, large investment banks such as J.P. Morgan Chase & Co. and Lehman Brothers, Inc. were becoming highly sensitive to credit risk and, thus, were less willing to issue loans with generous terms and low interest rates. Such banks, which committed to provide money for private equity firms to engage in leveraged buyout transactions, began to require such private equity firms, including Cerberus, to accept higher interest rates and/or additional debt covenants, making it far more expensive for such firms to finance leveraged buyout transactions. In the immediate past, investment banks had been willing to lend money on highly favorable terms because they could sell those loans to hedge funds and other investors worldwide, thereby spreading the risk of lending among investors. As the mortgage market collapsed, however, investors were unwilling to purchase loans from the investment banks. High interest rates and additional strict debt covenants put many leveraged buyout deals at risk of not closing or, at a minimum, at risk of renegotiation at significantly lower prices.

15

40.     These developments caused the Company, at a meeting of its Board and financial advisors on July 12, 2007, to specifically consider -- as a result of "the continued worsening of the credit markets "-- the "status quo alternative available to the Company along with the execution risks associated with such alternative." Final Proxy Statement, at 30.

41.     Prior to the Company's bid submission deadline of July 5, 2007, the field of potential acquirers had been narrowed to Cerberus and one other bidder. The Board considered the option of extending the bid submission deadline, but rejected this alternative due to the possibility of continued deterioration in the capital markets. Following the URI Board's meeting of July 12, 2007, URI concluded that it should press discussions with Cerberus.

42.     The negotiations between URI and Cerberus focused in large part on Cerberus's insistence that because of worsening credit markets Cerberus needed an "out" in the event it decided not to close the Transaction. As a result, Cerberus proposed -- and URI ultimately accepted -- a series of contractual provisions (described further below) under which Cerberus could "walk away" from the deal with no further liability before closing upon the payment of a $100 million "reverse termination fee." In particular, Cerberus recognized that the markets were "coming under pressure" to such an extent that its ability to complete the Transaction on favorable terms -- and its subsequent ability to manage the post-LBO company with access to sufficient financing -- were in question. As set forth herein, Cerberus would ultimately refuse to proceed with the Transaction for precisely the same financial market concerns it had identified in the negotiations leading up to the execution of the Merger Agreement. ***Cerberus itself was carefully and deliberately not made a party to that Merger Agreement.*** As summarized by the RAM Entities in a statement issued November 19, 2007:

> [a]t the time of the negotiations in July 2007, the deterioration of
> the financial markets was known to all parties. Due to the resulting

16

uncertainty, RAM and the other Cerberus-related participants
required that their liability be limited to US $100 million, which is
the exclusive remedy for United Rentals under all circumstances.
*Our concern regarding the weakness of the financial markets
and our resulting requirement that our liability be limited was
openly discussed with United Rentals and its advisors in a fair
and frank manner, was thoroughly negotiated by the participants
to the transaction, and was an essential element of RAM's
willingness to pay a premium to the market price when signing
the Merger Agreement.*

(Emphasis added).

43.     After several weeks of negotiation over terms, focusing in large part on this issue,

URI agreed to sell itself to the RAM Entities for $34.50 per share. The Merger Agreement and

other implementing documents were executed on July 22, 2007.

**B.     The Structure Of The Transaction**

44.     The Merger Agreement provided that upon closing, each outstanding share of URI

common stock would be converted into the right to receive $34.50 per share in cash. That

purchase price represented a 25.3% premium over the Company's common stock closing price of

$27.55 per share on April 9, 2007, one day prior to the Company's April 10, 2007

announcement.

45.     As noted, Cerberus itself was *not* a party to the Merger Agreement. Instead, it

insulated itself by creating two special-purpose subsidiaries, RAM Holdings and RAM

Acquisition. These were shell corporations with *de minimis* assets whose only function was to

effectuate the LBO and provide the necessary debt financing. The only parties to the Merger

Agreement were URI and the RAM Entities. Under the Merger Agreement, RAM Acquisition

was to be merged into URI, with URI being the surviving corporation.

46.     As discussed more fully below, pursuant to the Merger Agreement, the

Transaction would be financed through three primary arrangements:  (i) the RAM Entities would

17

borrow $4.0 billion in debt financing provided by several leading banks;[2] (ii) the RAM Entities would provide URI with borrowed funds so as to enable URI to refinance its long-term debt, including $1.9 billion of its outstanding Notes which would be redeemed through tender offers to the noteholders; and (iii) Cerberus itself would make an equity investment of $1.5 billion in the surviving company at closing.

47.    Since the RAM Entities had no assets, their ability to obtain the $4.0 billion in financing and to complete the refinancing of URI's debt was completely dependent upon, and would not occur without, Cerberus's contribution of the $1.5 billion equity investment. Thus, the LBO could not close unless Cerberus provided the essential $1.5 billion.

48.    With respect to the refinancing of URI's debt, Section 6.11(a) of the Merger Agreement required URI to commence tender offers for the outstanding Notes, and to solicit consents to amend the respective indentures governing the Notes from the holders of not less than a majority in aggregate principal amount of the Notes. Under Section 6.11(c) of the Merger Agreement, the closing of the tender offers was conditioned upon the closing of the LBO. The RAM Entities would provide URI with the funds necessary to consummate the tender offers simultaneously with the LBO closing.

49.    A major component of the proposed Transaction was Cerberus's Limited Guarantee Agreement, which provided in part that:

> The Company [URI] acknowledges that the sole assets of Parent and Merger Sub [RAM Acquisition] are cash in *a de minimis* amount and its rights under the Merger Agreement, and that no additional funds are expected to be contributed to Parent or Merger Sub unless and until the Closing occurs. The Company, by its acceptance of the benefits hereof, agrees that *it has no right of*

---

[2] Those banks included Bank of America, N.A., Banc of America Bridge LLC, Credit Suisse, Morgan Stanley Senior Funding, Inc., Lehman Brothers Commercial Bank and Lehman Brothers Commercial Paper Inc.

*recovery* in respect of a claim arising under the Merger Agreement or in connection with any documents or instruments delivered in connection therewith, including this Limited Guarantee, *against any former, current or future officer, agent, affiliate or employee of the Guarantor [Cerberus] or Parent.*

\*    \*    \*

*Recourse against the Guarantor under this Limited Guarantee shall be the sole and exclusive remedy of the Company and all of its affiliates against the Guarantor and any Guarantor/Parent Affiliates in respect of any liabilities or obligations arising under, or in connection with, the Merger Agreement or the transactions contemplated thereby* including in the event Parent or Merger Sub breaches any covenant, representation or warranty under the Merger Agreement or the Guarantor breaches a covenant, representation or warranty hereunder. *The Company hereby covenants and agrees that it shall not institute, and shall cause its controlled affiliates not to institute, any proceeding or bring any other claim arising under, or in connection with, the Merger Agreement or the transactions contemplated thereby, against the Guarantor* or any Guarantor/Parent Affiliates except for claims against the Guarantor under this Limited Guarantee. Nothing set forth in this Limited Guarantee shall affect or be construed to affect any liability of Parent or Merger Sub to the Company or shall confer or give or shall be construed to confer or give to any Person other than the Company any rights or remedies against any Person other than the rights of the Company against the Guarantor as expressly set forth . herein.

(Emphasis added).

50.    *The substantive terms of this Limited Guarantee, particularly the provisions which precluded URI from instituting any proceedings or claims against Cerberus arising under or in connection with the Merger Agreement, were not disclosed to investors until after the collapse of the Transaction on November 14, 2007, when RAM Holdings attached the Limited Guarantee to an SEC filing.*

51.    Thus, the Transaction documents made it clear from the start that the RAM Entities would not and could not complete the LBO without the $1.5 billion equity investment by

Cerberus, and that Cerberus could not be compelled to provide that equity investment even if the RAM Entities breached their agreements. In short, *the LBO would not close (and URI could not compel a closing) unless Cerberus agreed at the time of closing to participate in the Transaction and provide the necessary capital.* Cerberus's only obligation to provide its equity investment was contained in an Equity Commitment Letter to the RAM Entities -- its own subsidiaries -- which similarly required that any claims against Cerberus with respect to the LBO or other transactions contemplated by the Merger Agreement or the Equity Commitment Letter be made solely pursuant to the Limited Guarantee. URI was specifically *not* made a third-party beneficiary of this equity commitment obligation. If Cerberus exercised its unilateral right to abandon the LBO, the Transaction would effectively be terminated for lack of Cerberus's vital investment of $1.5 billion in essential capital.

52.     Since investors and the public securities markets did not have access to the specific terms of the Limited Guarantee and the Equity Commitment Letter, specifically the provisions which insulated Cerberus from any legal proceedings to enforce the Transaction, they could not effectively evaluate the likelihood that Cerberus would permit the Transaction to close on the announced terms.

C.     **Termination Provisions**

53.     The Merger Agreement contained two provisions relevant to the parties' ability to terminate. First, Section 8.2(e) of the Merger Agreement, entitled "Effect of Termination," provided that in the event the RAM Entities breached the Merger Agreement, they, as the parties to the agreement, could only be liable for payment of the $100 million Termination Fee. Section 8.2(e) of the Merger Agreement further provided that neither party, under any circumstances, could seek specific performance of the Merger Agreement in the event of its breach.

20

54.     The Merger Agreement also included Section 9.10, entitled "Specific Performance," which indicated that either party could seek an injunction or injunctions to prevent the other from breaching the terms of the Merger Agreement. Section 9.10 further provided that this section was subject to the provisions outlined in Section 8.2(e).[3]

55.     On July 23, 2007, URI issued a press release announcing that the Company had entered into the Merger Agreement. When the prospective Transaction was announced, URI's press release did not contained any "risk factor" disclosures cautioning that there was a known credit risk, *i.e.*, a risk that developments in the capital markets or deterioration in URI's business prospects could cause the price of the LBO to be renegotiated or could cause the LBO to terminate upon payment of the $100 million Termination Fee. On July 24, 2007, URI filed a Form 8-K (the "July 24, 2007 Form 8-K") with the SEC announcing the Company's entry into the Merger Agreement and attaching the July 23, 2007 press release as an exhibit. [4]

---

[3] In the Delaware Action, Chancellor Chandler found that Sections 8.2(e) and 9.10 of the Merger Agreement were ambiguous and concluded that URI could not compel specific performance on the part of RAM Holdings or RAM Acquisition. 937 A.2d 810, 845 (Del. Dec. 21, 2007). Cerberus was not a party to the Delaware Action, which involved only URI and the RAM Entities. Therefore, even if the decision had gone URI's way, Cerberus would not have been bound.

[4] In addition, the July 24, 2007 Form 8-K attached as exhibits the Merger Agreement and various other documents, *not* including the Limited Guarantee or the Equity Commitment Letter.

### D.    The Deterioration Of The Credit Markets Has A Direct Impact On Leveraged Buyout Transactions, Including The LBO

#### 1.    Cerberus Forces The Renegotiation Of Its Equity Acquisition Of Chrysler Based Upon The Deteriorating Credit Markets

56.    After the announcement of the Transaction, in the approximately five weeks before URI filed its Preliminary Proxy Statement seeking approval of the deal from its shareholders, the world credit markets continued to deteriorate as Cerberus had feared.

57.    In a May 14, 2007 press release, Cerberus stated it had agreed to purchase an 80.1% stake in Chrysler from DaimlerChrysler AG ("Daimler") for $7.4 billion. That transaction was expected to close on August 3, 2007. However, on July 26, 2007, it was announced that higher borrowing costs were making the deal more expensive, which would cut into Cerberus's profits. Those developments seriously jeopardized the Chrysler transaction and prevented its consummation unless the parties could agree on revised terms.

58.    Accordingly, on August 3, 2007, it was announced that Cerberus had renegotiated its previously agreed-upon deal with Chrysler. Cerberus forced that renegotiation *just days before the Transaction was scheduled to close*, citing the "highly volatile US loan markets" as the reason.

59.    This renegotiation, which was publicly reported, caused the URI Board to seriously question Cerberus's ability to consummate the LBO. Cary Kochman, a Managing Director of UBS who worked on the LBO as a representative of URI, testified during the trial in the Delaware Action that the URI Board had recognized by July 2007 that Cerberus's resources were in question and the LBO was at risk. Indeed, Kochman testified, he confronted Cerberus with that issue in July 2007, telling Cerberus that the URI Board "*ha[d] concerns about [Cerberus's] ability to consummate transactions. They see what's going on with Chrysler.*

They don't view you in the same breaths [sic] as KKR or Blackstone." Delaware Action Trial

Transcript 303: 23-304:5 (emphasis added).

    **2.    The August 7, 2007 Joint Meeting Of The Board Of Directors
Of URI And URNA At Which The Board Expresses Concern Over
The Impact Of The Deteriorating Credit Markets On The LBO**

    60.    On August 7, 2007, the Boards of Directors of URI and URNA jointly convened

to review the pending LBO. According to the minutes of that Joint Board Meeting, Bradley

Jacobs ("Jacobs"), Chairman of the Board of URI, "highlighted the Company's stock price

performance since the announcement of the Merger Agreement and asked representatives of UBS

[URI's investment bank] to comment on what might be the cause of the Company's stock trading

at a greater than expected discount to the deal price of $34.50." Representatives of UBS

indicated that the common shares of companies such as URI, which were the target of pending

leveraged buyout transactions, were trading at larger than normal discounts to deal prices because

of the current credit market environment. In response, the Board raised several questions

regarding the impact of the current credit market and leveraged buyout environments *on the*

*pending Transaction.* According to the minutes of the August 7, 2007 Joint Board Meeting:

> Representatives of UBS offered their perspectives on the
> underlying causes for the discount and noted that, among other
> matters, *in light of the credit market environment a number of*
> *target companies involved in pending leveraged buyout*
> *transactions were trading at discounts that were larger than*
> *historical norms.* A number of questions were asked by members
> of the Board and *a discussion ensued regarding the pending*
> *transaction and the current credit market and leveraged buyout*
> *environments.*

(Emphasis added).

23

61.   After UBS representatives left the Board meeting, representatives of Credit Suisse joined the meeting and Jacobs asked Credit Suisse "to offer their perspectives of the current credit market environment." According to the minutes:

> Representatives of Credit Suisse discussed with the Board their views on why the Company's stock was trading at a discount to the deal price and their perspectives on the current state of the leveraged finance market. *They noted that there was a large number of pending leveraged buyouts that would be seeking to complete their debt financing in the coming months, which was causing substantial stress in the market.*

(Emphasis added).

### 3.   The Deteriorating Credit Markets Cause Various Renegotiations

62.   On August 9, 2007, Home Depot, Inc. ("Home Depot") announced a possible restructuring of its previously announced agreement to sell its subsidiary HD Supply, Inc. According to Home Depot's press release on that date, *"in view of current financial market conditions,"* the company was amending the terms of its outstanding tender offer to reduce the $10.325 billion purchase price by approximately $1.8 billion. Home Depot subsequently announced on August 29, 2007 that the sale would close at $8.5 billion. This development was known to the URI Board.

63.   During the same time period, on August 21, 2007, a BusinessWeek.com article reported on numerous LBO deals at risk, stating as follows:

> Deals in Distress:
>
> The deals that have caused investors the most indigestion are remarkable in one of several ways. In some cases, their sheer volume arouses suspicion. The $28 billion deal for transaction processor First Data, for example, raises fundamental questions of supply and demand. *There's so much deal flow headed toward the debt markets that the price may fall, pushing up the yield the borrowers pay.* In other cases, such as Affiliated Computer, high debt levels and fundamental questions about the core business

climate *could be enough to make investors demand higher rates.*
*As the cost of such deals rises, the chance that one buyout firm*
*or another will walk away from a deal may be rising, too. That is*
*why the stock price of so many LBOs is trading below the buyout*
*price.*

(Emphasis added).

64.     Among the deals which that article reported were in distress (and which were no

doubt a part of the URI Board's contemporaneous consideration of the subject, discussed below)

were a $26 billion acquisition of First Data Corp. by Kohlberg Kravis Roberts & Co., a $25

billion acquisition of Sallie Mae by J.C. Flowers & Co., an $8.2 billion buyout of Tribune Co. by

Sam Zell, and a $44 billion buyout of Texas Utility Corp. by KKR, as well as the $6.2 billion

acquisition of Affiliated Computer, Inc. by Cerberus, itself -- a deal which Cerberus subsequently

abandoned, as discussed more fully below.  Significantly, the press did not report Cerberus's

proposed acquisition of URI to be a deal in distress -- no doubt because of the nature of URI's

disclosures.

> **4.     The August 20, 2007 Joint Meeting Of The Board Of Directors Of**
> **URI And URNA Concerning The Impact Of The Deteriorating Credit**
> **Markets On The Viability Of The LBO And The Decision To**
> **Retain Outside Counsel**

65.     On August 20, 2007, the Boards of Directors of URI and URNA again jointly

convened to review the pending LBO. At that Joint Board Meeting, Jacobs "asked

representatives of UBS to provide an update." According to the minutes:

> Mr. Kochman [of UBS]. . . offered his perspectives on the *current*
> *market environment*, including the current trading price of the
> Company's stock as well as *other companies that were subject to*
> *pending* leveraged buyouts. Representatives from UBS responded
> to *questions from members of the Board and a discussion*
> *ensued, during the course of which the Board discussed the*
> *recent public announcement that the private equity sponsors*
> *were seeking to renegotiate their pending deal to acquire Home*
> *Depot Supply*.

(Emphasis added).  In light of this discussion, the URI Board was clearly cognizant of the deterioration in the credit markets and the consequently depressed trading price of the Company's common stock.  The Board knew there was a strong possibility that Cerberus -- like other private equity firms faced with this dilemma -- would be asking to renegotiate the Transaction, if not to walk away from it entirely by paying the Termination Fee.  In anticipation of this and other issues impacting the LBO, "Mr. Jacobs discussed with the Board *the plan for the Company to retain an outside law firm that could advise on various litigation matters that could arise during the pendancy[sic] of the transaction*."  *Id.*  (Emphasis added).

## E.   Cerberus Demands Renegotiation Of The LBO In Light Of The Deteriorating Credit Markets

### 1.   The August 29, 2007 Conference Call From Cerberus To URI Seeking To Renegotiate The Terms Of The Merger Agreement

66.    On August 29, 2007, Steven F. Mayer, the President of Cerberus, contacted URI's investment banking representatives at UBS and explained that credit conditions had deteriorated to the point that Cerberus wanted to meet to renegotiate the purchase price and other terms of the LBO.  Cerberus also reiterated its view that it had a walk-away right for $100 million and was using that right as leverage to renegotiate the terms of the Transaction.  The August 29, 2007 call was reported to URI's counsel, Eric Swedenburg of Simpson Thacher, who was obligated to report it to URI's Board.  As Swedenburg testified:

> Q.  And you're aware that Cerberus had expressed its view that it had a walkaway right for $100 million in the course of that call; right?
>
> A.  That was what was reported to me; correct. (Del. Tr. 279: 9-13)

67.    This call occurred at the time URI was preparing to file with the SEC and distribute to its shareholders the Preliminary Proxy Statement seeking shareholder approval of the LBO on the previously announced terms. Later that same day (August 29, 2007), through counsel, Cerberus raised a number of substantive concerns with URI regarding the pending LBO and provided its comments on URI's draft Preliminary Proxy Statement. Cerberus told URI that it wanted to make additional disclosures in the Preliminary Proxy Statement to include the fact that, on August 29, 2007, *"Cerberus requested discussions with UBS and the Board to include, without limitation, the terms of the transaction . . . ." See Del. Tr. 278:21-23* (emphasis added). Cerberus also reiterated to URI that it *"wanted to discuss with the company possible changes to the merger agreement, including the purchase price, in light of credit market conditions." See* August 30, 2007, Joint Board Meeting Minutes, at p. 2 (emphasis added).

2.    **The August 30, 2007 Joint Meeting Of The Board Of Directors Of URI And URNA Concerning Cerberus's Request To Renegotiate**

68.    On August 30, 2007, the Boards of Directors of URI and URNA jointly convened to review the pending LBO. Notably, for the first time since the LBO was announced, Alan R. Friedman of Kramer Levin Naftalis & Frankel LLP, outside counsel to Defendants, attended the meeting. Mr. Friedman's practice focuses on the litigation and defense of complex civil and criminal cases. According to the minutes, Cary Kochman of UBS reported to the Board the details of the August 29, 2007 conference call with Cerberus as follows:

> Mr. Kochman reported that on August 29, 2007 he received a call
> from representatives of Cerberus, Steve Mayer and Mike Green, in
> which Messrs. Mayer and Green requested a meeting to discuss the
> terms of the merger agreement. *Mr. Kochman reported that when
> he asked Messrs. Mayer and Green to expand on the topics he
> wanted to discuss, they suggested that in light of the credit
> markets there should be a discussion regarding the per share
> merger consideration and alluded to Cerberus' view that it could
> terminate the merger agreement for $100 million if it felt doing*

27

> *so was in its best interests. Mr. Kochman reported that he*
> *informed Messrs. Mayer and Green that there was a fully*
> *negotiated and agreed-upon merger agreement in place that*
> *Cerberus was expected to honor, but that he would relay this*
> *request to the Board.*

(Emphasis added).

69.    According to the August 30, 2007 Joint Board Meeting minutes, Gary Horowitz

of Simpson Thacher (a major partner in that law firm's Mergers and Acquisitions practice group)

then reported that:

> *[L]ater on August 29, 2007 [Horowitz] received a call from*
> *representatives of Lowenstein Sandler and Cerberus asking for*
> *the opportunity to clarify the message Cerberus had given to*
> *UBS earlier in the day. Mr. Horowitz reported to the Board that*
> *the representatives of Cerberus stated that Cerberus did not want*
> *to terminate the merger agreement but that Cerberus wanted to*
> *discuss with the Company possible changes to the merger*
> *agreement, including the purchase price, in light of credit market*
> *conditions.* Mr. Horowitz reported that he told representatives of
> Lowenstein Sandler and Cerberus he would need to report the
> conversation and the request to the Board.
>
> *A discussion ensued regarding the appropriate response to*
> *Cerberus' request for a meeting. The Board's consensus was to*
> *have Mr. Horowitz tell Lowenstein Sandler that the Company*
> *would not discuss changing the terms of the merger agreement*
> *with Cerberus or its counsel.*

(Emphasis added).

70.    The Board then discussed the "state of play" with respect to the LBO, reflecting

the Board's assessment that it was uncertain whether the deal would go through.

71.    As noted, URI's negotiating tactic was to stonewall rather than to engage in any

discussion of the matter. Without further consultation with Cerberus or Cerberus's lawyers, URI

simply filed the Preliminary Proxy Statement *and did not add Cerberus's suggested disclosures*

*concerning the August 29, 2007 request to renegotiate or related events. See* Testimony of Eric Swedenburg, Simpson Thatcher, Del. Tr. 278:6 - 280:3.

72.     At a minimum, these discussions are clear evidence of the fact that URI was on notice that as of August 29, 2007, Cerberus had serious questions about proceeding with the LBO in light of credit market conditions. Cerberus pointedly reminded URI of the $100 million "walkaway" provision and stated that it regarded itself as having, in essence, an option to close or not. Cerberus's approach could not have come as a surprise to URI in light of the extensive discussions of the subject at URI's recent (August 7 and August 20) Board of Directors meetings.

73.     Indeed, in view of the *developed known risk to the Transaction being consummated on the agreed upon terms*, URI itself renegotiated its fee agreement with its own counsel Simpson Thatcher to provide for a reduced fee in the event the Transaction closed on terms less favorable to URI. As Swedenburg testified at the Delaware trial, *"[a]s early as August 29,* Simpson Thacher and URI worked out a fee proposal which contemplated the possibility that the Transaction would be done, *but at a price below $34.50."* Del. Tr. 281:9 - 283:10 ("Emphasis added).

74.     In seeking renegotiation on August 29, 2007, Cerberus was not just "blowing smoke." Rather, Cerberus advised its own investment bankers of its intent to renegotiate the Transaction to get a better price, and informed them that the Cerberus Investment Committee had decided to give at least some of the benefit from any renegotiated price to the lenders to reduce the amount of the bank debt that the merged entities would need to shoulder. An August 29, 2007 e-mail from Hayes Smith of Credit Suisse, URI's investment bankers in the LBO, confirmed these developments as follows:

> *Cerberus wants to renegotiate the purchase price for URI, given overall market conditions* (closing price today of $32.33 vs.

> purchase price of $34.5).  Their decision is not driven by any
> adverse change in the business or other.  Cerberus wants to **make**
> **sure that the bank's commitment will remain in place if they**
> **reach another agreement with URI.**  They suggested that the
> purchase price reduction will be applied pro-rata between the debt
> and the equity."

Del. Tr. 38: 1-10 (Emphasis added).

75.     An August 29, 2007 e-mail produced by Morgan Stanley, Cerberus's investment

bankers in the LBO, in the Delaware Action similarly stated:

> Guys we have just heard from Cerberus that they are going to go
> back and try to renegotiate purchase price on this.  They have a
> unilateral right to walk away by paying a $100M breakup fee, **and**
> **intend to use that as leverage.**  We asked them pointedly if there
> was anything about the business or the transaction that was driving
> this and they said no.  This is them trying to get a better deal.

Del. Tr. 36: 17-24 (emphasis added).

### 3.     The August 30, 2007 Preliminary Proxy Statement Fails To Include Cerberus's Request to Renegotiate

76.     As discussed above, in spite of Cerberus's request to URI requesting that it

provide URI's stockholders and the SEC with highly material information concerning the

discussions on August 29, 2007 regarding Cerberus's intent to renegotiate, URI deliberately

ignored that request and issued the Preliminary Proxy Statement on August 30, 2007.

77.     The Preliminary Proxy Statement contained a detailed discussion of the factors

which the URI Board purportedly considered in approving the proposed LBO, including the

following:

- [The Board decided not to pursue alternative transactions] in light of its belief
  that the merger **maximized stockholder value and was more favorable to**
  **the stockholders than any other strategic alternative** reasonably available
  to the Company and its stockholders;

30

- the price proposed by Cerberus represented the **highest price that the Company received** for the acquisition of the Company at the conclusion of its bidding process;

- the fact that the merger consideration is all cash, so that the transaction will allow the Company's stockholders to immediately realize a fair value, in cash, for their investment and **will provide such stockholders certainty of value for their shares;**

- the terms and conditions of the merger agreement, including:

  o the ability of the board of directors to actively solicit alternative proposals through August 31, 2007 and to terminate the merger agreement in order to accept a financially superior proposal …;

  o the limited number and nature of the conditions set forth in [RAM Acquisition Corp.'s] debt commitment letters, the obligation of [RAM Holdings] to use reasonable best efforts to obtain the debt financing and the obligation of [Ram Holdings'] debt financing sources to provide bridge financing if the public debt financing is not completed; and

  o **the limited number and nature of the conditions to [the RAM Entities'] obligation to consummate the merger and the limited risk of non-satisfaction of such conditions … .**

- **the receipt of executed commitment letters from [RAM Holdings'] sources of debt and equity financing for the merger, including the terms of the commitments** and the reputation of the financing sources **which,** in the judgment of the board of directors, **increases the likelihood of such financing being completed;**

- **the limited guarantee provided by Cerberus.**

Preliminary Proxy Statement at pp. 33-34 (emphasis added).

78.     The Preliminary Proxy Statement made only generic disclosure of certain

"potentially adverse factors" concerning the LBO:

- [T]he fact that the company was entering into the merger agreement with newly formed entities with essentially no assets, and that *in the event* the merger agreement is terminated under certain circumstances [URI's] remedy for losses or damages in connection with such termination *could be* limited to the $100 million limited guarantee provided by Cerberus

Preliminary Proxy Statement, at 34 (emphasis added).

- [T]he possible damage to [URI's] business, and the likely negative impact on the price of [the Company's] common stock, *if the merger is not consummated*

*Id.* (emphasis added).

79.    The Preliminary Proxy Statement also discussed generic risks to the completion of

the LBO, which included, among others:

- [T]he occurrence of any event, change or other circumstances that could give rise to the termination of, or a material change in the terms of, the merger agreement.

Preliminary Proxy Statement, at 15.

- [T]he failure of the merger to close for any other reason.

*Id.*

80.    Defendants represented in the Preliminary Proxy Statement that URI

"anticipate[d] completing the merger during the last quarter of 2007." The necessary implication

of this was that URI fully expected the LBO to go forward on the announced terms.

81.    As discussed more fully below in Section V, each of these statements in the

Preliminary Proxy Statement was materially misleading and omitted the glaringly material fact

that Cerberus had sought to renegotiate the terms of the LBO and in doing so had given notice

that the LBO was in serious jeopardy because of worsening conditions in the credit markets.

There was at that point a known and substantial undisclosed risk that because of credit market

developments, the Transaction would not close at the announced price.

**4.    The August 31, 2007 Letter From Cerberus To URI Confirming Cerberus's Desire To Renegotiate The LBO And Protesting The Filing Of The Preliminary Proxy Statement Without Cerberus's Substantive Comments**

82.    Troubled by URI's direct refusal to discuss the terms of the LBO, on August 31,

2007, the day after URI's Preliminary Proxy Statement was publicly disseminated, Steven Mayer,

Cerberus's president, sent a letter to Defendant Schwed, also copying URI's outside counsel,

Simpson Thacher, URI's investment banker, UBS, and Cerberus's counsel, Lowenstein Sandler.

The letter reiterated Cerberus's attempt on August 29, 2007 to discuss the terms of the LBO with

the intent to renegotiate, and protested URI's filing of the Preliminary Proxy Statement without

including certain of Cerberus's substantive comments. URI did not disclose this August 31,

2007 letter until after Cerberus had repudiated the LBO. The letter stated:

> As you know, on August 29, 2007, we communicated to UBS
> Investment Bank our desire to have a conversation with United
> Rentals, Inc. . . . about the terms of the Agreement and Plan of
> Merger, dated as of July 22, 2007, among URI, Ram Holdings, Inc.
> and Ram Acquisition Corp. . . . *We are troubled by URI's refusal
> to discuss the Merger Agreement with us.*
>
> *Our request for a discussion was prompted by our concerns
> about recent unanticipated developments in the credit and
> financial markets.* We fully understand the terms and conditions
> of the Merger Agreement, Guarantee and Stockholders Agreements
> (each as defined in the Merger Agreement) and related agreements.
> *We believe it is in all of the parties' best interests to discuss the
> impact of these unanticipated market developments sooner rather
> than later. We would have expected that URI's Board of
> Directors would prefer to address these concerns now through a
> constructive dialogue.*
>
> We are also troubled by URI's actions surrounding the filing of the
> Proxy Statement (as defined in the Merger Agreement). We raised
> a number of comments on the last draft we received, but *URI
> chose to file the Proxy Statement without addressing our
> substantive comments or even discussing them with our counsel*.
> In light of the foregoing concerns, we are renewing our request to
> discuss the terms of the Merger Agreement. We will look forward
> to your response.

(Emphasis added).

83.    In context, the fact that Cerberus stated it believed it was in the parties' interest to

deal with these issues "*sooner rather than later*" was of enormous importance. It indicated that

Cerberus's invitation to renegotiate was not merely a passing overture. Unless and until the price

33

term of the LBO was renegotiated, there was *a continuing, significant undisclosed risk* that

Cerberus would abandon the Transaction. Cerberus was not a party to the Merger Agreement,

and if it did not supply the essential equity infusion, the LBO could not take place. Preferably

"sooner rather than later," but in any event before any scheduled closing date, Cerberus would

have to make a final decision as to whether or not to proceed with that $1.5 billion equity

infusion. The worsening credit markets provided an objectively verifiable basis upon which URI

could assess the ever-diminishing likelihood that Cerberus would supply that equity infusion on

the announced terms.

     84.     When Cerberus advised in its oral communications and correspondence with URI

that it would be better to deal with the issue of price "sooner rather than later" and that Cerberus

thought that "the [URI] board would want to address the issue now," URI could not rationally

construe Cerberus's letter to mean anything other than that Cerberus considered the financial

terms of the LBO subject to renegotiation until the point of closing -- and the more credit market

conditions continued to weaken, the greater the need for renegotiation became. URI's complete

failure to address this present and identifiable threat represented a gross departure by the URI

Board from the fiduciary duties of informed deliberation and action which it owed to URI's

public security holders -- security holders who were completely in the dark as to this material

undisclosed risk. URI's conduct was especially reckless in failing to inquire of Cerberus about

the pricing risk when it knew unequivocally that the Transaction could not close without

Cerberus's final decision to provide the necessary $1.5 billion in equity, and that if Cerberus

opted not to proceed (which it could do at any time), URI could not (by litigation or otherwise)

compel it to go forward. This pricing risk was plainly real: just one month earlier, Cerberus had

renegotiated the terms of its Chrysler acquisition based upon the same deterioration in the credit

markets which it cited to URI.

### 5.   The September 6, 2007 Letter From URI To Cerberus In Which URI Refuses To Meet With Cerberus Regarding Proposed Revisions To The Merger Agreement

85.    On September 6, 2007, URI sent a letter to Cerberus (the "September 6, 2007

Letter") responding to the August 31, 2007 Letter and other related discussions, including the

August 29, 2007 telephone discussion referenced in the August 31, 2007 Letter.

86.    The September 6, 2007 Letter was written by Keith Wimbush, Chair of the URI

Board's Transaction Committee, at the request of the URI Board, and was addressed to Stephen

Feinberg, Chief Executive Officer of Cerberus.  Among the parties copied on the letter were

Defendant Schwed, URI's Board and Mayer.  The September 6, 2007 Letter stated in relevant

part, that:

> As our advisors previously communicated to your colleagues,
> Steven Mayer and Mike Green, *there is no basis for any*
> *discussion regarding changes to the merger agreement*.  The sole
> basis cited in the letter is your organization's "concerns about
> recent unanticipated developments in the credit and financial
> markets."  We fail to see how these developments have any
> relevance to our negotiated transaction, as their impact is expressly
> carved out of the merger agreement. Section 3.1 of the merger
> agreement, for example, is clear that "facts, circumstances, events,
> changes, effects or occurrences . . . generally affecting the economy
> or the financial, debt, credit or securities markets in the United
> States . . ." do not excuse *RAM's performance* under our
> agreed-upon transaction.  Moreover, *RAM* has committed debt
> financing which by its terms is not conditioned on the
> developments referenced in your team's letter.

> \*       \*       \*

> Simply put, we are sorely disappointed that *your organization is*
> *now looking to renegotiate our deal* without cause or contractual
> support. Steve and Mike repeatedly represented at the time of our
> negotiations that Cerberus prided itself on not renegotiating its

35

deals and should be viewed as being in the same league as other top-tier private equity firms. *RAM's* seeking any modifications to the merger agreement is wholly inconsistent not only with these representations but also with the good faith discharge of its contractual obligation to use its reasonable best efforts to consummate the merger.

Finally, RAM's complaints about our filing the preliminary proxy statement without calling its counsel to discuss the final few comments sent for our review are not warranted. We provided RAM with a number of drafts of the proxy statement, and we waited to file the proxy statement until we had a chance to carefully consider and discuss with our advisors all of the suggestions RAM submitted.

(Emphasis added).

87.    In this carefully worded letter, URI acknowledged that it was clearly aware that Cerberus (not the RAM Entities) was "looking to renegotiate" the terms of the Merger Agreement, a highly material fact which URI was required to disclose to the investing public. URI also reiterated its unwillingness to even discuss the matter, exhibiting a gross departure from its fiduciary duties to shareholders. Those duties required the URI Board to explore the extent of the risk to the consummation of the LBO in light of the fact that Cerberus -- the equity sponsor of the Transaction -- had reiterated that it could walk away from the LBO for $100 million at any time notwithstanding any obligations of the RAM Entities, which were judgment-proof.

88.    Cerberus did not respond immediately to the September 6, 2007 Letter from URI, since it had been told flatly that there was "no basis for any discussion," but its silence cannot legitimately be read as acquiescence. Cerberus gave URI no reason to believe that Cerberus had abandoned its request to renegotiate the Transaction at a lower price. Indeed, when Cerberus advised URI on November 12, 2007 that it was not prepared to proceed with the LBO on the agreed-upon terms, Cerberus referred back to its earlier renegotiation efforts when it expressed a continuing willingness to acquire URI, albeit on revised terms.

**F.    Negative Developments In The Financial Markets And URI's
        Disappointing Cash Flow Cause Cerberus To Further Reevaluate
        The Purchase Price Of The LBO**

89.    Following URI's September 6, 2007 Letter, Cerberus (together with its financial
advisors) continued its internal analyses of the terms upon which a possible renegotiated LBO
might be structured. This effort included continued intensive due diligence investigations of
URI's financial condition and the creation of internal "Late Recession Comparative Analyses" of
URI. These efforts provided Cerberus with little encouragement. For the three months ended
September 30, 2007, URI's cash flow from operations (a key metric for assessing the Company's
performance) was $164 million, representing a **31% decrease** over the comparable quarter a year
earlier. The ability of URI's operations to throw off sufficient cash to service its vastly increased
debt was a critical component in Cerberus's evaluations of the Transaction. Along with the
increased cost of that debt service, URI's significant decline in reported cash flow had a material
adverse impact on the evaluations Cerberus had performed prior to executing the Merger
Agreement which lent support to the $34.50 per share Transaction price from a financial point of
view. This fact was not lost on URI, which itself acknowledged on October 31, 2007 that "*[i]f
and when* the announced merger closes, we expect our cash needs for debt service to increase
significantly." URI Form 10-Q for the period ended September 30, 2007, filed with the SEC on
November 1, 2007 (the "November 1, 2007 Form 10-Q"), at p. 30.

90.    On September 5, 2007, a PrivateEquityOnline.com article reported on the
continued worsening of the credit markets and the resulting impact on leveraged buyout deals.
That article reported that such deals fell 64% worldwide in August 2007 as a result of the
continued decline of the credit markets and lack of liquidity in the debt markets. It further

reported that there were only \$4.2 billion worth of leveraged buyouts announced in the U.S. in August 2007 -- down 68% from 2006, representing the lowest volume since January 2004.

91.     The statistics reported in the September 5, 2007 article emphasized the risk that the LBO would not close unless URI renegotiated the price term. Nonetheless, URI continued to refuse to speak to Cerberus about such a renegotiation -- with full knowledge that Cerberus could, and was increasingly likely to, walk away from the deal upon payment of the \$100 million Termination Fee.

## G.     The September 19, 2007 Final Proxy Statement

92.     On September 19, 2007, less than two weeks after URI had refused to communicate with Cerberus concerning the terms of the LBO, URI filed with the SEC and disseminated to the Company's shareholders its Final Proxy Statement, seeking shareholder approval of the LBO on the previously announced terms.

93.     The Final Proxy Statement reiterated *verbatim* the Preliminary Proxy Statement's discussions quoted above at paragraphs 77-80 concerning the supposed benefits of the LBO and the "potentially adverse factors." In doing so, it reiterated the failures of disclosure in the Preliminary Proxy Statement. In addition, it included a lengthy discussion of URI Board meetings and certain events leading up to the Merger Agreement, as well as various actions by Cerberus and other bidders. It stated the following:

> Following the announcement of the execution of the merger
> agreement, Sponsor C (on behalf of itself and its portfolio
> company, Company Y) contacted representatives of UBS and
> expressed an interest in pursuing a possible transaction with the
> Company. The Sponsor C/Company Y group informed
> representatives of UBS that they were interested in conducting due
> diligence, and on July 27, 2007, in accordance with the "go-shop"
> provisions of the merger agreement, representatives of the Sponsor
> C/Company Y group were given access to due diligence materials.
> During the week of July 30, 2007, the Sponsor C/Company Y

38

group held a number of due diligence meetings with the Company and its representatives, and members of the Company's management conducted in-depth business presentations with Sponsor C/Company Y. During the course of the next three weeks, Sponsor C/Company Y continued their due diligence review of the Company. *On August 31, 2007, representatives from UBS spoke with a senior representative of Sponsor C. This senior representative informed UBS that the Sponsor C/Company Y group had largely completed its due diligence review but that due to the financing markets, among other things, it would not be able to make a proposal to the Company that was superior to the transaction contemplated by the merger agreement at the current time.* This senior representative further noted that the Sponsor C/Company Y group remained interested in the possibility of acquiring the Company. *In this regard, the senior representative of Sponsor C discussed with UBS that the Sponsor C/Company Y group would continue to monitor the pending transaction and the market environment so as to evaluate whether any future developments would make it more practical for this group to put forth a competing proposal.*

Also following the execution of the merger agreement, representatives of UBS contacted each of Sponsor A and Sponsor B, as well as two additional parties who had previously indicated an interest in considering a transaction with the Company. Sponsor B and one of the additional two parties each informed UBS that it was not interested in pursuing a transaction with the Company. The other additional party expressed an interest in certain assets of the Company, but informed representatives of UBS that it was not interested in pursuing an acquisition of the whole Company. *Sponsor A, however, reiterated its interest in acquiring the Company and periodically contacted UBS in this regard. During the last week of August, Sponsor A informed the Company that it remained interested in pursuing a transaction with the Company, but that it was not in a position to make a proposal to the Company that was superior to the transaction contemplated by the merger agreement. Sponsor A stated that it would continue to monitor the pending transaction and market conditions to see if an opportunity to re-evaluate its position would arise.*

As of the date of this proxy statement, none of these potential acquirors or any other potential acquiror has submitted a proposal to pursue a transaction with the Company.

Final Proxy Statement, at 32 (emphasis added).

94.     This minutely detailed discussion of URI's failed efforts to attract other bidders during the period permitted for such efforts by the Merger Agreement (known as the "go-shop" period) attributed the failure of those efforts to *"the financing markets, among other things."* Despite this, the Final Proxy Statement contained not one word about the expressed reluctance of Cerberus, the "successful" bidder, to close the LBO on the announced terms for the same "financing markets" reasons that had dissuaded the "unsuccessful" bidders -- notwithstanding the fact that Cerberus had expressly requested such a disclosure.

95.     Instead, the Final Proxy Statement contained (without qualification) the following language with respect to Cerberus's equity commitment. "Parent [RAM Holdings] has obtained an aggregate of $1.5 billion in equity commitments from Cerberus. . . . The merger agreement does not contain a financing condition to the closing of the merger." Final Proxy Statement, at p. 14. *In fact, however, URI could not require Cerberus to provide the $1.5 billion and had agreed not to sue Cerberus if it failed to do so.* No disclosure in this document revealed that important fact.

96.     The Final Proxy Statement continued to assure investors that URI anticipated "completing the merger during the last quarter of 2007 " -- by necessary implication, meaning that the terms for "completing" the LBO would be those which the Final Proxy Statement was asking the shareholders to approve.

97.     As discussed more fully below, each of these statements in the Final Proxy Statement was materially misleading and omitted the glaringly material facts that Cerberus considered the LBO to be in serious jeopardy and had sought to renegotiate its terms "sooner rather than later." There was at that point a known and substantial undisclosed risk that (as Cerberus had pointedly warned) the deal would *not* close at the announced price because of

40

credit market developments -- a risk that was exacerbated in the period after dissemination of the Final Proxy Statement because of continued adverse developments.

## H. Continued Adverse Developments in the Credit Markets

98.     On October 8, 2007, the Weekly Corporate Growth Report ("WCGR") reported on the continuing impact of the credit crunch on corporate transactions. As this publication disclosed, the dollar value of the deals terminated in the U.S. from January 2007 to September 2007 was $214 billion, representing an increase of 62% over the same period in 2006. As a result of the deterioration in the credit markets, WCGR reported that equity buyout spending on an annual basis fell 84% from $44 billion in the third quarter of 2006 to only $7 billion in the third quarter of 2007. According to this report, "[r]ecent changes in the lending markets *may be considered adverse material changes* for companies that deal in those markets, *giving buyers for such companies a reason to pull out of those deals*." (Emphasis added). The October 8, 2007 WCGR cited a recent instance in which Cadbury Schweppes plc terminated a deal for its United States beverages unit when the buyer asked the seller to assist in financing that transaction because of the credit crunch.

## I. URI Holds Its Stockholders Meeting To Approve The Transaction And Issues A Press Release; The Market For URI Stock Stabilizes

99.     On October 19, 2007, URI held its stockholders meeting. Immediately afterwards, URI issued a press release announcing that its shareholders had "approved the merger agreement providing for the purchase of the Company by affiliates of Cerberus Capital Management, L.P." Upon this announcement, the market for URI common stock stabilized a few cents below the Transaction price of $34.50 per share, and traded in that range for nearly a month.

100.    Reproduced below is a chart showing the daily closing prices of URI common stock during the period covered by this Second Consolidated Amended Complaint, annotated with the dates of significant events pleaded herein.

[SEE GRAPH ON FOLLOWING PAGE]



United Rentals, Inc.
Event Study
Closing Prices - New York Stock Exchange

43

**J.    Cerberus Abandons Its Acquisition Of Affiliated Computer Citing The Downturn In The Credit Markets**

101.    On October 31, 2007, *The Wall Street Journal* reported that Cerberus itself had

terminated its pending $6.2 billion leveraged buyout transaction of Affiliated Computer Services

("ACS"), citing *"the continuation of poor conditions in the debt markets"* as the reason.

(Emphasis added). The article stated that the deal had become increasingly difficult to finalize

because Cerberus and ACS had difficulty obtaining financing. According to *The Wall Street*

*Journal*, "[w]ith the recent downturn in the credit markets, sellers have lost some of their

leverage, leaving some deals in the lurch."

**K.    The October 31, 2007 Press Release And November 1, 2007 Form 8-K**

102.    On October 31, 2007, URI issued a press release (the "October 31, 2007 Press

Release"), which was later attached as an exhibit to a Form 8-K filed with the SEC by the

Company on November 1, 2007 (the "November 1, 2007 Form 8-K"). The October 31, 2007

Press Release stated, in relevant part, that:

> On July 23, 2007, the company announced that it had signed a
> definitive merger agreement to be acquired by affiliates of
> Cerberus. The signing followed the April 10, 2007 announcement
> that the board of directors had authorized a process to explore a
> broad range of strategic alternatives to maximize shareholder
> value. The board of directors then approved the merger agreement
> and recommended the adoption of the merger agreement by United
> Rentals stockholders. On October 19, 2007, at a special meeting,
> stockholders approved the merger agreement. **Subject to the**
> **provisions of the merger agreement,** the company currently
> expects the transaction to close on or about November 16, 2007.
> **Completion of the transaction is subject to customary closing**
> **conditions, but is not subject to a financing condition.** The
> acquiring Cerberus affiliate **has obtained debt and equity**
> **financing commitments** for the transactions contemplated by the
> merger agreement, the aggregate proceeds of which will be
> sufficient to pay the aggregate merger consideration, related fees
> and expenses and any required refinancings or repayments of

44

existing company indebtedness.

(Emphasis added).

103.    This press release was materially false and misleading.  It carried the necessary

implication that both Cerberus and URI had agreed to close on the previously-announced terms,

which was false; it omitted to state that Cerberus was not a party to the Merger Agreement and

could pull out of the deal and not supply the required $1.5 billion in equity financing upon

payment of a $100 million termination fee; it stated that there was no "financing condition" to

completion of the Transaction when the necessity for Cerberus to supply $1.5 billion in equity in

order for the Transaction to close was a "financing condition" of the first magnitude; and it

completely omitted to comment on the fact of (or the underlying reasons for) Cerberus's decision

announced *that day* to terminate another leveraged buyout because of "the continuation of poor

conditions in the debt markets."

## L.    Before The Scheduled Closing, Cerberus Reiterates Its Intent To Renegotiate Its Transaction With URI

104.    On November 12, 2007, Cerberus's Stephen Feinberg met with bankers for URI at

his office in New York City and informed them once again that he wanted to renegotiate the

price of the LBO.  Feinberg also asked again to meet with the URI Board to discuss renegotiating

the terms of the Transaction.  During those discussions, which were not disclosed publicly,

Cerberus reiterated the credit market concerns it had raised with the URI Board in late August

and expressed the view that Cerberus remained interested in pursuing a merger transaction with

URI -- but not on the previously announced terms.  These discussions bore no fruit.

## M.    Cerberus Formally Withdraws From The LBO

105.    On November 14, 2007, at 9:37 a.m. Eastern Time, it was reported that *Reuters*

had indicated that Cerberus was considering withdrawing from the LBO as a result of Cerberus's

concerns about URI's outlook and the significant deterioration in the credit markets, which were making it difficult for investment banks to sell debt offerings for the deal. At 10:06 a.m. Eastern Time, *Reuters Limited* issued a confirming report. In the afternoon, before the market closed for trading, URI issued a press release finally acknowledging its dispute with Cerberus and revealing that there was a substantial risk to the closing of the LBO.

106. Cerberus's withdrawal from the Transaction cannot have come as a surprise to URI's Board. Cerberus had communicated to URI beginning on August 29, 2007 that it intended to renegotiate the terms of the Transaction due to the deteriorating credit markets, and the condition of those markets continued to worsen thereafter. Indeed, in a press release, dated November 15, 2007, when asked about the collapse of the United Rentals deal, Cerberus said that *it approached URI in August 2007 "as conditions in the capital markets continued to worsen"* to *"either to arrange for the payment of the negotiated $100 million termination fee, or to engage United Rentals in a constructive dialogue to negotiate a transaction on revised terms."* (Emphasis added). According to Cerberus, and as demonstrated by the letters between Cerberus and URI as well as the August 30, 2007 URI Board minutes, URI had refused to meet with Cerberus or engage in any discussion regarding renegotiation of price terms.

107. Senior executives of URI knew affirmatively during the Class Period that there was a serious risk that Cerberus would seek to renegotiate if not abandon the Transaction, and had every reason to believe that URI's sole remedy if Cerberus did so would be to pursue the $100 million Termination Fee. For example, in an e-mail exchange on November 14, 2007 between URI's Vice President for Marketing Strategy, Ken Mettel, and Jay Maymudes of Westford Capital LLC, Mettel volunteered that he *"never trusted Cerberus*, which is why

[Mettel] was glad [he] had [a] 10b5-1 [plan]" pursuant to which he "sold all [of his] vested stock prior to close" of the deal. (Emphasis added).

108.    Following the close of the market on November 14, 2007, URI filed with the SEC a Form 8-K disclosing for the first time the August 31, 2007 Letter and the September 6, 2007 Letter. This November 14, 2007 Form 8-K also included as an exhibit Cerberus's letter sent to URI that same day in which Steven Mayer, Cerberus's President, stated, in pertinent part, that RAM Holdings was prepared to engage in a "constructive dialogue" about revised terms, or in the alternative to pay the Termination Fee of $100 million.

### N.    **The Market Reaction**

109.    In reaction to the disclosures on November 14, 2007, URI's common stock declined on extraordinary volume (exceeding 36 million shares) from an opening price of $34.37 per share on November 14 -- a slight discount to the $34.50 per share deal price -- to a closing price of $23.50 per share, a more than 31 percent decline. Thus, when Cerberus announced it would not be prepared to proceed on the price and other terms set forth in the Merger Agreement, URI common shares lost more than 30% of their value, or almost $900 million in market capitalization. URI's other publicly issued securities also experienced material causally-related price declines.

110.    The next day, November 15, 2007, a PrivateEquityOnline.com article reported that "the value of canceled deals globally ha[d] already broken the $200 billion mark [in 2007], far surpassing [the total value of canceled deals in 2006] of $127.1 billion."

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
## STATEMENTS AND OMISSIONS OF MATERIAL FACT

111.    The Class Period begins on August 30, 2007, the date that URI filed its Preliminary Proxy Statement with the SEC and just one day after Cerberus first approached URI

seeking to renegotiate the price of the Transaction. As discussed above, during the entire Class Period, Defendants were fully aware that the credit markets were deteriorating at unprecedented levels. Because of the August 29, 2007 call from Cerberus's president Mayer, Defendants were also aware during the entire Class Period that, as a result of the severe credit crunch, the Transaction was in serious jeopardy of not closing because Cerberus could opt not to provide the necessary $1.5 billion infusion of equity capital and wanted to renegotiate. Defendants were further aware that Cerberus was not a party to the Merger Agreement, was not bound by its terms and, thus, had pointed out to URI that it could walk away from the deal by paying the $100 million Termination Fee pursuant to the Limited Guarantee. URI was fully aware that it had agreed not to sue Cerberus.

112.    Notwithstanding Defendants' knowledge of these facts, URI never disclosed in its filings with the SEC or its other public statements the real and substantial risk that Cerberus might terminate the Transaction at any time by simply paying the Termination Fee. In particular, URI never disclosed the critical language of the Limited Guarantee which made this clear. Instead, throughout the Class Period, Defendants made numerous material misrepresentations and omissions, discussed below, that served to persuade the public that the deal was "on track." This artificially inflated the price of URI common stock and continued to cause the stock price to be artificially inflated throughout the Class Period.

113.    The nondisclosures alleged herein were particularly material to investors under applicable SEC guidelines due to the fact that at all relevant times, URI had every reason to know that the disclosure of Cerberus's request to renegotiate the terms of the LBO -- and in particular the price to be paid per share of URI stock -- would result in a significant negative market reaction. *See* SEC Staff Accounting Bulletin No. 99. Indeed, URI shares lost more than 30% of

48

their value (almost $900 million in market capitalization) when Cerberus announced it would not be proceeding with the LBO.

## A. The August 30, 2007 Preliminary Proxy Statement

114. The operative statements in the Preliminary Proxy Statement of August 30, 2007 are quoted at paragraphs 77-80 above.

115. By choosing to speak about specific terms of the Merger Agreement, the generic risks of the deal and potentially adverse factors, Defendants put such topics "in play" and, therefore, had a duty to disclose facts to ensure those disclosures were complete and accurate so as not to mislead. Defendants violated those disclosure obligations by failing to disclose that: (a) consummation of the LBO was wholly dependent upon Cerberus providing equity financing for the Transaction; (b) Cerberus's obligation to provide $1.5 billion in equity capital to fund the LBO was merely an obligation to its own subsidiaries and could not be enforced by URI; (c) Cerberus's only obligation to URI was contained in Cerberus's guarantee of the $100 million Termination Fee; (c) the Limited Guarantee specifically insulated Cerberus from any attempt by URI to "institute ... any proceeding or bring any claim" against Cerberus in connection with the Transaction; (d) as a result of the significant deterioration in the credit markets, Cerberus approached URI on August 29, 2007 seeking to renegotiate the terms of the LBO (in particular, the price term); (e) URI deliberately refused even to discuss the matter with Cerberus, in violation of its fiduciary responsibilities to shareholders to investigate and keep them informed of the potential risks and impact of Cerberus's request; and as a result of (a) through (e) there was a known substantially elevated risk that the LBO would not close on the terms contemplated by the Merger Agreement -- if at all -- if credit market conditions continued to deteriorate. Thus, Defendants' statements above were materially false and misleading when made.

49

116.   Moreover, URI's affirmative statement that a "potentially adverse factor[]" was

that the Company's remedy for losses or damages if the LBO were terminated "***could be*** limited

to the $100 million limited guarantee provided by Cerberus" (emphasis added) was merely a

statement of generic risk, when in fact there was a real and material threat throughout the Class

Period that a triggering event under the Limited Guarantee would occur.

117.   In addition, Defendants falsely represented in the Preliminary Proxy Statement

that URI "anticipate[d] completing the merger during the last quarter of 2007." Defendants'

statement was materially false and misleading because, in light of the rapidly deteriorating credit

markets and Cerberus's pointed requests to renegotiate the price or risk termination, Defendants'

statement lacked any reasonable basis.

**B.      The September 19, 2007 Final Proxy Statement**

118.   On September 19, 2007, URI filed with the SEC and disseminated to the

Company's shareholders the Final Proxy Statement. The Final Proxy Statement was signed by

Defendant Kneeland and proxies were solicited by the Board of URI, as attested to by Defendant

Schwed. The operative statements in the Final Proxy Statement are quoted at paragraphs 93-96

above.

119.   The Final Proxy Statement repeated *verbatim* the generic descriptions contained

in the Preliminary Proxy Statement of the "potentially adverse factors" concerning the LBO and

the potential risks to its completion.

120.   These statements concerning potentially adverse factors and the purported risks to

the completion of the LBO contained in the Final Proxy Statement were materially false and

misleading, and omitted material facts necessary to make the statements made not misleading, for

the same reasons applicable to the Preliminary Proxy Statement set forth in paragraphs 115-17

above. In addition, by September 19, 2007, when the Final Proxy Statement was filed, URI had become even more fully aware than at the time of the Preliminary Proxy Statement of the risk that Cerberus might well not consummate the LBO because of: (i) the additional correspondence between Cerberus and URI on August 31, 2007 and September 6, 2007, in which Cerberus continued to press URI to renegotiate the terms of the LBO and in which URI flatly refused to enter into a dialogue with Cerberus; and (ii) the continued deterioration in the credit markets.

121.    Moreover, URI's statement that a "potentially adverse factor[]" was that the Company's remedy for losses or damages if the LBO were terminated "*could be* limited to the $100 million limited guarantee provided by Cerberus" was seriously misleading because Cerberus had twice actually used the threat of walking away from the deal and paying the fee as a club to persuade URI to renegotiate, and URI had twice refused to do so. Thus, URI was under a duty to disclose that, before closing, Cerberus would have to decide whether or not to make its $1.5 billion equity contribution, and that if it decided not to do so Cerberus had a well-grounded belief that it could walk away from the deal upon payment of the $100 million Termination Fee. Defendants, however, made no mention of any of these matters, and never went beyond their generic and totally uninformative risk disclosures.

122.    The Final Proxy Statement also included a lengthy discussion of URI Board meetings and events leading up to the Merger Agreement and various actions by Cerberus and other actual and potential bidders through August 31, 2007, the date after which the Merger Agreement no longer permitted URI to seek a better offer. ¶ 93.

123.    This lengthy recital of essentially irrelevant events (culminating in each instance in the withdrawal of potential bidders from the field because they could not match the terms offered by Cerberus) was materially false and misleading when made because such disclosures

51

were designed to cause investors to believe that they were being given the full story as to developments concerning the LBO after the signing of the LBO documents, when in fact the most important developments -- those concerning Cerberus's own explicitly-declared misgivings about the deal -- were entirely omitted. In particular, URI failed to disclose the discussions at the August 30, 2007 Board meeting where the Board (with the assistance of litigation counsel) specifically addressed Cerberus's request to renegotiate and deliberately chose not even to engage in discussions with Cerberus. In this special context, disclosure of Cerberus's request to renegotiate was clearly necessary so as not to render what was said about the negotiations with other bidders entirely misleading, because the logical underpinning of the entire discussion was the unstated but necessary assumption that Cerberus was committed to the terms of the Merger Agreement, which was the most favorable deal possible for URI. At that time, URI had no sound factual basis for believing (much less representing) that the LBO would close on the terms set forth in the Merger Agreement.

124.    In the same vein, the Final Proxy Statement continued to assure investors that URI anticipated "completing the merger during the last quarter of 2007." Defendants' statement was materially false and misleading because, in light of the rapidly deteriorating credit markets and the uncertainty that Cerberus would proceed with the LBO unless the parties could renegotiate the price, Defendants' statement lacked any reasonable basis.

## C.    The October 19, 2007 Press Release

125.    On October 19, 2007, URI issued a press release (the "October 19, 2007 Press Release") announcing that its stockholders, at a special meeting held earlier in the day, had approved the Merger Agreement providing for the LBO of the Company by shell entities formed by Cerberus, and that "[t]he Company currently anticipates that the transaction will close in

November 2007." This press release was made an Exhibit to the Company's Form 8-K, filed with the SEC on the same day (the "October 19, 2007 Form 8-K).

126.    The October 19, 2007 Press Release and October 19, 2007 Form 8-K were materially false and misleading for the reasons set forth in paragraphs 115, 117, 120, and 124 above.

### D.    The October 30, 2007 Form 8-K

127.    On October 30, 2007, URI filed with the SEC a Form 8-K (the "October 30, 2007 Form 8-K") signed by Defendant Schwed and stating that: "Subject to the provisions of the merger agreement, the Company currently anticipates completing its merger with an entity indirectly controlled by affiliates of Cerberus Capital Management, L.P. on or about November 16, 2007."

128.    The statement made in the October 30, 2007 Form 8-K was materially false and misleading for the same reasons set forth in paragraphs 115, 117, 120, and 124 above.

### E.    The October 31, 2007 Press Release And November 1, 2007 Form 8-K

129.    On October 31, 2007, URI issued a press release, which was later attached as an exhibit to a Form 8-K filed with the SEC by the Company on November 1, 2007. The relevant portions of the October 31, 2007 Press Release are quoted above at paragraph 102.

130.    The October 31, 2007 Press Release and November 1, 2007 Form 8-K were materially misleading for the reasons set forth in paragraphs 103, 115, 117, 120, and 124 above. In addition, the statements that the closing "is not subject to a financing condition" and that the acquiring Cerberus affiliate "has obtained [an] equity commitment" were highly misleading because the fact that Cerberus was not a party to the cited Merger Agreement -- and could pull out of the deal and not supply the anticipated $1.5 billion in equity financing upon payment of a

53

$100 million termination fee -- *constituted*, in practical effect, a highly important financing

condition. In short, if Cerberus declined to provide the equity financing, the deal was dead.

**F.    The November 1, 2007 Form 10-Q**

131.    On November 1, 2007, URI filed with the SEC a Form 10-Q for the fiscal quarter

ended September 30, 2007. According to Exhibit 31(a) to the November 1, 2007 Form 10-Q,

Defendant Kneeland certified that it did not "contain any untrue statement of a material fact or

omit to state a material fact necessary to make the statements made, in light of the circumstances

under which such statements were made, not misleading with respect to the period covered by

this report."

132.    The November 1, 2007 Form 10-Q made the following statement (on page 8)

concerning the LBO:

> In April 2007, we announced that our board of directors had
> authorized the commencement of a process to explore a broad
> range of strategic alternatives to maximize shareholder value,
> including a possible sale of the Company, and had retained
> financial advisors in this process. On July 23, 2007, we announced
> that we had signed a definitive merger agreement to be acquired by
> affiliates of Cerberus Capital Management, L.P. . . . , in a
> transaction valued at approximately $6.66 billion, inclusive of
> approximately $2.60 billion in outstanding debt obligations, but
> exclusive of transaction costs. **Completion of the transaction is
> subject to customary closing conditions, including approval of
> the transaction by our stockholders, but not to a financing
> condition.** On October 19, 2007, at a special meeting of our
> stockholders, the merger agreement was approved. **We currently
> expect the transaction to close on or about November 16, 2007,
> but cannot guarantee this timing or result.**

(Emphasis added).

133.    The November 1, 2007 Form 10-Q was materially false and misleading for the

reasons stated in paragraphs 103, 115, 117, 120, 124, and 130 above.

## G.    The November 7, 2007 Form 8-K

134.    On November 7, 2007, URI filed with the SEC a Form 8-K (the "November 7,

2007 Form 8-K"), signed by Defendant Schwed. The November 7, 2007 Form 8-K stated that:

> On July 22, 2007, as previously disclosed, United Rentals, Inc.
> ("URI") entered into an agreement and plan of merger . . . with
> affiliates of Cerberus Capital Management, L.P.
>
> URI expects that the consummation of the transactions
> contemplated by the Merger Agreement, including payment of the
> merger consideration to URI equity holders, the repayment of
> existing debt of URI and its subsidiaries and the payment of related
> fees and expenses, will be financed with a combination of (1)
> proceeds from the private sale of certain new debt securities (the
> "Debt Securities"), (2) borrowings under new credit facilities, (3)
> equity contributions and (4) cash on hand.

135.    The November 7, 2007 Form 8-K was materially false and misleading for the

reasons set forth in paragraphs 103, 115, 117, 120, 124, and 130 above.

## VI.    POST-CLASS PERIOD DEVELOPMENTS

136.    On November 15, 2007, RAM Holdings filed with the SEC an amendment to its

previously-filed August 1, 2007 Schedule 13D. The amended Schedule 13D (the "Schedule

13D/A"), contained the following disclosure concerning the Merger Agreement and the LBO:

> On November 14, 2007, RAM [Holdings] notified the Company
> that it is not prepared to proceed with the acquisition of the
> Company on the terms contemplated by the Merger Agreement and
> offered either to arrange for the payment of the negotiated $100
> million termination fee or to engage the Company in a constructive
> dialogue to negotiate a transaction on revised terms. A copy of the
> letter delivered by RAM is attached hereto as Exhibit 1 and is
> incorporated herein by reference.
>
> The Merger Agreement was negotiated in July 2007, when the debt
> capital markets were beginning to deteriorate. **Due to the
> resulting uncertainty, RAM  required that its liability be
> limited to $100 million, which is the Company's exclusive
> remedy in the event that RAM and Merger Sub do not
> consummate the transaction, and RAM agreed to a higher per**

**share purchase price in consideration for this limitation on liability.** The limited guarantee provided by Cerberus Partners, L.P. . . . in favor of the Company, a copy of which is attached hereto as Exhibit 2 and is incorporated herein by reference . . . in respect of RAM's and Merger Sub's obligations under the Merger Agreement was similarly expressly limited to $100 million, and recovery of that amount was expressly stated to be the Company's sole and exclusive remedy under the Limited Guarantee. The $100 million limitation of liability was specifically negotiated, was unconditional and was not dependent on the occurrence of a material adverse change. As one indication of the importance to Cerberus of this limitation of liability under the Limited Guarantee, the parties agreed that in the event that the Company challenged the validity of the limitations set forth in the Limited Guarantee, the Company would forfeit its right to recover any amount under the Limited Guarantee.

In August 2007, as conditions in the capital markets continued to worsen, RAM contacted the Company and its representatives and asked to engage in a constructive dialogue to address concerns arising out of these developments. The Company refused to meet or engage in this dialogue. Since that time, RAM has been diligent in its efforts to consummate the transaction, but has encountered sustained volatility in the credit markets, which has had a variety of adverse consequences.

(Emphasis added).

137.    RAM Holdings' Schedule 13D/A attached a copy of the Limited Guarantee as

Exhibit 2. *That was the first public disclosure of this critical document,* which fully supported

Cerberus's contentions asserted in the Schedule 13D/A that it could abandon the Transaction

solely upon the payment of the Termination Fee.

138.    In reaction to this disclosure, URI's common stock declined once again on

November 15, falling from its opening price of $23.85 per share to close at $22.91 per share.

The prices of URI's other publicly issued securities also declined, as set forth *infra.*

139.    On November 19, 2007, URI issued a press release announcing that the Company

had filed the Delaware Action against the RAM Entities, seeking "specific performance" by the

"Cerberus acquisition vehicles to complete the agreed-upon transaction" pursuant to provision 9.10 of the Merger Agreement. Cerberus itself was not (and could not have been) joined as a defendant.

140. On December 21, 2007, the Delaware Chancery Court issued a decision finding that the RAM Entities were "not obligated to complete their purchase of United Rentals." Specifically, after a two-day bench trial focusing on the understanding of the parties as to the remedies provided by the Merger Agreement, Chancellor Chandler found that neither RAM Holdings nor RAM Acquisition had breached the terms of the Merger Agreement. The Chancery Court based its decision predominantly on evidence presented at trial which indicated that, in the course of negotiations, Cerberus had clearly communicated its intentions and understandings to URI that it could choose not to proceed with the LBO in return for paying the Termination Fee of $100 million and that the $100 million Termination Fee was the "sole and exclusive" "recourse available to URI in the event the Merger Agreement failed to close." Chancellor Chandler further found that Cerberus "communicated this understanding to URI in such a way that URI either knew or should have known of their understanding." Given that (1) no agreement affording URI the right to specific performance had been reached, (2) URI knew Cerberus's position that specific performance was not a remedy for termination of the LBO, and (3) URI failed to convey any contrary understanding to Cerberus, the Delaware Chancery Court concluded that URI could not compel specific performance even by the RAM Entities.

141. On December 24, 2007, URI announced that it would not appeal the Chancery Court's decision and that it had "delivered a notice of termination of their July 22, 2007 Merger Agreement with RAM Holdings, Inc. and RAM Acquisition Corp." In delivering the notice, URI

requested that Cerberus pay URI the $100 million Termination Fee required by the Merger

Agreement. Cerberus subsequently paid the Termination Fee.

## VII.  ADDITIONAL SCIENTER ALLEGATIONS

142.    As alleged herein, each of the Defendants acted with scienter in that Defendants

knew or recklessly disregarded that the public statements and documents identified above, issued

and disseminated in the name of the Company during the Class Period, were materially false and

misleading, knew or acted with recklessness in disregarding that such statements and documents

would be issued and disseminated to the investing public, and knowingly and substantially

participated and/or acquiesced in the issuance or dissemination of such statements and

documents as primary violators of the federal securities laws.

143.    The Defendants' scienter is demonstrated in part by the fact that they engaged in a

"failure to check information they had a duty to monitor" -- in particular, about the ever-

decreasing likelihood that Cerberus would supply the necessary $1.5 billion equity infusion to

complete the Transaction. The November 1, 2007 Form 10-Q (at p. 33) reported:

> In order to finance the proposed merger, we expect to incur and
> carry substantial additional debt, both under refinanced senior
> secured credit facilities and a new senior unsecured bridge credit
> facility, as well as by the issuance of new second priority senior
> secured notes. Immediately after closing, we expect to have
> aggregate borrowings under such facilities (excluding
> approximately $138 [million] of outstanding letters of credit) and
> notes of approximately $5.44 billion, with additional borrowing
> capacity under such facilities of approximately $919 [million].

> This high degree of leverage could:

> •    increase our vulnerability to adverse economic, industry or
> competitive developments

The November 1, 2007 Form 10-Q (at p. 32) further reported:

58

In the event that the proposed merger is not completed:

the market price of shares of our common stock is likely to decline to the extent that the current market price of those shares reflects a market assumption that the proposed merger will be completed.

In spite of these known risks, which Defendants had a duty to monitor, Defendants refused to investigate or communicate further with Cerberus beginning on August 29, 2007 regarding Cerberus's proposed renegotiation of the price term of the Merger Agreement. This constituted a breach of the Defendants' duty to URI's shareholders. That breach of duty was exacerbated because Cerberus was not a party to the Merger Agreement and had clearly asserted to URI that Cerberus had a right to walk away from the Transaction simply by paying the $100 million Termination Fee.

144. Throughout the Class Period, each of the Individual Defendants intentionally or recklessly participated in and orchestrated the fraudulent misstatements and omissions alleged herein. This had the purpose and effect of concealing the fact that the LBO was in serious jeopardy as a result of Cerberus's request to renegotiate the price of the Transaction in light of the turmoil in the credit markets and Defendants' complete refusal to even discuss renegotiating the price terms of the Transaction with Cerberus. This fraud allowed URI to portray to investors that the Transaction was on track and maintain the Company's artificially inflated stock price. The scienter of the Individual Defendants may be imputed to URI because the Individual Defendants were among URI's most senior officers and were acting within the scope of their employment.

145. Defendants were aware through direct communications with Cerberus and the terms of the Merger Agreement that, in light of the significant deterioration in the credit markets, which continued to worsen throughout the Class Period, there was a high likelihood that

Cerberus would not go through with the Transaction unless URI agreed to renegotiate the price.

These undisclosed facts, which were known to Defendants from the beginning of the Class

Period, placed the Transaction in serious jeopardy of not closing (as it eventually did not) and

rendered Defendants' Class Period statements materially false and misleading when made.

### A. The Individual Defendants' Knowledge Or Reckless Disregard That Cerberus Could, And Was Likely To, Walk Away From The LBO Unless URI Agreed To Renegotiate The Price Of The Transaction

146. As discussed above, Defendants have admitted unequivocally that they became

aware of Cerberus's desire to renegotiate the price terms of the Merger Agreement as a result of

substantial turmoil in the credit markets (Section IV, *supra*), through the following direct

communications between Cerberus and URI:

- August 29, 2007 Conference Call - Call from representatives of Cerberus to URI's financial advisors seeking to renegotiate the price of the LBO as a result of unexpected changes in the credit markets (¶¶ 66-67). During the call, Cerberus's representatives also alluded to Cerberus's view that it *"could terminate the merger agreement for $100 million if it felt doing so was in its best interests."* ¶¶ 66-67 (emphasis added).

- August 29, 2007 Request for Proxy Statement Revisions - Written comments from Cerberus regarding the draft of the Preliminary Proxy Statement that URI was planning to file the next day, including a pointed suggestion that URI disclose that "On 8/29 Cerberus requested discussions with UBS and the [URI] Board to include, without limitation, the terms of the transaction." ¶¶ 66, 76. Cerberus's comments and request were ignored.

- August 31, 2007 Letter - Letter from Steven Mayer to Defendant Schwed reiterating Cerberus's attempt on August 29, 2007 to discuss the terms of the LBO with intent to renegotiate price as a result of *"concerns about recent unanticipated developments in the credit and financial markets"* and stressing *"[w]e believe it is in all of the parties' best interests to discuss the impact of these unanticipated market developments sooner rather than later* [and] *[w]e would have expected that URI's Board of Directors would prefer to address these concerns now through a constructive dialogue."* ¶¶ 82-84 (emphasis added).

- <u>September 6, 2007 Letter</u> - Letter from URI to Cerberus acknowledging that URI was aware that Cerberus was seeking to renegotiate the terms of the Merger Agreement, and stating that *"there is no basis for any discussion regarding changes to the merger agreement."* ¶¶ 85-88 (emphasis added).

147. As Defendants must also admit, Cerberus was not a party to the Merger Agreement and, thus, could walk away from the Transaction at any time by paying the $100 million Termination Fee pursuant to the Limited Guarantee. ¶¶ 42, 49, 53, 55. Indeed, Defendants did admit in their purported risk disclosures that the RAM Entities had *de minimis* assets -- but nowhere stated directly or by implication that the LBO could not close without the financial backing of Cerberus, a non-party to the Merger Agreement. ¶¶ 45, 47-51, 78, 121.

148. These facts, when viewed holistically, demonstrate that Defendants were aware that it was highly unlikely Cerberus would close the deal without renegotiating the price, and that without Cerberus's financial backing to the tune of $1.5 billion, the LBO would collapse. Yet Defendants deliberately refused to engage in any discussions with Cerberus regarding its attempts to renegotiate the terms of the LBO, knowing full well that if the credit markets continued to worsen (as they did) Cerberus would likely not close on the LBO under the terms contemplated in the Merger Agreement. These known, undisclosed material facts placed the LBO at serious risk.

149. Moreover, by deliberately failing to engage in any dialogue with Cerberus to determine the nature and extent of the price renegotiation being sought, Defendants willfully breached the fiduciary duties they owed shareholders to obtain information about matters which they had a duty to monitor -- information they certainly needed in order to make educated decisions in the best interest of the Company's shareholders.

150.    The above facts give rise to a cogent inference, at least as likely as any plausible opposing inference, that the Individual Defendants knew or recklessly disregarded that the Company's public statements regarding the status of the LBO and related risks were materially false and misleading when made to investors. In particular, URI's refusal to engage in discussions with Cerberus weighs in favor of an inference of scienter.

**B.      The Individual Defendants Were Aware of, But Chose To Ignore Or Recklessly Disregard, Numerous Red Flags Demonstrating The Severe Deterioration Of The Credit Markets And Resulting Risk To The LBO Closing**

151.    The Individual Defendants, as the Company's most senior executive officers in charge of negotiating the terms of the Merger Agreement, regularly communicated with URI's investment advisors, reported on the status and progress of the LBO to the Board, and otherwise oversaw and monitored every aspect of the LBO.  Because of their positions and duties they were keenly aware of all major developments relating to the terms of the Merger Agreement, LBO negotiations and other material facts affecting the closing of the LBO.

152.    "Red flags" continually alerted the Individual Defendants during the Class Period of the increasing risks to the LBO unless a renegotiation took place, including that:  (1) the credit markets were deteriorating at unprecedented levels; and (2) leveraged buyout deals, *including two other deals involving Cerberus*, were being renegotiated or abandoned at record levels for the same reason that Cerberus first communicated to URI on August 29, 2007.

153.    Even prior to the August 29, 2007 call from Cerberus communicating its desire to renegotiate the terms of the LBO, Defendants repeatedly expressed concerns and discussed those concerns at length with the Company's financial advisors regarding the impact of the credit

markets on the Company's stock and the impending LBO. Such discussions occurred on at least

the following occasions:

- August 7, 2007 Board Meeting - discussing the status of the pending LBO by Cerberus, the Company's stock price performance, and the current credit market environment. ¶ 60.

- August 20, 2007 Board Meeting - discussing the status of the pending LBO by Cerberus and the *potential impact of the current credit markets on the LBO* and the Company's stock price. ¶ 65.

- August 29, 2007 Conference Call - Cerberus "wanted to discuss with the company possible changes to the merger agreement, including the purchase price, *in light of credit market conditions*." ¶¶ 66-67 (emphasis added).

- August 30, 2007 Board Meeting - discussing that Cerberus "suggested that *in light of the credit markets* there should be a discussion regarding the per share merger consideration." ¶¶ 68-75 (emphasis added).

- August 31, 2007 Letter - stating Cerberus's "*request for a discussion was prompted by [Cerberus's] concerns about recent unanticipated developments in the credit and financial markets*." ¶¶ 82-84 (emphasis added).

154. As alleged herein, conditions in the credit markets only worsened throughout the

Class Period (¶¶ 56-110), further increasing the likelihood that Cerberus would not close the

LBO under the terms contemplated by the Merger Agreement and increasing the necessity of

discussions between URI and Cerberus if there was to be any serious possibility of closing the

LBO. URI deliberately refused to engage in such discussions and, thus, acted with a high degree

of recklessness.

155. The dramatic adverse events in the credit and financial markets during the period

from August 29, 2007 through November 14, 2007 and the predictable impact they had on

Cerberus's willingness to proceed with the Transaction on the agreed-upon terms present much

stronger compelling inferences of materiality and scienter in Plaintiffs' favor than any procedural steps that the parties took with a view to the possible completion of the Transaction.

156.    As alleged herein, the significant and continuing deterioration in the credit markets before and during the Class Period caused the costs of leveraged buyouts to increase and the terms to be less favorable for equity sponsors of those deals. Thus, as the Individual Defendants well knew, private equity firms, including Cerberus, were seeking in that time frame to renegotiate the terms of pending deals, or terminate them completely.

157.    For example, on August 3, 2007, Daimler announced that it had renegotiated a deal in which Cerberus sought to acquire Chrysler from Daimler, just days before the deal was supposed to close, citing the "highly volatile US loan markets" as the reason.

158.    On August 9, 2007, Home Depot announced that it was in discussions with affiliates of Bain Capital Partners, The Carlyle Group and Clayton, Dubilier & Rice for the purpose of restructuring the previously announced agreement for the sale of HD Supply, Inc. "in view of current financial market conditions." Shortly afterwards the company amended the terms of the tender offer to reduce the $10.325 billion purchase price by approximately 1.8 billion and, on August 29, 2007, Home Depot announced that the acquisition would close at $8.5 billion.

159.    As noted above in paragraph 101, Cerberus itself disclosed on October 31, 2007 that because of difficulties in obtaining financing, it was abandoning its $6.2 billion deal to acquire Affiliated Computer Services. The cited reason was "the continuation of poor conditions in the debt markets."

160.    Because numerous other LBO deals were being renegotiated or terminated as a result of the deteriorating credit markets, including deals involving Cerberus, and because of Cerberus's communications to URI beginning on August 29, 2007 seeking to renegotiate the

64

terms of the LBO for the same reasons, Defendants were on notice that there was during the

Class Period an increasingly substantial risk that Cerberus would not proceed with the LBO

under its announced terms.

## VIII.    LOSS CAUSATION

161.    At all relevant times, URI common stock was publicly traded on the NYSE and

the other URI Securities were publicly traded on the Over-the-Counter ("OTC") market.

Defendants' material misrepresentations and omissions had the effect of creating and maintaining

an artificially inflated price for URI Securities throughout the Class Period. Those

misrepresentations and omissions that were not immediately followed by an upward movement

in the Company's stock price served to maintain the securities' prices at artificially inflated levels

by maintaining and supporting the false positive public perception that the LBO was highly likely

to close on the announced terms and on the schedule Defendants publicized.

162.    Defendants had a duty to promptly disseminate accurate and truthful information

about the LBO and direct that such information be disseminated, and to promptly correct or

update any previously disseminated information that was materially misleading to the market.

As a result of their failure to do so, the prices of URI Securities were artificially inflated during

the Class Period, directly causing Plaintiffs and the Class to suffer damages when the market

prices of URI common stock and other Securities declined upon disclosure of the truth on

November 14, and 15, 2007.

163.    During the period from the distribution of the Preliminary Proxy Statement

(August 30, 2007) until the announcement that Cerberus would not go through with the LBO

(November 15, 2007), essentially the only material factor affecting the price of URI stock was

the known or perceived risk that the LBO would not close.

164.    The disclosures on November 14 and 15, 2007, which revealed the previously

undisclosed material risks to Cerberus's consummation of the LBO pursuant to the Merger

Agreement, proximately caused the price of URI common stock to drop by more than thirty

percent, from $34.37 per share on November 13, 2007 to $22.61 per share on November 15,

2007, on unusually high trading volume over the two days of more than 55 million shares, or

more than fifteen times the average daily trading volume. In addition, the 6 ½ % Notes declined

from 103.375 % of face amount to 96.00 % of face amount on November 14, 2007 and to

95.50% of face amount on November 15, 2007.  The 7 % Notes declined from 99.25 % of face

amount to 94.00 % of face amount on November 14, 2007 and to 91.00 % of face amount on

November 15, 2007.  Finally, the 7 ¾ % Notes declined from 100.85 % of face amount to

95.00% of face amount on November 14, 2007 and to 93.75 % of face amount on November 15,

2007.  Defendants' materially false and misleading statements in their press releases, SEC filings

and other public statements during the Class Period were the proximate cause of losses suffered

by the Class.

## IX.    GROUP PLEADING

165.    Defendants Kneeland and Schwed are liable for the materially false and

misleading statements made by URI as recited above, since each of those statements was "group-

published" information (the result of the collective actions of these Defendants).  It is appropriate

to treat Defendants Kneeland and Schwed as a group and to presume that the public filings, press

releases and other public statements complained of herein are the product of their collective

actions.  These Defendants, as CEO and General Counsel of URI, respectively, directly and

actively participated in the preparation of the press releases and other public statements, and were

involved in drafting, reviewing and/or disseminating the materially false and misleading

statements issued by URI and approved or ratified those statements, and, therefore, adopted them

as their own.

## X.     FRAUD-ON-THE-MARKET PRESUMPTION

166.    At all relevant times, the markets for URI common stock and Notes were efficient

markets for the following reasons, among others:

> (a)    URI's common stock was listed and actively traded on the
> NYSE, a highly efficient national market, with more than 85.79
> million shares issued and outstanding and a public trading float of
> 54.81 million shares as of the end of the Class Period. The Notes
> were actively traded on the OTC market, an efficient national
> market, with $1,900,000,000 outstanding in the aggregate and at
> least $500 million in Notes traded during the Class Period;
>
> (b)    As a registered and regulated issuer of securities, URI filed
> periodic reports with the SEC, in addition to the frequent voluntary
> dissemination of information described in this Complaint;
>
> (c)    URI regularly communicated with public investors through
> established market communication mechanisms, including through
> regular dissemination of press releases on the national circuits of
> major newswire services and through other wide-ranging public
> disclosures such as communications with the financial press and
> other similar reporting services;
>
> (d)    URI was followed by several different securities analysts
> employed by major brokerage firms, including UBS, J.P. Morgan,
> Jefferies & Co., CIBC World Markets, and Banc of America
> Securities, LLC which followed URI's business and wrote reports
> which were distributed to the sales force and customers of their
> respective brokerage firms. Those reports were publicly available
> and affected the public marketplace;
>
> (e)    The material misrepresentations and omissions alleged
> herein would tend to induce a reasonable investor to misjudge the
> value of URI Securities; and
>
> (f)    Without knowledge of the misrepresented or omitted facts,
> Plaintiffs and the other members of the Class purchased or
> otherwise acquired URI Securities between the time that
> Defendants made the material misrepresentations and omissions

and the time that the truth was revealed, during which time the price of URI Securities was artificially inflated by Defendants' misrepresentations and omissions.

167. As a result of the above, the market for URI Securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the price of the URI Securities. Under these circumstances, all purchasers of URI Securities during the Class Period suffered similar injuries through their purchases at prices which were artificially inflated by the Defendants' misrepresentations and omissions. Thus, a presumption of reliance applies.

## XI.    THE SAFE HARBOR PROVISION OF THE PSLRA IS INAPPLICABLE

168. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint because none of the statements pleaded herein are "forward-looking" statements, and no such statement was appropriately identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made. Moreover, meaningful cautionary statements did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

169. In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, Defendants are liable for the false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that any such forward-looking statement was materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer who actually knew or recklessly disregarded the fact that

68

each such statement was false and/or misleading when made. None of the historic or present tense statements made by Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, because they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XII.    CLASS ACTION ALLEGATIONS

170.    Lead Plaintiffs bring this class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a class of all persons who purchased URI Securities during the period beginning on August 30, 2007 through and including November 14, 2007, and who thereby suffered damages. Excluded from the Class are the Defendants named herein, members of the immediate families of the Defendants, any firm, trust, partnership, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of any such excluded person.

171.    The Class is so numerous that joinder of all members is impracticable. According to the Company, as of October 25, 2007, URI had more than 85 million shares of common stock issued and outstanding. In addition, there were $1,900,000,000 principal amount of the Notes outstanding in the aggregate. URI shares were actively traded on the NYSE and the Notes were actively traded on the OTC market. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are, at a minimum, thousands of geographically dispersed Class members.

Record owners and Class members can be identified from records maintained by URI or its transfer agent, and can be notified of the pendency of this action by mail and publication, using forms of notice similar to those customarily used in securities class actions.

172. Lead Plaintiffs' claims are typical of the members of the Class, because Lead Plaintiffs and all of the Class members sustained damages that arose out of the Defendants' unlawful conduct complained of herein.

173. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class, and Plaintiffs have no interests that are contrary to, or in conflict with, the interests of the Class members that they seek to represent. Lead Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to ensure such protection, and intend to prosecute this action vigorously.

174. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to seek redress individually for the wrongs done to them. There will be no difficulty in the management of this action as a class action.

175. The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications, which could establish incompatible standards of conduct for Defendants. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class. The questions of law and fact common to the Class include:

70

(a)     whether Defendants' acts violated the federal securities laws as alleged herein;

(b)     whether Defendants' publicly disseminated press releases and other statements during the Class Period omitted and/or misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct or update material facts previously disseminated;

(c)     whether Defendants participated in and pursued the common course of conduct complained of herein;

(d)     whether Defendants acted with scienter;

(e)     whether the prices of URI Securities were artificially inflated during the Class Period as a result of the material misrepresentations and omissions complained of herein; and

(f)     whether members of the Class have sustained damages and, if so, the proper measure of such damages.

176.    Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     such misrepresentations and omissions were material;

(c)     the securities of the Company traded in an efficient market, for the reasons alleged above;

(d)     the misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Lead Plaintiffs and the other members of the Class purchased URI Securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

71

177.    Based upon these factors and those set forth in paragraphs 166-67 above, Lead
Plaintiffs and the other members of the Class are entitled to the presumption of reliance upon the
integrity of the market.

## COUNT I

### Violation Of Section 10(b) Of The Exchange Act And
### Rule 10b-5 Of The Securities And Exchange Commission

178.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully
set forth herein.

179.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule
10b-5(b) promulgated thereunder, on behalf of Plaintiffs and all other members of the Class,
against the Defendants.

180.    Throughout the Class Period, the Defendants individually and in concert, directly
and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and
the facilities of a national securities exchange, employed devices, schemes and artifices to
defraud, made untrue statements of material fact and/or omitted to state material facts necessary
to make statements made not misleading, and engaged in acts, practices and a course of business
which operated a fraud and deceit upon Plaintiffs and Class members, as detailed above, in
violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

181.    Specifically, the Defendants initiated or pursued a scheme and course of conduct
which: (a) concealed that completion of the Transaction was subject to the risk that Cerberus
could terminate the LBO merely upon the payment of the Termination Fee; (b) concealed that the
LBO was, as far as Cerberus was concerned, nothing more than a $100 million option; (c)
concealed that Cerberus had only agreed to the purchase price of $34.50 per share in

72

consideration for this option and what it believed to be a $100 million limitation on liability; (d) concealed that even if stockholder and other customary approvals were obtained, Cerberus could terminate the LBO with only payment of the Termination Fee; and (e) concealed that Cerberus sought to renegotiate the pricing terms of the LBO, had indicated that it could terminate the LBO solely upon payment of the Termination Fee, and URI had refused to engage in any discussion with Cerberus in response to Cerberus's request to renegotiate the terms of the LBO. As a result of these omissions, there was a material undisclosed risk that Cerberus would seek to terminate the LBO and leave payment of the Termination Fee as URI's only redress.

182. The Defendants are sued as primary participants in the wrongful and illegal course of conduct charged herein, by virtue of having made statements that misrepresented or omitted the material facts detailed herein, or by virtue of their agents having made such misstatements. Specifically, Defendants URI, Kneeland and Schwed may be held primarily liable for misrepresentations in or omissions from their own statements.

183. These Defendants' false and misleading statements and omissions were made knowingly and intentionally, or in an extremely reckless manner as to constitute a fraud upon Plaintiffs and other members of the Class who purchased URI Securities during the Class Period. They were intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Plaintiffs and the other members of the Class to purchase URI Securities at inflated prices.

184. A strong inference of the URI Defendants' scienter is supported by, among other things, the following: (a) URI's agents, Swedenburg, of Simpson Thacher, and Kochman and McNeal of UBS, were repeatedly advised by Cerberus's counsel, Ehrenberg and by Cerberus's

73

Mayer, that Cerberus was unwilling to proceed without having the option to terminate the LBO with the payment of a fee, which would be URI's sole and exclusive remedy; and that URI's representatives expressed agreement with that position on more than one occasion, yet took no steps to communicate to Cerberus's representatives that they believed otherwise (*see* ¶¶ 42, 49, 66-72, 82-88 above); Defendants Kneeland and Schwed attended Board meetings (*see* ¶¶ 34-35, 60, 65, 68-70 above); (b) on August 29, 2007, Mayer of Cerberus advised representatives of URI, including McNeal, that due to changing credit markets and because Cerberus could abandon the LBO for $100 million, Cerberus wanted to renegotiate the LBO (*see* ¶ 66-67 above); (c) Defendant Schwed was the addressee of the August 31, 2007 Letter from Mayer, in which Mayer reiterated Cerberus's intent to renegotiate the terms of the LBO and the Board was informed of the August 31, 2007 Letter (¶ 82); and (d) Defendants Kneeland and Schwed knew of and participated in URI's September 6, 2007 refusal to negotiate with Cerberus. *See* ¶¶ 85-88 above.

185.    Throughout the Class Period, the Defendants named in this Count had a duty to disclose the material undisclosed risks to the LBO closing and to correct and/or update their prior statements concerning those risks which became materially misleading in light of subsequent events, including URI's refusal to renegotiate the terms of the Merger Agreement as requested by Cerberus. There is a substantial likelihood that the disclosure of these omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available about the prospects of the LBO being consummated.

186.    The false and misleading statements and omissions by the Defendants named in this Count were made in connection with the purchase or sale of the Company's Securities.

187.    In ignorance of the false and misleading nature of these Defendants' statements and/or upon the integrity of the market price for URI Securities, Plaintiffs and the other members

74

of the Class purchased URI Securities at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the securities at artificially inflated prices, or at all.

188.    Until shortly after the revelations on November 14, and 15, 2007, Plaintiffs were unaware of the facts alleged herein and could not have reasonably discovered the fraudulent scheme alleged herein by the exercise of reasonable diligence.

189.    The market price for URI Securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by these Defendants, as described above.

190.    Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of URI Securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

191.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

192.    By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, and are liable to Plaintiffs and the members of the Class, each of whom has been damaged as a result of such violation.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act

193.    Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein. This Claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants Kneeland and Schwed (the Individual Defendants).

194.    As alleged herein, URI is primarily liable to Plaintiffs and the members of the Class who purchased URI Securities based on the materially false and misleading statements and

omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

195. Throughout the Class Period, Defendants Kneeland and Schwed were controlling persons of URI within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the URI fraud, as detailed herein. These Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, by virtue of their direct control over the content of the alleged false and misleading statements. In addition, Defendants Kneeland and Schwed each had the power and authority to control the content of the Preliminary Proxy Statement and Final Proxy Statement by which URI sought approval of the Transaction from its shareholders. Accordingly, each of these Defendants were in a position to control or influence the contents of, or otherwise cause corrective disclosures to be made in the Company's SEC filings, along with the Company's other public statements that contained materially false and misleading statements that were disseminated during the Class Period.

196. This claim is brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to the materially false and misleading.

197. By reason of the wrongful conduct alleged herein, Defendants Kneeland and Schwed are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of URI Securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Awarding Plaintiffs and the members of the Class compensatory damages;

(c)     Awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as

well as reasonable attorneys' fees, expert witness fees and other costs; and

(d)     Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury in this action for all issues so triable.

THE PLAINTIFFS

BY _____

David A. Slossberg ct13116
Andrew W. Skolnick ct13422
**HURWITZ, SAGARIN, SLOSSBERG
& KNUFF, LLC**
147 North Broad Street, P.O. Box 112
Milford, Connecticut 06460
Telephone: (203) 877-8000
Facsimile: (203) 878-9800
DSlossberg@hssklaw.com
ASkolnick@hssklaw.com

*Liaison Counsel for Lead Plaintiffs and The Class*

Vincent R. Cappucci
Stephen D. Oestreich
Robert N. Cappucci
Shannon L. Hopkins
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone: (212) 894-7200
Facsimile: (212) 894-7272

*Lead Counsel for Lead Plaintiffs and
The Class*

77

Jeffrey S. Abraham
Philip T. Taylor
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

*Attorneys for Plaintiffs Glazer Capital*
*Management, LP and Glazer Offshore Fund, Ltd.*

Stephen Lowey
David Harrison
**LOWEY DANNENBERG COHEN, P.C.**
White Plains Plaza
One North Broadway
White Plains, NY 10601-23 10
Telephone: (914) 997-0500
Facsimile: (914) 997-0035

*Attorneys for Plaintiff Brownstone Asset*
*Management, L.P.*

Salvatore Graziano
Mark Lebovitch
David H. Webber
**BERNSTEIN LITOWITZ BERGER &**
**GROSSMANN LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*Attorneys for Plaintiff Raven Credit Opportunities*
*Master Fund, Ltd.*

## CERTIFICATE OF SERVICE

This is to certify that on April 16, 2009, in accordance with the instructions of chambers

of the Honorable Janet C. Hall, the original Second Consolidated Amended Class Action

Complaint was filed by hand. Copies of the Second Consolidated Amended Class Action

Complaint were served on counsel on April 16, 2009.

ANDREW W. SKOLNICK

Copies to:

David J. Elliott, Esq.
Day Pitney LLP
242 Trumbull Street
Hartford, CT  06103

Terence J. Gallagher, Esq.
Day Pitney LLP
One Canterbury Green
Stamford, CT  06901