## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FIRST NEW YORK SECURITIES, L.L.C., ET AL., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:07-cv-01708 (JCH) |
| | : | |
| UNITED RENTALS, INC., ET AL., | : | AUGUST 24, 2009 |
| | : | |
| Defendants | : | |

### RULING RE: DEFENDANTS' MOTION TO DISMISS SECOND CONSOLIDATED AMENDED COMPLAINT (Doc. No. 109)

Plaintiffs, shareholders of United Rentals, Inc. ("URI"), bring this putative securities fraud class action against defendants URI, Michael Kneeland, and Roger Schwed. Plaintiffs allege violations of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b). They also bring a claim for control person liability against the individually named defendants, pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Plaintiffs principally object to alleged misrepresentations and omissions of material facts by URI in connection with a proposed all-cash acquisition of URI by Cerberus, acting through various entities.[1] These misrepresentations and failures to disclose, plaintiffs allege, caused plaintiffs to suffer significant losses when Cerberus ultimately failed to consummate the merger and URI's stock price plunged.

On March 10, 2009, the court granted defendants' Motions to Dismiss and

---

[1]Throughout this Ruling, the court generally uses the term "Cerberus" when referring to one or more of these various entities, including Cerberus, RAM Holdings, RAM Holdings Company, LLC, Cerberus Partners, and Cerberus Associates, L.L.C. Where necessary, the court refers to the specific entity at issue.

1

dismissed plaintiffs' Consolidated Amended Complaint without prejudice.  See DeCicco v. United Rentals, Inc., 602 F. Supp. 2d 325 (D. Conn. 2009).  With leave of the court, plaintiffs moved to reopen the case and filed a Second Consolidated Amended Complaint.[2]  Pending before the court are defendants' Motion to Dismiss the Second Consolidated Amended Complaint for failure to state a claim (Doc. No. 109).  Because the court concludes that plaintiffs have not sufficiently alleged scienter as required by the Private Securities Litigation Reform Act of 1995 (PSLRA), it grants defendants' Motion.

## I.    BACKGROUND[3]

### A.    Negotiations

In the second half of 2006 and the first quarter of 2007, URI explored "strategic alternatives," including the potential sale of the company.  On April 10, 2007, URI publicly announced that its Board of Directors was exploring "strategic alternatives," and its financial advisors solicited inquiries from potential acquirers.

At first, URI had difficulty finding a buyer.  It received no indications of interest in 2006, and deteriorating credit markets starting in the spring of 2007 made debt financing increasingly difficult to obtain on favorable terms.  As of its bid submission deadline of July 5, 2007, URI was negotiating with just two potential acquirers, one of which was Cerberus.

---

[2]Plaintiffs direct their Second Consolidated Amended Complaint against only United Rentals, Inc., Michael Kneeland, and Roger Schwed.  The Consolidated Amended Complaint, which was the subject of the prior Motions to Dismiss, also alleged claims against Keith Wimbush, an employee of United Rentals, Inc., as well as various Cerberus entities and two employees of Cerberus.

[3]On a Motion to Dismiss, the court accepts all factual allegations in the complaint as true.

On July 12, 2007, URI's Board met and decided to pursue a transaction with Cerberus.  During negotiations, Cerberus insisted that due to the deteriorating credit markets, it required a means to exit the transaction if it wished to do so.  Cerberus specifically discussed its concerns about credit market weakness with URI and, after thorough negotiations, the parties agreed to contractual terms permitting Cerberus to unilaterally abandon the transaction upon payment of a $100 million termination fee.

B.    Merger Agreement

In order to permit Cerberus to unilaterally abandon the transaction, Cerberus was not made a party to the Merger Agreement.  Instead, Cerberus created two subsidiaries, RAM Holdings, Inc. and RAM Acquisition Corp. (collectively, "the RAM Entities"), which entered into the Merger Agreement with United Rentals, Inc.  To finance the transaction, these entities would borrow debt financing from banks, and Cerberus would invest $1.5 billion in equity at closing.  Cerberus's agreement to invest $1.5 billion was contained not in the Merger Agreement but in a separate document, the "Equity Commitment Letter."  The Equity Commitment Letter was an obligation of Cerberus only to the RAM Entities; United Rentals, Inc. was specifically not made a party to or a third-party beneficiary of Cerberus's obligation.

A third document, styled the "Limited Guarantee," was executed by Cerberus Partners, L.P. in favor of United Rentals, Inc.  The Limited Guarantee provided that Cerberus Partners, L.P. would guarantee the due and punctual payment by RAM Holdings, Inc. and RAM Acquisition Corp. of up to $100 million, plus costs, expenses, and interest, in the event the RAM Entities incurred that payment obligation under certain sections of the Merger Agreement.  Both the Equity Commitment Letter and

3

Limited Guarantee provided that URI could not institute legal proceedings or make a claim against Cerberus itself arising under the Merger Agreement, except to recover the $100 million in the event it became due.  The Limited Guarantee and Equity Commitment were referenced in the Merger Agreement and Proxy Statement.  The identity of the parties to each agreement were disclosed and the terms of the respective agreements were partially disclosed.  However, the full text of the documents was not publicly disclosed until after the transaction fell apart.

The Merger Agreement itself provided that in the event the RAM Entities breached the Agreement, they could only be liable for payment of the $100 million termination fee.  Merger Agreement, section 8.2(e).  The same section prohibited either party (i.e., URI or the RAM Entities) from seeking specific performance of the Agreement in the event of its breach.  Id.; see Merger Agreement, section 9.10 (providing for specific performance but making that section subject to section 8.2(e), which prohibits seeking specific performance); United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810, 845 (Del. Ch. 2007) (holding that specific performance was not available to URI under the agreement).  As noted, the Merger Agreement did not bind Cerberus itself because Cerberus was not a party to the Agreement.

C.    Initial Filings

On July 23, 2007, URI issued a Press Release announcing the Merger Agreement.  Among other things, the Release noted that, "Completion of the transaction is subject to customary closing conditions, including approval of the transaction by United Rentals' stockholders and regulatory review."  The Press Release did not disclose that completion of the transaction was subject to the risk that Cerberus

4

could terminate the transaction by paying the termination fee.  It also did not caution

that because Cerberus could exit the deal upon paying the fee, there was a known risk

that developments in the capital markets or a decline in URI's fortunes could lead to a

renegotiation of the price or termination of the deal.

On July 24, 2007, URI filed a Form 8-K with the SEC.  The filing included, among

other documents, the Merger Agreement and the July 23, 2007 Press Release.  The

filing did not include the Limited Guarantee or Equity Commitment Letter.  Aside from

the disclosures made in the text of the Merger Agreement itself, the Form 8-K did not

disclose the allegedly material information omitted from the July 23, 2007 Press

Release.

On August 1, 2007, URI issued a Press Release, and on August 2, 2007, URI

filed a Form 8-K with the SEC, including the August 1, 2007 Press Release as an

exhibit.  Among other things, the Release noted that:

> Completion of the transaction is subject to customary closing conditions,
> including approval by United Rentals stockholders and regulatory review, but is
> not subject to a financing condition.  The acquiring Cerberus affiliate has
> obtained debt and equity financing commitments for the transactions
> contemplated by the merger agreement, the aggregate proceeds of which will be
> sufficient for it to pay the aggregate merger consideration, related fees and
> expenses and any required refinancings or repayments of existing company
> indebtedness.

The Release did not disclose the allegedly material information omitted from the Form

8-K and July 23, 2007 Press Release.  In addition, it did not disclose that the statement

about obtaining sufficient financing commitments did not itself demonstrate that

Cerberus was fully committed to proceeding with the closing of the Agreement.  Nor did

it disclose that Cerberus's "commitment" to provide the equity financing was not

enforceable by URI.

On August 1, 2007, URI filed a Form 10-Q with the SEC.  Among other things, it

provided that:

> Consummation of the proposed merger contemplated by our merger agreement
> with affiliates of Cerberus is subject to the satisfaction of various conditions,
> including the approval of our stockholders, expiration or termination of applicable
> waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976
> and applicable foreign antitrust laws, and other customary closing conditions
> described in the merger agreement.

The Form 10-Q did not disclose the allegedly material information omitted from the

Form 8-K and July 23, 2007 Press Release.  In addition, it did not disclose that, even if

the various stated approvals were obtained, Cerberus need not fulfill its Equity

Commitment and could terminate the transaction by paying a termination fee.

D.    Discussion about Evolving Market Conditions

In the five weeks after the announcement of the transaction on July 23, 2007 and

before the filing of the Preliminary Proxy Statement on August 30, 2007, world credit

markets continued to weaken.  On August 3, 2007, it was publicly reported that

Cerberus had renegotiated a deal to purchase an 80.1% stake in Chrysler from

DaimlerChrysler AG, on the grounds that higher borrowing costs had made the initially-

contemplated deal more expensive and that the U.S. loan markets were "highly volatile."

As a result of the renegotiation of the Chrysler purchase, URI's Board and its

advisors began to question whether Cerberus had the resources and ability to

consummate the URI transaction.  A representative of URI, Cary Kochman, expressed

these concerns to Cerberus sometime in July 2007.

On August 7, 2007, the Board of URI and the Board of its wholly-owned

operating subsidiary, URNA (collectively "URI Board") met to review the transaction.  In response to a question by the Chairman of the Board of URI as to why URI's stock price continued to trade at a greater than expected discount to the negotiated deal price, the Board's advisors informed the Board that many target companies involved in pending leveraged buyout transactions were trading at larger than ordinary discounts in light of the state of the credit markets.  A second set of advisors noted that the large number of pending leveraged buyouts seeking to complete debt financing was causing substantial stress in the market.  The Board discussed the pending transaction and credit environment.

On August 20, 2007, the URI Board met again to review the transaction.  The Board discussed the market environment, including other companies involved in pending leveraged buyouts.  It also discussed recent announcements about efforts by private equity to renegotiate a pending purchase of HD Supply, a subsidiary of Home Depot.  Finally, it discussed a plan to retain outside counsel to advise URI on litigation matters that could arise during the pendency of the Cerberus-URI transaction.

E.    Renegotiation Efforts and Proxy Filings

On August 29, 2007, representatives of Cerberus contacted URI's advisors and explained that, due to changing credit markets and in light of Cerberus's ability to terminate the acquisition by paying the termination fee, Cerberus wanted to renegotiate the transaction.  This call was reported to URI's counsel.  Defendants did not publicly disclose this call or update prior disclosures to reflect that the call had taken place, or to reflect any increased risk that Cerberus might terminate the acquisition.

Later on August 29, 2007, Cerberus's counsel reiterated to URI's counsel that it

7

wanted to discuss possible changes to the Merger Agreement, including the purchase price, in light of the credit market conditions.  Cerberus's counsel emphasized that Cerberus did not want to terminate the Merger Agreement.  Cerberus's counsel also told URI that Cerberus wanted the Preliminary Proxy Statement, which URI was in the process of preparing for filing the following day, to disclose that Cerberus had requested discussions with URI to include "without limitation, the terms of the transaction."  That same day, Cerberus informed its investment bankers that it was seeking to renegotiate the purchase price for URI, and that it would share some of the benefit of any renegotiated price with the lenders.

On August 30, 2007, the URI Board met, and Cary Kochman and URI's counsel, Gary Horowitz, conveyed the details of the two August 29, 2007 calls from Cerberus. Kochman informed the Board that Cerberus wanted to discuss the per share merger consideration, and that Cerberus had referenced its view that it could terminate the transaction upon payment of $100 million.  Kochman told the Board that he had informed Cerberus that it was expected to honor its agreement but agreed to relay Cerberus's request to the Board.  Horowitz informed the Board that Cerberus wished to discuss possible changes to the agreement but that it did not want to terminate the Merger Agreement.  In response, the Board decided to have Horowitz inform Cerberus's counsel that URI would not discuss changing the terms of the Merger Agreement.

On August 30, 2007, URI filed its Preliminary Proxy.  It emphasized that the Board had considered and approved the transaction based on a number of factors, including the limited number and nature of the conditions on the RAM Entities' obligation to consummate the merger, the limited risk of non-satisfaction of those

8

conditions, the receipt of executed commitment letters from RAM Holdings' sources of debt and equity financing, and Cerberus's Limited Guarantee. The Proxy described risks to completion of the acquisition but did not disclose the allegedly material information omitted from the Form 8-K and July 23, 2007 Press Release. Nor did it contain the disclosure, requested by Cerberus, acknowledging the increased risk that Cerberus might terminate the acquisition based on the August 29, 2007 telephone calls.

On August 31, 2007, Cerberus sent a letter to URI reiterating Cerberus's desire to discuss the terms of the Merger Agreement, and expressing its dismay at URI's refusal to discuss the Agreement. It stated Cerberus's position that, "it is in all of the parties' best interests to discuss the impact of these unanticipated market developments sooner rather than later." Finally, the letter objected to URI's decision to file the Proxy Statement without addressing or discussing Cerberus's concerns.

On September 6, 2007, URI sent a letter to Cerberus, stating that "there is no basis for any discussion regarding changes" to the Agreement, noting that Cerberus had not identified any basis for reopening the discussion, and expressing disappointment "that your organization is now looking to renegotiate our deal." URI's letter also stated that URI had carefully considered and discussed all of RAM's suggested changes to the Preliminary Proxy Statement prior to filing it.

On September 13, 2007, URI issued a Press Release and filed a Schedule 14A with the SEC that included the Press Release. It announced a special meeting of stockholders to approve the Merger Agreement. The Press Release and Schedule 14A again did not disclose the allegedly material information omitted from the Form 8-K and July 23, 2007 Press Release, nor did it disclose Cerberus's efforts to renegotiate the

9

agreement or URI's refusal to do so.

On September 19, 2007, URI filed its Proxy Statement with the SEC, which again did not disclose the allegedly material information omitted from the Form 8-K and July 23, 2007 Press Release. Unlike the Preliminary Proxy Statement, the Proxy Statement included a detailed discussion of URI's unsuccessful efforts to attract other bidders, but noted that, in part due to market conditions, those efforts had not worked out. The Proxy did not, however, disclose that Cerberus had sought to renegotiate the agreement for similar reasons. Nor did it disclose that URI had refused to renegotiate with Cerberus. Finally, the Proxy Statement noted that RAM had obtained $1.5 billion in equity commitments from Cerberus and again provided that there was not a "financing condition" to the merger closing. Although it provided that RAM had obtained the commitments, and that Cerberus's Equity Commitment was made to RAM, it did not separately disclose that URI could not require Cerberus to provide the $1.5 billion.

      F.    <u>Developments After the Issuance of the Proxy Statement</u>

For the quarter ending September 30, 2007, URI's cash flow from operations decreased 31% over the comparable quarter a year earlier. Media outlets continued to note around this time that the credit markets had deteriorated and that equity buyout spending had dropped precipitously on an annualized basis since the previous year.

Further press releases followed on October 16, 2007, announcing the commencement of tender offers, and October 19, 2007, announcing approval of the Merger Agreement by URI stockholders. URI attached both press releases to a Form 8-K filed with the SEC on October 19, 2007. URI filed another Form 8-K on October 30, 2007, stating that URI anticipated completing the Merger Agreement subject to the

10

provisions of the Agreement.

On October 31, 2007, it was reported that Cerberus had terminated a pending leveraged buyout of Affiliated Computer Services, citing the continuation of poor debt market conditions as the reason.  A Wall Street Journal article noted that the parties had had difficulty obtaining financing for the deal, which made it difficult to finalize.

An October 31, 2007 Press Release and November 1, 2007 Form 8-K and Form 10-Q provided additional information and reiterated earlier statements that completion of the transaction was subject to customary closing conditions and stockholder approval, but not a financing condition.  It stated that URI expected the transaction to close, subject to the provisions of the merger agreement, on or about November 16. The Press Release noted that the "acquiring Cerberus affiliate" had obtained debt and equity financing commitments sufficient to cover the merger transaction.  The Form 10-Q also acknowledged that URI expected its cash needs for debt service to increase significantly following the closure of the merger.  URI also filed a Form 8-K on November 7, 2007, supplying further details about how the transaction would be financed.  None of these releases or filings disclosed the allegedly material information omitted from the Form 8-K and July 23, 2007 Press Release, nor did they disclose Cerberus's efforts to renegotiate the agreement or URI's refusal to do so.

Finally, in early November 2007, Cerberus participated in a "road show" to assist in placing debt related to the acquisition.  At the Road Show, Cerberus did not disclose its efforts to renegotiate the agreement or URI's refusal to do so.

G.    The Merger Falls Apart

On November 12, 2007, Cerberus advised URI that it was not prepared to

proceed with the transaction on the agreed-upon terms.  Cerberus stated that it wanted to renegotiate the price and terms of the transaction, and reiterated its concerns about the credit markets.  URI did not immediately disclose these discussions, nor did the parties effect any changes to the Merger Agreement.

On the morning of November 14, 2007, media outlets reported that Cerberus was considering withdrawing from the transaction.  That afternoon, URI issued a Press Release that acknowledged a dispute with Cerberus and revealed a substantial risk to the closing of the transaction.  In reaction to these disclosures, URI's common stock price fell from an opening price of $34.37 per share to close at $23.50 per share. Following the market close, URI filed a Form 8-K disclosing a letter received that day, November 14, 2007, stating that Cerberus's acquisition vehicle, RAM Holdings, desired to either engage in constructive dialogue about revised terms, or to pay the termination fee if URI was unwilling to renegotiate the Merger Agreement.  It also disclosed the letters between URI and Cerberus of August 31, 2007 and September 6, 2007.

H.    Subsequent Developments

On November 15, 2007, RAM Holdings filed an amendment to its Schedule 13D, stating that it had informed URI that it was not prepared to proceed on the existing terms, and that it was willing to either pay the termination fee or renegotiate the transaction.  It highlighted the fact that its liability was limited to the $100 million termination fee and noted that it "agreed to a higher per share purchase price in consideration for this limitation on liability."  It disclosed the terms of the Limited Guarantee by which Cerberus Partners, L.P., had limited its liability to $100 million. RAM Holdings also noted its earlier efforts to engage in a dialogue with URI to address

12

its concerns.  This disclosure of the Limited Guarantee was the first time the document had been publicly disclosed.  URI's common stock price fell that day from an opening price of $23.85 per share to close at $22.91 per share.

On November 19, 2007, URI filed a suit in Delaware Chancery Court against the RAM Entities seeking specific performance of the Merger Agreement.  See United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810 (Del. Ch. 2007).  Cerberus itself, which was not a party to the Merger Agreement, was not joined as a defendant.  In a written decision issued December 21, 2007, the court concluded that the Merger Agreement was ambiguous and that both parties' interpretations were reasonable.  Id. at 834.  It then considered extrinsic evidence and determined that no agreement had been reached on the right to specific performance.  Id. at 836-37.  It determined, however, that Cerberus had clearly communicated its understanding that the $100 million termination fee was the "sole and exclusive" remedy available to URI if the merger did not go through.  Id. at 840-41.  It found that Cerberus "communicated this understanding to URI in such a way that URI either knew or should have known of their understanding."  Id.  Therefore, given that no agreement had been reached on the right to specific performance, and based on URI's knowledge of Cerberus's position and URI not having conveyed any contrary understanding to Cerberus, the court applied the "forthright negotiator" principle and concluded that URI could not compel specific performance.  Id. at 836-37, 844-45.

URI did not appeal the decision, but instead delivered a notice of termination. URI requested that Cerberus pay the termination fee, and Cerberus did so.

## II.    CLAIMS

Plaintiffs allege violations of section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b).  They also bring a claim for control person liability against the individual named

defendants, pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

In the prior Complaint, styled the "Consolidated Amended Complaint," plaintiffs'

allegations focused on the defendants' alleged failure to disclose Cerberus's view that

URI's sole and exclusive remedy if Cerberus breached its contract was a $100 million

termination fee, that Cerberus considered the Acquisition to be a "$100 million option,"

and that Cerberus's willingness to offer $34.50 per share was in part consideration for

this "option" and the limitation on liability.  Plaintiffs alleged that, in representing the

specific performance provision of the Merger Agreement in summary form in the Proxy,

and in saying that the deal was only subject to customary closing conditions,

defendants misrepresented the availability of specific performance and misrepresented

the risks of the deal not closing.  Plaintiffs also alleged that negotiations over the

termination fee and availability of specific performance were omitted from the detailed

disclosures in the Preliminary Proxy and Proxy of the history of the negotiation, and that

because other aspects of the negotiation were disclosed, the public was led to believe

that there were no other principal points of contention, when in fact the parties had

disputed the availability of specific performance and the termination fee.  Finally,

plaintiffs alleged that the discussions and letters exchanged, on August 29, August 31,

and September 6, called the viability of the Agreement into question and should have

been promptly disclosed to the public.

In their Second Consolidated Amended Complaint, plaintiffs reiterate a number

14

of these factual allegations, add some new factual allegations, and shift their focus.

Plaintiffs again emphasize that Cerberus insisted upon, and the ultimate agreement in

fact included, provisions under which Cerberus could walk away from the deal subject

only to payment of the $100 million termination fee.  However, plaintiffs now emphasize

that Cerberus was not a party to the Merger Agreement, and that only the RAM Entities,

together with URI, were parties to the Merger Agreement.  Plaintiffs contend this fact is

significant because, for the RAM Entities to obtain the necessary financing for which it

had commitments and therefore for the transaction to close, Cerberus had to provide a

$1.5 billion equity investment, but URI had no means by which to compel Cerberus to

provide that investment.  Plaintiffs allege that the dependence of the transaction on

Cerberus's willingness to go through with its investment, and the risks posed by that

dependence, were not made clear to the public as a result of URI's failure to disclose

the substance of two important documents: The Limited Guarantee, which limited URI's

remedy against Cerberus to the $100 million termination fee and prevented URI from

instituting legal proceedings against Cerberus, and the Equity Commitment Letter, in

which Cerberus committed to fund the equity portion of the transaction but made that

commitment only to the RAM Entities (its own subsidiaries), and not to URI.

Plaintiffs allege that the structure of the transaction as detailed in these

undisclosed documents, together with the publicly-known decline in the credit markets,

the collapse of other private equity deals, and Cerberus's decision to renegotiate

several other major deals during the same time period, led to the creation of a

significant, undisclosed risk that the transaction would not be consummated.  Plaintiffs

allege that the Board, furthermore, was actually concerned about these risks, engaged

15

in extensive discussions about them, and retained outside litigation counsel to advise

the Company about them.  Viewed against this background, plaintiffs contend,

Cerberus's efforts to renegotiate the transaction must be viewed as confirmation that a

substantial threat existed that Cerberus would abandon the transaction.  Further,

plaintiffs contend, not only did URI fail to disclose Cerberus's renegotiation efforts, but it

also made repeated announcements that the transaction was on track to close and was

"not subject to a financing condition."  Plaintiffs argue that the failure to disclose,

combined with the announcements, served to placate investors by preventing them

from becoming aware of the substantial risk that the deal would not close on the

negotiated terms.

Defendants' misrepresentations and omissions, plaintiffs allege, caused plaintiffs

to suffer significant losses when, in November 2007, the parties ultimately failed to

consummate the merger and URI's stock price plunged from an opening price of $34.37

per share to close at $23.50 per share.

## III.    DISCUSSION

### A.    Legal Standards

On a motion to dismiss, the court must accept all factual allegations in the

complaint as true.  ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan

Chase Co., 553 F.3d 187, 193, 196 (2d Cir. 2009) (citation omitted).  The court may

also consider "any written instrument attached to the complaint, statements or

documents incorporated into the complaint by reference, legally required public

disclosure documents filed with the SEC, and documents possessed by or known to the

plaintiff and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc. v. Shaar

16

Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Under Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a complaint alleging securities fraud must meet heightened pleading requirements, stating with particularity the circumstances constituting fraud. JP Morgan Chase, 553 F.3d at 196; ATSI Commc'ns, 493 F.3d at 99. Under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Any allegations of false statements or omissions must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1).

Plaintiffs allege violations of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements the statute, prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b); see JP Morgan Chase, 553 F.3d at 197. To bring such a claim, a plaintiff must allege that "the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, 493 F.3d at

17

105; see also JP Morgan Chase, 553 F.3d at 197 (citations omitted).  In their Motion,

defendants contend that the Second Consolidated Amended Complaint fails to

adequately allege a false statement or omission of material fact, and fails to adequately

allege scienter.

Plaintiffs also bring a claim for control person liability against the individual

named defendants, pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

"To establish a prima facie case of control person liability, a plaintiff must show (1) a

primary violation by the controlled person, (2) control of the primary violator by the

defendant, and (3) that the defendant was, in some meaningful sense, a culpable

participant in the controlled person's fraud."  ATSI Commc'ns, 493 F.3d at 108.

1.    Materiality

The materiality inquiry is fact-specific and depends on all relevant circumstances.

JP Morgan Chase, 553 F.3d at 197 (citation omitted).  "The materiality of a

misstatement depends on whether there is a substantial likelihood that a reasonable

shareholder would consider it important in deciding how to act." Id. (citations,

alterations, and internal quotation marks omitted).  To be material, "there must be a

substantial likelihood that the disclosure of the omitted fact would have been viewed by

the reasonable investor as having significantly altered the total mix of information made

available." Id. (citations and internal quotation marks omitted).  On a motion to dismiss

for failure to state a claim, a complaint may only be dismissed on the grounds of a lack

of materiality if the alleged misstatements or omissions "are so obviously unimportant to

a reasonable investor that reasonable minds could not differ on the question of their

importance." Id. (citations and internal quotation marks omitted).

18

2.    Scienter

On a motion to dismiss, the court ordinarily draws all reasonable inferences in favor of the plaintiff.  However, to plead scienter under the PSLRA, a plaintiff's complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); see Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008).  To qualify as "strong," an "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Teamsters Local 445, 531 F.3d at 194 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007)).  That is, the plaintiff "must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference."  Tellabs, 551 U.S. at 328 (emphasis in original).  "In determining whether this inference can reasonably be drawn, courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively."  JP Morgan Chase, 553 F.3d at 198 (citing Tellabs, 551 U.S. at 314, 321-22).

The required state of mind is an intent "to deceive, manipulate, or defraud,"  Id. (quoting Tellabs, 551 U.S. at 318-19), or "reckless conduct,"  ATSI Commc'ns, 493 F.3d at 99 n.3; see JP Morgan Chase, 553 F.3d at 198 ("In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud in this circuit.").  Scienter can be established by alleging facts that sufficiently show (1) that defendants had the motive and opportunity to commit the fraud, or (2) strong circumstantial evidence of conscious

19

misbehavior or recklessness.  <u>ATSI Commc'ns</u>, 493 F.3d at 99 (citing <u>Ganino v.</u>

<u>Citizens Utilities Co.</u>, 228 F.3d 154, 168-69 (2d Cir. 2000)).  The Second Circuit has

explained that at least four circumstances may give rise to a strong inference of the

requisite scienter: where the complaint sufficiently alleges that the defendants (1)

benefitted in a concrete and personal way from the purported fraud; (2) engaged in

deliberately illegal behavior; (3) knew facts or had access to information suggesting that

their public statements were not accurate; or (4) failed to check information they had a

duty to monitor."  <u>JP Morgan Chase</u>, 553 F.3d at 199; <u>Teamsters Local 445</u>, 531 F.3d at

194; <u>Novak v. Kasaks</u>, 216 F.3d 300, 311 (2d Cir. 2000); <u>see also</u> <u>South Cherry Street,</u>

<u>LLC v. Hennessee Group LLC</u>, No. 07-3658-cv, — F.3d —, 2009 WL 2032133, at *10-

11 (2d Cir. July 14, 2009) (discussing situations giving rise to an inference of

recklessness).

      B.     <u>Analysis of Plaintiffs' Section 10(b) Claims</u>

      Plaintiffs contend that defendants made false and misleading material

statements or material omissions by (1) failing to disclose Cerberus's efforts to

renegotiate the Merger Agreement, even after Cerberus had asked defendants to do

so; (2) issuing Press Releases and SEC filings that detailed other risks but failed to

disclose that completion of the transaction was subject to the risk that Cerberus could

terminate the transaction by paying the termination fee; (3) issuing Press Releases and

SEC filings that, by suggesting that the deal was on track, that it was subject only to

customary closing conditions and not a financing condition, and that sufficient debt and

equity commitments had been obtained, misrepresented the limited nature of

Cerberus's commitment and hence the risk that the deal might not close; (4) issuing

20

SEC filings that, by extensively detailing the substance of various negotiations and Board discussions, but not detailing Cerberus's efforts to renegotiate and the related Board discussions, suggested that no such effort existed and thereby misrepresented the risk that the deal might not close; (5) failing to disclose Board discussions that reflected the Board's concern, and awareness, of the significant undisclosed risk that the transaction would not be consummated; and (6) failing to adequately disclose the terms and structure of the transaction, including the failure to disclose the Limited Guarantee and Equity Commitment Letter, such that the investing public would have understood that Cerberus had a unilateral walk-away right, and therefore completion of the transaction was subject to the risk that Cerberus could terminate the transaction simply by paying the termination fee.

The court first considers whether plaintiffs' Second Amended Complaint raises a strong inference of scienter.  Insofar as allegations that defendants did not disclose material facts that they had a clear duty to disclose may support allegations of scienter, see Kalnit v. Eichler, 264 F.3d 131, 144 (2d Cir. 2001), the court will discuss the materiality of the statements to the extent necessary to resolve the question of whether plaintiff has adequately alleged scienter.  Because it finds that plaintiffs' Amended Complaint does not raise a strong inference of scienter as required by the PSLRA and Tellabs, it will not separately address whether the statements in question were material.

### 1.    Motive and Opportunity

Plaintiffs allege that the defendants had a motive to commit fraud, specifically, that they sought to "prop up" URI's stock price in order "to benefit insiders who would profit handsomely from the sale of their stock if the LBO occurred."  Mot. at 20.

"Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Kalnit, 264 F.3d at 139 (internal quotation marks and citation omitted). "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." Id. (citing Novak, 216 F.3d at 307-08). Therefore, it is insufficient for plaintiffs to allege that defendants have the general desire to make the corporation appear profitable or to keep stock prices high to increase their compensation. Id. (citing Novak, 216 F.3d at 307-08). On the other hand, motive is adequately pleaded where the plaintiffs allege that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares. Id.; Novak, 216 F.3d at 307-08 (citing cases).

As the court held with regard to the Consolidated Amended Complaint, plaintiffs have not alleged any such "concrete and personal benefit;" they point only to defendants' general interest in maintaining a high stock price and successfully closing the merger. There are no allegations that defendants contrived to sell their own shares before the allegedly material information became public, or otherwise sought to keep URI's stock price high in order to personally profit. See, e.g., Novak, 216 F.3d at 307-08.[4] Accordingly, plaintiffs have not adequately alleged a motive to commit fraud.

---

[4]In a different context, plaintiffs make reference to an email exchange between two URI employees who did in fact profit from the sale of URI stock during the Class Period. However, the referenced sales were made as part of a 10b5-1 plan, over which the individuals presumably had no control. See 17 C.F.R. § 240.10b5-1(c)(1)(i) (defining so-called "10b5-1 plans" by which insiders may buy and sell securities provided that they do not, subsequent to entering into the plan, exercise influence over "how, when, or whether to effect purchases or sales").

2.      Conscious Misbehavior and Recklessness

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant[s], though the strength of the circumstantial allegations must be correspondingly greater." Kalnit, 264 F.3d at 142.  To do so, plaintiffs must plead "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant[s] or so obvious that the defendant[s] must have been aware of it." JP Morgan Chase, 553 F.3d at 202-03 (internal quotation marks and citations omitted).  Typically, plaintiffs adequately state a claim based on recklessness by alleging that defendants knew facts or had access to non-public information contradicting their public statements, and thus that defendants knew, or should have known, that they were misrepresenting material facts related to the corporation.  In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001); Novak, 216 F.3d at 308.  These allegations may include ignoring obvious signs of fraud or failing to review information that defendants had a duty to monitor.  See South Cherry Street, 2009 WL 2032133, at *10.  In addition, as discussed earlier, in order to state a claim, the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Teamsters Local 445, 531 F.3d at 194 (quoting Tellabs, 551 U.S. at 314).

Plaintiffs' allegations of fraud concern statements and omissions that fall into two broad categories.  First, plaintiffs allege that defendants publicly misrepresented the terms of the transaction, primarily by failing to disclose the limited nature of Cerberus's Equity Commitment and its ability to exit the transaction by paying a termination fee.

23

Second, plaintiffs allege that defendants failed to disclose that Cerberus sought to renegotiate the terms of the Merger Agreement, and the related Board discussions that followed. Plaintiffs also link these sets of failures to disclose, alleging that the structure of the transaction and Cerberus's efforts to renegotiate, when viewed against the backdrop of contemporaneous developments in the credit markets, created a substantial risk that the transaction would not close at the agreed-upon terms and price. Plaintiffs allege that defendants were aware of but did not publicly disclose this risk.

In their Motion to Dismiss, defendants argue that plaintiffs' misrepresentation claims fail for lack of any alleged affirmative misrepresentations. They contend that plaintiffs' claims of failure to disclose similarly fail because defendants did not have a clear duty to disclose any of the facts that they did not disclose. Because the knowing failure to disclose a fact cannot give rise to a strong inference of scienter absent a clear duty to disclose, they argue that plaintiffs' claims fail for want of scienter.

a.    Affirmative Misrepresentations

The court will first address whether plaintiffs have adequately alleged the making, with scienter, of any affirmative material misrepresentations. Plaintiffs' allegations center primarily around failures to disclose. However, plaintiffs also contend that by suggesting the deal was subject only to customary closing conditions and not a financing condition, and that sufficient debt and equity commitments had been obtained, defendants affirmatively misrepresented the limited nature of Cerberus's commitment and hence the risk that the deal might not close. In the October 31 Press Release, URI stated that

Completion of the transaction is subject to customary closing conditions, but is

24

> not subject to a financing condition.  The acquiring Cerberus affiliate has
> obtained debt and equity financing commitments for the transactions
> contemplated by the merger agreement, the aggregate proceeds of which will be
> sufficient to pay the aggregate merger consideration . . . .

The November 1 Form 10-Q similarly stated that, "Completion of the transaction is subject to customary closing conditions, including approval of the transaction by our stockholders, but not to a financing condition."

Plaintiffs contend that the statement that the merger was "not subject to a financing condition" was categorically false, in light of the fact that Cerberus's Equity Commitment was not enforceable by URI.  Pls.' Opp'n at 18.  Defendants counter that URI's statements were accurate and hence cannot give rise to a misrepresentation claim.  They argue that financing was not a condition to RAM's obligation to close, and had Cerberus's financing commitments not been fulfilled and RAM been unable to close, RAM therefore would have been in breach of the Merger Agreement.

As defendants accurately point out, a "condition" in a contract generally refers to an act or event that must occur before a party becomes obligated to perform its contractual duty.  See Restatement 2d of Contracts § 224.  Indeed, the Merger Agreement itself employs the term "condition" this way.  See Merger Agreement, Article VII (Conditions of Merger).  Financing conditions typically make the closing of a deal contingent on obtaining adequate financing, permitting one or the other party to terminate the transaction without breaching the contract if sufficient financing is not obtained.  It is undisputed that the Merger Agreement contained no provision conditioning RAM's performance on the fulfillment of financing commitments by Cerberus or the suppliers of debt financing.  Therefore, RAM's performance would not

25

have been excused had Cerberus failed to come up with the promised $1.5 billion.

Perhaps a jury could conclude, as plaintiffs suggest, that the statement meant that

financing provided no practical obstacle to closing and was intended as an assurance

that Cerberus would fulfill its Equity Commitment.  However, in light of the fact that an

equally reasonable, if not more reasonable, reading of the statement is a truthful

one—that RAM's obligation to fulfill the Merger Agreement was not contingent on the

fulfillment of financing commitments[5]—the statement cannot give rise to a strong

inference that the defendant acted with scienter.

> b.      Omissions

Plaintiffs allege that defendants failed to disclose material information.

Specifically, they allege that URI knew facts that were not disclosed, that these facts

were material, and that the failures to disclose were clearly deliberate and not

inadvertent.  See Opp'n at 19.  In support of their scienter allegations, plaintiffs contend

that they have sufficiently alleged that defendants knew facts or had access to

information suggesting that their public statements were not accurate, and that

defendants failed to check information they had a duty to monitor.  Id. (citing DeCicco,

602 F. Supp. 2d at 338). Defendants primarily seek dismissal on the grounds that

plaintiffs' allegations of scienter fail for lack of a clear duty to disclose.

> i.      Limited Guarantee, Equity Commitment, and
>         Covenant Not to Sue

Plaintiffs allege that defendants acted with scienter in not disclosing that URI

---

[5]The court recognizes, of course, that this may have been an empty promise in light of the fact that the RAM Entities had no assets of their own.  It did, however, serve to emphasize that if financing did not come through, URI would be entitled to a remedy for breach of the contract—that is, the $100 million termination fee.

promised not to sue Cerberus. Defendants object that URI never falsely disclosed that it would have any direct rights against Cerberus to enforce the Equity Commitment or to recover anything beyond the $100 million termination fee, and that it had no obligation to make an additional affirmative disclosure of the limitations on its ability to sue Cerberus.

The covenant not to sue was contained within the Limited Guarantee, the full terms of which were not publicly disclosed. The Equity Commitment Letter provided that it was not enforceable by URI; this letter was also not publicly disclosed. However, as URI's filings did publicly disclose, the Merger Agreement was entered into between URI and the RAM Entities, the Equity Commitment was provided to RAM Holdings, Inc., by Cerberus, and the Limited Guarantee was provided to URI by Cerberus. Therefore, the only contract entered into directly between Cerberus and URI was the Limited Guarantee. The Preliminary Proxy, Proxy Statement, and Merger Agreement make clear that the Limited Guarantee existed to guarantee RAM's payment obligations under the Merger Agreement of the termination fee and associated termination costs, and that the Guarantee specifically provided URI with the right to recover up to $100 million directly from Cerberus in the event the merger agreement was terminated. It was also publicly disclosed that Cerberus's maximum aggregate liability was $100 million plus certain costs and expenses. Disclosures about the Equity Commitment Letter state that Cerberus's commitment was made to RAM; they make no mention of any commitment to URI.

As the previous Ruling discussed at length, the Merger Agreement was ambiguous as to whether URI was entitled to specific performance by the RAM Entities.

27

See DeCicco, 602 F. Supp. 2d at 342.  In addition to URI's ability to recover against Cerberus pursuant to the Limited Guarantee, the Merger Agreement could have been read to entitle URI to specific performance by the RAM Entities.  Id.  Ultimately, the Chancery Court, correctly in this court's view, read the Agreement to preclude the availability of specific performance against the RAM Entities.

Plaintiffs contend that, even if a careful reader who gathered information across multiple documents might have been able to infer that URI's remedies were limited to a $100 million termination fee if Cerberus decided not to fulfill its Equity Commitment, that was no substitute for adequate disclosure.  Yet whatever their ambiguities about the availability of specific performance, the Preliminary Proxy, Proxy Statement, and Merger Agreement make clear that URI's remedies directly against Cerberus are limited to recovering up to $100 million pursuant to the Limited Guarantee.  See Merger Agreement, section 8.2(e).  Under the terms of the Limited Guarantee, URI was entitled to sue Cerberus to recover the $100 million; the covenant restricted URI's ability to sue to recover beyond this amount.  Under the terms of the Equity Commitment Letter, URI could not directly enforce Cerberus's commitment.  Neither the actual text of the Limited Guarantee nor that of the Equity Commitment Letter were publicly disclosed. Nevertheless, URI's disclosures made apparent that URI's potential recovery in money damages from Cerberus was limited to $100 million, as in fact it was, and neither the Merger Agreement nor the Equity Commitment Letter contained commitments made by Cerberus directly to URI.

Plaintiffs contend that section 8.2(e) concerned only breaches of the Merger Agreement.  The final sentence of section 8.2(e) provides:

> In no event, whether or not this Agreement has been terminated pursuant to any provision hereof, shall [the RAM Entities or Cerberus] . . . be subject to any liability in excess of the Parent Termination Fee for any or all losses or damages relating to or arising out of this Agreement or the transactions contemplated by this Agreement, including breaches by [the RAM Entities] of any representations, warranties, covenants or agreements contained in this Agreement, and in no event shall [URI] seek equitable relief or seek to recover any money damages in excess of such amount from [the RAM Entities], Guarantor, or any Parent Related Party or any of their respective Representatives or Affiliates.

Merger Agreement, section 8.2(e). Plaintiffs argue that this section did not explicitly limit URI's ability to recover from Cerberus in the event that Cerberus breached its financing commitment to RAM Holdings; the Limited Guarantee, on the other hand, did provide for such a limitation, and therefore, they argue, it should have been disclosed.

The court disagrees. Although Cerberus was not a party to the Merger Agreement, this sweeping provision can be read to limit Cerberus's liability in all circumstances to the termination fee, including the circumstance in which the Agreement has been terminated or breached, or where losses or damages have otherwise arisen out of the Agreement "or the transactions contemplated by this Agreement." As if the first extended clause of this final sentence was not sufficient to cover the gamut of possibilities, the final clause of the sentence reiterates that "in no event shall [URI] . . . seek to recover any money damages in excess of such amount from . . . [Cerberus] . . . ." The covenant not to sue in the Limited Guarantee similarly limited the ability of URI to recover from Cerberus "in respect of any liabilities or obligations arising under, or in connection with, the Merger Agreement or the transactions contemplated thereby . . . ." Limited Guarantee, section 4(b). Further, the Preliminary Proxy and Proxy Statement explicitly pointed out that Cerberus's equity commitment was made to RAM Holdings and hence not directly to URI. At no point

29

does either document, or the Merger Agreement, affirmatively suggest that URI had a right of specific performance against Cerberus to force it to fulfill its Equity Commitment, or to recover damages in excess of $100 million.

The court agrees with plaintiffs that disclosure of the terms of the Limited Guarantee and Equity Commitment, or a straightforward risk disclosure including the relevant terms, could well have made it clearer to a reasonable investor that URI had no ability to force Cerberus to fulfill its Equity Commitment. Yet a reasonable investor seeking to understand what would take place if Cerberus decided not to go through with the deal would likely have looked to the risk factor disclosure in the Proxies, and the provisions of section 8.2(e) of the Merger Agreement, suggesting that URI's remedies in the event of termination could be limited to the $100 million termination fee. In light of the accurate disclosures that URI did make, the court cannot conclude that URI had a clear duty to disclose additional information such as would give rise to a strong inference of scienter.

ii.    Cerberus's Efforts to Renegotiate the Transaction

Plaintiffs allege that defendants acted with scienter in failing to disclose Cerberus's efforts to renegotiate the transaction. As they did in their Amended Complaint, plaintiffs allege that Cerberus's efforts to discuss or renegotiate the terms of the transaction on August 29, August 31, and September 6, 2007, made clear that the transaction was in serious jeopardy. In their Second Amended Complaint, plaintiffs add several allegations. They allege that prior to the threats, URI's Board was sufficiently concerned about the potential impact of deteriorating credit markets on the transaction that they met on August 7 and August 20 to discuss those concerns. At the August 20

meeting, the Board discussed retaining litigation counsel.  Once Cerberus sought to renegotiate, plaintiffs allege that URI's Board interpreted Cerberus's gestures to be a serious threat to the deal's success.  As evidence in support of this claim, plaintiffs point to minutes of a Board meeting held August 30, 2007 at which URI discussed how to respond to Cerberus's overtures.  URI did not disclose any of Cerberus's communications or the Board's discussions.

Plaintiffs allege additional facts that during the class period, Cerberus specifically, and private equity firms more generally, failed to consummate transactions at a rising rate, and that the credit markets continued to deteriorate.  While these additional facts were publicly known, plaintiffs contend that, by stating that the transaction was on track to close and by failing to disclose any of Cerberus's communications or the Board's discussions, URI prevented the market from appreciating the significance of the additional facts in evaluating the likely success of the transaction.  Plaintiffs allege that all of these facts should have been disclosed to investors, and that defendants' failures to disclose these facts in their filings constituted material misrepresentations and omissions.

Defendants contend, as they did in their previous Motion to Dismiss, that the facts best support an inference that Cerberus's efforts to discuss the terms of the transaction were a bargaining tactic, not an effort at repudiation.  See JP Morgan Chase, 553 F.3d at 198 (citing Tellabs, 551 U.S. at 314, 321-22) ("[C]ourts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively.").  URI points to the fact that no renegotiation discussions took place between Cerberus's letter on September 6,

2007, and its decision to repudiate the transaction on November 14, 2007, and contends that in fact Cerberus did not intend to repudiate the transaction until shortly before doing so. URI also notes that Cerberus explicitly disclaimed any intention to walk away from the Merger Agreement in its August communications, that the parties continued to work diligently towards completing the transaction between September 6 and mid-November, and that the minutes of Board discussions upon which plaintiffs newly rely do not indicate that URI's directors regarded market conditions as a threat to the transaction. Further, URI argues that the fact that the Board discussed how to respond to RAM's communications did not change the equivocal nature of the communications or make the Board obligated to disclose them. Finally, URI contends that the October 31, 2007 earnings release did not put the deal in jeopardy.

As the court noted in its prior Ruling, in its late August communications, Cerberus expressed a desire to renegotiate the transaction.[6] URI responded in its September 6 letter, stating that there was no basis for any discussion and expressing disappointment

---

[6]The court did not definitively conclude, as both plaintiffs' and defendants' counsel suggest, that URI regarded Cerberus's renegotiation requests as an immaterial bargaining tactic. See Mot. at 28; Opp'n at 30. Rather, it is clear in context that the quoted text to which both counsel refer consisted of the court's paraphrasing the inference defendants wished the court to draw from the facts:

> In their Motion to Dismiss, the URI defendants contend that Cerberus's efforts to discuss the terms of the transaction were a bargaining tactic, not an effort at repudiation. The conclusion that the August request to discuss the Merger Agreement was a bargaining tactic and immaterial because it was not accompanied by an intention to repudiate nor any statement that Cerberus would abandon the merger if URI refused to renegotiate, the URI defendants argue, far outweighs any inference of scienter. URI contends that the facts as alleged better support their version of events.

DeCicco, 602 F. Supp. 2d at 343 (emphasis added). While the court ultimately ruled for the defendants in holding that plaintiffs' complaint did not raise a strong inference of scienter, it based its conclusion on the fact that the efforts at renegotiation were not repeated, even as the parties engaged in extensive efforts to close the deal: "Cerberus's brief, rebuffed, un-repeated effort at renegotiation, when contrasted with the extensive efforts of both parties to close the deal on its original terms, cannot lead to a strong inference of scienter based upon a failure to disclose." Id. at 345-46; see also id. at 348 (describing the court's conclusion in similar terms).

that Cerberus sought to renegotiate the deal.  A two month period then ensued during which no further discussions about renegotiation took place, and in which the parties engaged in extensive efforts to close the deal.  In its prior Ruling, the court found this undisputed fact dispositive, holding that "Cerberus's brief, rebuffed, un-repeated effort at renegotiation, when contrasted with the extensive efforts of both parties to close the deal on its original terms, cannot lead to a strong inference of scienter based upon a failure to disclose."  DeCicco, 602 F. Supp. 2d at 345-46.

In the Second Amended Complaint, plaintiffs allege several new facts regarding Cerberus's efforts to renegotiate the transaction.  The court will consider whether these facts, taken together with the re-alleged facts, lead to a strong inference of scienter.

Plaintiffs allege that the Board meeting minutes reveal that URI's Board interpreted Cerberus's gestures as a serious threat to the consummation of the transaction, but failed to disclose that threat to the public.  On August 20, the Board engaged in discussions about the "current market environment," including that the private equity sponsors of the then-pending deal to acquire Home Depot Supply were seeking to renegotiate.  This discussion immediately followed a discussion regarding the limited interest in the company by interested buyers during the "go shop" period. While defendants contend that this second discussion concerned the go-shop period and did not indicate that URI's directors regarded market conditions as a threat to the Cerberus-URI transaction, one could infer from the fact that the Board discussed "the current trading price of the Company's stock," the stock price of other companies subject to "pending leveraged buyouts," and the fact that private equity sponsors were renegotiating a pending deal as indicating concern about the risks associated with the

contemplated Cerberus-URI transaction.  The Board also discussed a plan "to retain an outside law firm that could advise on various litigation matters that could arise during the pendency [sic] of the transaction."  There is no indication from the minutes that the Board particularly feared litigation with Cerberus in particular as opposed to having general concerns arising from the litigation exposure any company faces when engaging in a major transaction.

On August 30, the Board engaged in a discussion about the calls received from representatives of Cerberus on August 29.  The minutes reference that Cerberus had suggested that there should be a discussion about the price, and that it had alluded to the option to terminate the transaction by paying the $100 million fee.  The minutes also emphasize that, "Cerberus did not want to terminate the merger agreement" but rather "wanted to discuss with the Company possible changes to the merger agreement."  The Board decided to respond that it would not engage in such discussions.  URI's counsel responded to Cerberus accordingly.

Plaintiffs' allegations raise a stronger inference of scienter than the allegations of the Consolidated Amended Complaint.  It can be inferred from the Board discussions, which took place prior to the receipt of communications from Cerberus, that the Board had become concerned about the fate of the Cerberus-URI transaction as it saw other deals disintegrating.  The communications from Cerberus could only have served to heighten the risk that the deal might not close on the agreed-upon terms, particularly since Cerberus referenced its view that "it could terminate the merger agreement for $100 million if it felt doing so was in its best interests."  Cerberus's request to renegotiate was serious and the Board appears to have taken it seriously; Cerberus

specifically requested to renegotiate the purchase price and terms of the deal, and it expressed concerns when URI refused to discuss the Agreement.  In light of the rapidly deteriorating credit markets, it is a plausible inference from the facts that Cerberus's communications revealed a substantial risk, known to the Board, that the deal would not close on the agreed-upon terms.  The fact that the Board took the position that it would not negotiate did not make less material the fact that the risk of the deal not closing had substantially increased.

Cerberus, however, did not follow up on its initial effort at renegotiation, and the matter was dropped.  Cerberus's own statements and email discussions with its bankers support the conclusion that Cerberus was not intending to repudiate the transaction but rather sought to get a better price.  Second Am. Compl. ¶¶ 74-75.  When asked by URI if it intended to repudiate the contract, Cerberus responded that it did not, but emphasized the $100 million termination fee and sought to use that fee as leverage.

Materiality and scienter must be measured at the time of the alleged misrepresentation or omission.  However, later events can be used to illuminate the parties' intent at that time.  Following Cerberus's efforts at renegotiating, the parties proceeded for over two more months to endeavor to close the deal, before it finally came apart in mid-November.  Cerberus never engaged in further renegotiation efforts until right before the deal fell apart on November 12.  Cerberus did remind URI, in the course of proposing a renegotiation, of its position that the Merger Agreement could be terminated for $100 million.  At the very least, this was an effort to show URI's Board that Cerberus had a strong position from which to press a renegotiation.  And had

35

Cerberus pressed the renegotiation further after its receipt of the September 6 letter, then that fact most certainly would have indicated that the transaction was in serious jeopardy.  URI would have had a clear duty to disclose the renegotiations.

The fact remains, though, that Cerberus did not press efforts to renegotiate after receipt of the September 6 letter and, indeed, both parties continued to expend time and resources on efforts to close the transaction for over two more months.  At no point did the parties engage in extensive renegotiation efforts or any efforts to renegotiate the deal beyond the brief exchange of letters.

Plaintiffs emphasize that the deterioration in the credit markets and the collapse of other private equity deals, both situations known to the Board, support an inference that the Board knew that Cerberus's renegotiation efforts were not a mere bargaining tactic but represented a substantial threat to the deal being consummated.  The court agrees that this is a plausible inference.  However, the discussions ended quickly and were not continued.  There is no evidence that Cerberus's intention vis-a-vis closing or repudiating the deal in fact changed at the time of the letters, an inference buttressed by the fact that Cerberus did not attempt further renegotiation discussions for over two months.  See DeCicco, 602 F. Supp. 2d at 345 ("[A] party's change in attitude or position with respect to a transaction triggers a duty to disclose only when that change is sufficiently significant as to render prior or subsequent public disclosures materially misleading.").[7]  While ultimately the deal fell apart, causing plaintiffs to suffer losses,

---

[7]Plaintiffs also contend that defendants breached a fiduciary duty to "monitor" Cerberus's position. Second Am. Compl. ¶ 149.  The "duty to monitor" of which the securities cases speak, however, does not extend to a duty to affirmatively ascertain another company's negotiating position.  That is particularly true here, since URI could reasonably have concluded that they were successful in calling Cerberus's "bluff," and that further gestures to inquire about Cerberus's position could have been seen as inviting

that collapse was sufficiently distant in time from the initial exchange of letters that it does not make compelling the inference that Cerberus intended to repudiate the deal in late August.  Further, the investing public, too, was aware of the collapsing deals and deteriorating credit markets.  It is not clear that awareness that Cerberus briefly sought, unsuccessfully, to renegotiate the terms of the deal would have heightened the awareness the public already had of the potential threat to the Cerberus-URI transaction posed by collapsing deals and deteriorating credit markets.  Accordingly, while the inference of a failure to comply with clear duty to disclose is certainly plausible, on balance, the court is not persuaded that the inference of scienter is "at least as compelling as any opposing inference of nonfraudulent intent." Teamsters Local 445, 531 F.3d at 194 (quoting Tellabs, 551 U.S. at 314.  Thus, plaintiffs have not pled a strong inference of conscious misbehavior or recklessness based upon the failure to disclose the suggestion of renegotiations.

> 3.    Conclusion

Because the plaintiffs have not pled motive and opportunity, or conscious misbehavior or recklessness, they have failed to adequately allege scienter on the part of the defendants.

> C.    Analysis of Plaintiffs' Section 20(a) Claims

Having found that plaintiffs have failed to state a claim under section 10(b), their control person liability claims pursuant to section 20(a) fail for want of a primary violation.  See JPMorgan Chase Co., 553 F.3d at 206-07.

---

renegotiation.

IV.    **CONCLUSION**

For the foregoing reasons, defendants' Motion to Dismiss (Doc. No. 109) is

GRANTED.  Plaintiffs' claims are DISMISSED.  Given that the court has already

afforded the plaintiffs the opportunity to amend, and yet they have been unable to plead

a cause of action, the court will not permit further attempts to replead.  The Clerk is

directed to close the case.


**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 24th day of August, 2009.


 /s/ Janet C. Hall_____
Janet C. Hall
United States District Judge